**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03837-RMR-NRN

MYKAELA MOORE,
SYDNEY GOMES,
SULLIVAN MOON,
KENNEDY HARA,
DRAKE HARMAN,
JARREL OKOROUGO, and
ANDREW ZIELINSKI,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

---

**AMENDED CLASS ACTION COMPLAINT WITH DEMAND FOR JURY TRIAL**

---

Plaintiffs MYKAELA MOORE, SYDNEY GOMES, SULLIVAN MOON, KENNEDY HARA, DRAKE HARMAN, JARREL OKOROUGO, and ANDREW ZIELINSKI ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this class action against Defendant NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("NCAA" or "Defendant"), and allege the following based upon personal knowledge as to their own acts and experiences, and upon information and belief, including the investigation of counsel, as to all other matters.

## CONCISE INTRODUCTION

1. This class action seeks urgent injunctive and related relief on behalf of two very discrete groups of collegiate student-athletes: (i) Division II and Division III student-athletes who graduated high school in 2022 and are currently in the NCAA's Transfer Portal looking to transfer to a Division I school at which to compete for a fifth year (the "Division I Transfer Class"); and, separately, (ii) Division II student-athletes who graduated high school in 2022 and wish to compete for an additional, fifth year of eligibility at a Division II school (the "Division II Class") (collectively, the "Classes").

2. The Classes will suffer immediate, irreparable harm as a result of the NCAA's unlawful enforcement of an age-based eligibility rule adopted on June 23, 2026, the NCAA's Division I Five-Year Eligibility Rule (the "Division I Rule"), and a substantively identical rule implemented on August 5, 2026 by the NCAA for Division II (the "Division II Rule") (collectively, the "Rules").

3. The new Rules establish a five-year period of eligibility tied directly, and exclusively, to a student-athlete's age and year of initial college enrollment.

4. The NCAA has applied the Rules to prohibit Plaintiffs and the Classes from playing at a Division I or Division II school simply because they graduated high school in 2022 and have

already competed for four years. The NCAA has done this even though all other student-athletes, both younger and older than the Class, may compete for five years under the Rule.

5. Thus, the NCAA has placed Plaintiffs, and the hundreds (if not thousands) of similarly situated student-athletes in a distinct limbo status, either unable to transfer to a Division I school despite properly entering the NCAA's Transfer Portal, or unable to transfer to or remain at a Division II school. This constitutes an unlawful restraint of trade under Section 1 of the Sherman Act.

## NATURE OF THE ACTION

6. The NCAA has arbitrarily, unfairly, and anticompetitively applied the Rules to foreclose Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinski, and the Division I Transfer Class from competing a fifth year with a Division I school, and to foreclose Plaintiff Moore, Plaintiff Hara, Plaintiff Harman, and the Division II Class from competing a fifth year with a Division II school.

7. The Division I Rule essentially provides that nearly all eligible student-athletes may compete for five seasons in five years in Division I. For example, a student-athlete who graduated high school in 2023 can compete in Division I for five seasons in five years.

8. The NCAA has inexplicably targeted Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinski and the Division I Transfer Class for unequal treatment under the Division I Rule. Per the NCAA, student-athletes who graduated high school in 2022, and who have already completed four years of collegiate competition, are *excluded* from transferring to and competing with a Division I school for a fifth year.

9. Similarly, the NCAA has irrationally targeted Plaintiff Moore, Plaintiff Hara, Plaintiff Harman, and the Division II Class for unequal treatment under the Division II Rule. Like the Division I Rule, the NCAA's Division II Rule prohibits student-athletes who graduated high school in 2022, and who have already completed four years of collegiate competition from competing with a Division II school for a fifth year.

10. Many student-athletes structured their collegiate athletic career on climbing the ladder for four years, to best-position themselves for a potential fifth year.

11. As to the Division II Class, a fifth year of competition has numerous personal, professional, and commercial benefits for student-athletes. A fifth year of play carries with it academic and reputational benefits, and opens doors to potential greater opportunities to play in post-collegiate leagues or to earn Name, Image and Likeness ("NIL") compensation.

12. Plaintiff Moore illustrates this. A Colorado native, she graduated high school in 2022. She played four seasons of Division II basketball for two different Division II schools in Colorado; first at Colorado Christian University, and then at Colorado Mesa University. She accumulated substantial statistics across multiple categories (e.g., points, minutes played, etc.) at Colorado Mesa University. She would be welcomed back to Colorado Mesa University for a fifth year of competition, but for the NCAA's arbitrary implementation of its Division II Rule. Plaintiff Hara Plaintiff Harman are similarly foreclosed by the NCAA's anticompetitive conduct.

13. As to the Division I Transfer Class, transferring to a Division I school for a fifth year of competition also has many obvious personal and commercial benefits for student-athletes. Aside from the academic and reputational benefits of playing for a reputable school in the NCAA's marquee division, Division I student-athletes typically (i) receive greater and more lucrative scholarships, (ii) earn more NIL compensation, and (iii) garner greater post-collegiate offers, opportunities, and salaries.

14. The foregoing benefits and opportunities are contingent on a student-athlete being able to transfer to a Division I school. The NCAA's foreclosing these benefits to student-athletes who happened to graduate high school in 2022 robs them of these benefits and opportunities.

15. Take Plaintiff Gomes and Plaintiff Moon for example. After graduating high school in 2022, Plaintiff Gomes played four seasons of Division II basketball for Florida Southern College. She achieved considerable success for her team, her school, and herself, such as by attaining multiple statistical records, career accolades, and scholarship support at Florida Southern

College. Plaintiff Moon also graduated from high school in 2022 in Colorado, and has competed for four years with two Division II football teams in Colorado as a kicking specialist.

16. These Plaintiffs' hard work and success engendered significant interest in them as players. Each of them entered the NCAA's Transfer Portal, which is the only way under NCAA rules that a student-athlete can transfer from a Division II or Division III school to a Division I school.

17. Multiple Division I schools (and Division II schools) have expressed interest in Plaintiff Gomes's transferring so she can play basketball for them in what should be her fifth year of collegiate eligibility were she to transfer to a Division I school, and have extended invitations of interest to her.

18. Similarly, Plaintiff Moon has received interest from Division I or II schools as well. In fact, he has been invited to practice at a Division I school this summer, and may join the team this coming fall but for the NCAA's Division I Rule.

19. Were Plaintiff Gomes or Plaintiff Moon to transfer to a Division I school (or, for Plaintiff Gomes, a Division II school as well), they would be eligible for additional scholarships, greater NIL earning potential, and an enhanced post-collegiate salary.

20. The same is true as to Plaintiff Okorougo and Plaintiff Zielinski. Plaintiff Okorougo competed for four years with the men's basketball team at Trinity College – Hartford, and seeks to transfer to a Division I school. Plaintiff Zielinski completed his fourth year of eligibility on the men's golf team at Lee University, a Division II school, and was the first-ever Division II golfer to earn a PGA Tour exemption.[1] He seeks to transfer to a Division I school for what should be his fifth year of eligibility.

21. None of that is now possible for Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, and Plaintiff Zielinski. The NCAA has arbitrarily decided that student-athletes who graduated high school in 2022, like Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, and

[1] https://golfweek.usatoday.com/story/sports/golf/college/2025/10/21/golfweek-fripp-island-to-bermuda-invite-drew-zielinski-lee/86825931007/.

Plaintiff Zielinski, can no longer compete at a Division I school if they already competed collegiately for four years. They also are unable to compete with their prior Division II schools (or any other Division II school, for that matter) for a fifth year under NCAA's rules.

22. The NCAA's conduct constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act.

23. Indeed, just a couple of weeks ago, Judge Sweeney in this District enjoined the NCAA from enforcing its Division I Rule as to a class of existing Division I student-athletes who had already completed four years of play and wished to play a fifth year at a Division I school. *See Wisne v. NCAA*, No. 1:26-cv-03063 (D. Colo. July 31, 2026) (ECF 38), *clarified*, Aug. 2, 2026 (ECF 41). That ruling is currently on appeal to the United States Court of Appeals for the Tenth Circuit.

24. The *Wisne* class included only student-athletes who *already* competed at a Division I school, and wanted to compete for a fifth year. It did not include the Classes here, *viz.*, (i) student-athletes at Division II or Division III schools in the Transfer Portal looking to transfer to a Division I school for what would be a fifth year of collegiate competition, or (ii) student-athletes already at a Division II school looking to compete for a Division II school for a fifth year.

25. The same reasoning in *Wisne* applies with equal force here.

26. The NCAA's coercive use of its monopsony power is even more evident here than it was in *Wisne*. Just a few days *after* the *Wisne* court issued its injunction as to the Division I Rule, the NCAA boldly implemented a substantively identical rule for Division II. It also has indicated that it may implement a similar rule for Division III.

27. Accordingly, Plaintiffs seek damages and injunctive relief on behalf of themselves and all other similarly situated persons in the United States whose rights are implicated by the Rules and who are not part of the *Wisne* class.

**<u>THE PARTIES</u>**

28. Plaintiff Mykaela Moore is a native Coloradoan and current resident of Windsor, Colorado. She is a women's basketball guard who competed at two different Colorado Division II

schools for a total of four years. She attended Colorado Christian University, a Division II school, in the Rocky Mountain Athletic Conference ("RMAC") her freshman year. As a freshman, she played in all 28 games of the season.[2] Thereafter, she transferred to Colorado Mesa University, another Division II school in the RMAC. Across her three years of competition with Colorado Mesa University, Plaintiff Moore steadily increased her playing time and statistics year-over-year, culminating in senior-year season-highs in points (21), minutes (43), and field goals made (8), among other categories.[3]

29. Plaintiff Sydney Gomes is a women's basketball guard. She graduated high school in 2022 from Nease High School, and was named her team's all-time leading scorer. After high school, she studied at and competed for four years with Florida Southern College, a Division II school. Academically, she maintained a 3.97 GPA and made academic honor roll all four years; she also was named to the CSC Aademic All-District Team and was an Academic All-American. Athletically, among other things, she was named Sunshine State Conference Player of the Year, a WBCA All-American, and South Region First Team. She also earned several athletic accolades such as having over 1,000 points, 500 rebounds, and 300 assists during her career, which makes her only the second player in Florida Southern women's basketball history to accomplish this.[4]

30. Plaintiff Sullivan Moon graduated from Cheyenne Mountain High School in Colorado Springs, Colorado in 2022. He then enrolled at Colorado State University Pueblo, a Division II school, where he studied and competed with the football team as a kicking specialist. His strong work ethic and performance led him to transfer to Colorado Mesa University, where he competed for two years. In his first year at Colorado Mesa, Plaintiff Moon was named to the NFF Academic All-Colorado First-Team, the RMAC Special Teams Player of the Week (Sept. 16), and averaged 41.2 yards per punt with a long of 68 yards. In his second year at Colorado Mesa, his

---

[2] https://ccucougars.com/sports/womens-basketball/roster/mykaela-moore/4602.
[3] https://cmumavericks.com/sports/womens-basketball/roster/mykaela-moore/23682.
[4] https://fscmocs.com/sports/womens-basketball/roster/sydney--gomes/6936.

fourth year of collegiate football, he was named RMAC Special Teams Player of the Week (Sept. 1) after averaging 48.5 yards per punt.[5]

31. Plaintiff Kennedy Hara is a class of 2022 high school graduate from Mid-Pacific Institute high school in Honolulu, Hawaii. Thereafter, he enrolled at Colorado Mesa University to major in business, where he competed with the Division II baseball team for four years. He held a 3.73 GPA, majored in business analytics, and was named to the RMAC Academic Honor Roll multiple times. In his senior year, among other things he earned First Team All-South Central Region honors from both the American Baseball Coaches Association and National Collegiate Baseball Writers Association, was named a First-Team All-RMAC infielder, and was14th in the nation for doubles (22) this past season and led his conference while ranking eighth in the country for sacrifice bunts (8).

32. Plaintiff Charles "Drake" Harman graduated from Bloomingdale Senior High School in Florida in 2022. He began his collegiate academic and athletic journey at Santa Fe College, a junior college, where he played baseball, for two years. He started 45 games in both freshman and sophomore seasons.[6] He then transferred to the University of Tampa, a Division II school, for a year. Then, he transferred to Georgia Southwestern University for his fourth year of eligibility, where he achieved single-game statistical highs for hits (4), RBIs (5), and runs scored (4), among other statistics and accolades.[7]

33. Plaintiff Jarrel Okorougo is a men's basketball guard and forward. He graduated from Brimmer and May high school in Massachusetts in 2022. Later in 2022, he enrolled in Trinity College – Hartford, a Division III school. He has competed with the Trinity College basketball team for four years. Year over year, Plaintiff Okorougo put in the work to continually improve his contributions to the team. By his fourth year, he delivered season career-highs in field goals (199), points (467), and scoring (15.6).[8] Earlier this year, he became the seventh player in his school's

---

[5] https://cmumavericks.com/sports/football/roster/sullivan-moon/23384.
[6] https://gswcanes.com/sports/baseball/roster/drake--harman/3363.
[7] *Id.*
[8] https://bantamsports.com/sports/mens-basketball/roster/jarrel-okorougo/13878

history to receive two or more National Association of Basketball Coaches ("NABC") All-District selections. He was also honored to be named a D3hoops.com All-American this year, and is the only the second player in program history to earn two-plus D3hoops.com All-Region nominations.[9]

34. Plaintiff Andrew Zielinski is a men's golfer. He graduated Ocean Springs High School in Mississippi in 2022. He first began his collegiate journey at Mississippi Gulf Coast Community College, a junior college ("JUCO"), in 2022, where he competed on the golf team in Southern Division of the Mississippi Association of Community Colleges Conference ("MACCC"). He transferred to Lee University, a Division II school in the Gulf South Conference ("GSC"), in 2024, where he studied in health science and also competed on the men's golf team. Through commitment and hard work, he attained a number of achievements at Lee, including 2026 GSC Commissioner Trophy Winner, 2026 Ping First Team All-American, 2026 GSC Golfer of the Year, 2026 Ping All-Region, and 2026 GSC All-Academic.[10] And, as noted *supra*, he was the first-ever Division II golfer to earn a PGA Tour exemption.[11]

35. Defendant National Collegiate Athletic Association holds itself out as an unincorporated non-profit education organization. Its principal place of business is in Indianapolis, IN.

36. The NCAA is the governing body of college sports with approximately 1,100 member colleges and universities throughout the United States, including institutions in the District of Colorado. It is a member-controlled organization that claims it exists to regulate college sports and protect college athletes. The NCAA's Mission and Priorities state that the organization is "guided by its commitment to college athlete well-being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions."[12] The NCAA's Constitution Principles further articulate a purported dedication to "The Primacy of Academic Experience,"

---

[9] *Id.*
[10] https://leeuflames.com/sports/mens-golf/roster/drew-zielinski/4858.
[11] https://golfweek.usatoday.com/story/sports/golf/college/2025/10/21/golfweek-fripp-island-to-bermuda-invite-drew-zielinski-lee/86825931007/.
[12] NCAA Mission and Priorities, NCAA, https://www.ncaa.org/about-us/mission-and-priorities/.

"The Collegiate Student-Athlete Model," and "Student-Athlete Wellbeing."[13] But despite that stated mission, the NCAA oversees a massive commercial enterprise that generates billions of dollars from the labor and performance of college athletes.

37. There are 1,086 active NCAA member schools, and these schools are organized into three divisions. Division I includes 366 schools, including 265 with major football programs. These are the best-known schools in the country. Divisions II and III include schools with less extensive athletic programs, more limited or localized competition, lower or no athletic scholarship offerings, and reduced athletic budgets. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

38. As the NCAA acknowledged in *NCAA v. Alston*, 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for college athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

39. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions (though often only select subsets of such institutions) and may be amended by votes of the member institutions (or select subsets thereof). The NCAA is responsible for the passing, implementation, and enforcement of the Five-Year Eligibility Rule. Beyond including college athlete members chosen not by their college-athlete peers, but by the NCAA and/or member institutions and affiliates on certain NCAA committees, there is no

[13] NCAA Constitution Principles, NCAA, https://www.ncaa.org/about-us/mission-and- priorities/constitution-principles/. Note that the term "student-athlete" is a construct used by the NCAA as a means to obfuscate the labor of college athletes and is disfavored by those who actually play.

involvement of, or formal NCAA process for soliciting input from, or considering the input of, athletes in formulating rules such as the Five-Year Eligibility Rule.

40. The NCAA generates billions of dollars largely because of the massive commercial success of Division I men's and women's basketball, FCS (lower Division I) football, and other NCAA championship sports. Together, Division I college sports rank among the most profitable entertainment products in the country—outstripping sports as venerable and as much a part of the national firmament as Major League Baseball. Only the NFL surpasses the collegiate sports enterprise in annual revenue. In the 2024–2025 season alone, the NCAA, itself, reported approximately $1.56 billion in revenue, driven overwhelmingly by the talent, labor, and marketability of college athletes. Yet despite creating that value, athletes have long been restricted by NCAA rules from sharing fairly in the economic success they help produce.

41. In its Consolidated Financial Statements for the fiscal year ending August 31, 2025, the NCAA reported total revenues of $1,566,533,639.[14] The vast majority of that money came from Television and Marketing Rights Fees for the March Madness men's basketball tournament, which brought in revenues of $1,121,881,244 – over one billion dollars to broadcast and market these collegiate competitors.[15]

42. Co-conspirators, while not named as defendants, facilitate the NCAA's illegal conduct in promulgating and enforcing the Five-Year Eligibility Rule. They include Division I and Division II conferences and member institutions, and representatives of member institutions and conferences that serve on NCAA Division I committees responsible for promulgating the rule change.

## JURISDICTION AND VENUE

43. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under

[14] NCAA Consolidated Financial Statements August 31, 2025, https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024- 25NCAAFIN_FinancialStatement.pdf.
[15] *Id.*

Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. Jurisdiction also exists under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

44. The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d), in that this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed classes are citizens of a state different from the Defendant.

45. This Court has general personal jurisdiction over Defendant because NCAA's contacts in this District are systematic and continuous. Furthermore, specific personal jurisdiction exists because this action arises out of or relates to the NCAA's purposeful contacts or activities in or directed to Colorado, and NCAA's anticompetitive conduct specifically relates to or arises out of the impact of that conduct on Plaintiff Moore's, Plaintiff Moon's, and Plaintiff Hara's ability to compete at a Division I or Division II following their attendance of a school in this District for a fifth year of eligibility, Plaintiff Moore's and Plaintiff Moon's ability to compete as Colorado residents, and on Plaintiff Gomes's or Plaintiff Moon's ability to receive and accept an offer of interest to compete at a Division I school located in this District.

46. Venue is proper in this District because at least some of the class claims alleged in this action accrued in this District, Plaintiff Moore's, Plaintiff Moon's, and Plaintiff Hara's claims and those of certain members accrued in this District, and Defendant regularly transacts its affairs in this District.

## FACTUAL ALLEGATIONS

47. It is a well-trod path discussing the NCAA's anticompetitive effects. The antitrust violations alleged in this Complaint, while aimed at Division II and Division III student-athletes, also occur in Division I athletics.

### A. Division I Athletics and the Division I Rule

48. Division I athletics alone covers more than 360 NCAA member institutions, 6,000 teams, and 190,000 NCAA athletes. Division I generates more than a billion dollars in revenue

every year, including nearly $1.5 billion in revenue in the 2022-23 school year. While it is hard to quantify exactly how much money is being paid for NIL, the NCAA recently agreed to pay $2.8 billion in "back pay" damages to Division I athletes who participated in college athletics between 2016 and 2024.

49. The NCAA regulates the market for college athletic labor by promulgating rules to which all of its member institutions are expected to adhere. These rules, as laid out in the NCAA Constitution, Bylaws, and Division I Manual, specify to a high degree whether and how student athletes are allowed to participate in Division I. Moreover, the NCAA's regulations of participation also carry-over into the impact of its conduct on compensation of student-athletes. As Justice Brett Kavanaugh noted in his concurrence in *Alston*, "the NCAA's remaining compensation rules also raise serious questions under the antitrust laws." 594 U.S. at 108.

50. Every rule put forth by the NCAA indicates an agreement among the NCAA and its member institutions to restrict the market for Division I athletic labor, having direct implications for the ability of hundreds of thousands of athletes to receive compensation for the skill and effort they put in which generates billions of dollars in revenue.

51. The relevant geographic market for Division I athletics is as broad as the United States. NCAA member institutions exist in all 50 states and multiple territories, and the Division I Transfer Class may accept opportunities in each of the 50 states, when recruited.

52. NCAA Bylaw 12.6 lays out the Division I Rule, which implemented a new age-based eligibility model that changed prior practice. Per the NCAA, under the Division I Rule, NCAA eligibility is primarily aged-based. Student athletes receive a five-year eligibility period beginning at the start of the academic year following their 19th birthday or upon full-time enrollment at a collegiate institution, whichever comes sooner, and the student-athletes may compete during that five-year period of eligibility provided they meet all other requirements. The NCAA specifically did not apply the Division I Rule to student-athletes who completed four years of eligibility because, e.g., they graduated high school in 2022 and enrolled at a college.

53. The NCAA does not explain why it has decided to allow certain exceptions to the Division I Rule but not others—it had previously allowed many different types. The NCAA retains all decision-making authority as to whether an exception shall apply to a student-athlete.

54. The NCAA abuses its market power to ensure student-athletes and colleges are afraid to challenge their regulations in court.

55. The first, known as the "Rule of Restitution," NCAA Bylaw 12.9.4.2 is a regulation stating that "if a [college] athlete who is ineligible under the terms of the bylaws or other [NCAA] legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative … and said injunction is voluntary vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified," the NCAA may take actions that punish the institution. In other words, the Rule of Restitution allows the NCAA to retroactively punish an athlete, their coaches, teammates and opponents, and their institution if a court-ordered injunction is later overturned on appeal. That punishment can be severe.

56. The second is a newly adopted anticompetitive ban on what the NCAA calls "Ghost Transfers," codified in Division I Manual Rule 13.1.1.4.9, where the NCAA will both suspend a team's head coach for half a season and fine the college's budget for the sport 20% if they deem that a player "transferred" to the team outside of the player transfer portal. While it is a clear restraint on the market for student athlete services, the severe penalties in place ensure that players are unable to have colleges compete for their services outside of the express structures controlled by the NCAA.

**B. Division II Athletics and the Division II Rule**

57. On August 5, 2026, the NCAA adopted the Division II Rule. Per the NCAA itself, the Division II Rule "mirrors" the Division I Rule set forth above.

58. Parenthetically, the NCAA also currently has a proposal to adopt a substantively identical rule for Division III as well.

59. Division II athletics covers more than 290 NCAA member institutions and over 126,000 NCAA athletes. Division II athletics generate median total revenue between $6.99 million and $9.24 million per school per year.

60. As with Division I, the NCAA regulates the market for college athletic labor in Division II by promulgating rules to which all of its member institutions are expected to adhere. These rules, as laid out in the NCAA Constitution, Bylaws, and Division II Manual, specify to a high degree whether and how student athletes are allowed to participate in Division II.

61. Every rule put forth by the NCAA indicates an agreement among the NCAA and its member institutions to restrict the market for Division II athletic labor, having direct implications for the ability of hundreds of thousands of athletes to receive compensation for the skill and effort they put in which generates substantial revenue.

62. The relevant geographic market for Division II athletics is as broad as the United States. NCAA member institutions exist in nearly all of the states and multiple territories.

**C. The NCAA's Arbitrary Implementation of the Rules Harms Competition and Injures the Class**

63. The NCAA's conduct has harmed Plaintiffs and the Classes by creating an irrational rule with only arbitrary exceptions, a mandate designed with seemingly little consideration of issues that have regularly occurred in the past and that can be easily foreseen as likely to recur in the future. The Rules extend a valuable benefit to one group of athletes—those who, through waiver or fortunate timing, will receive the benefit of playing for five total years—while foreclosing that benefit to Plaintiffs and the Classes, who through no fault of their own were deemed eligible for four seasons but now, per the NCAA, cannot play a fifth, even if they would like to remain in school.

64. There are many student-athletes in this cohort, including Plaintiffs. Most obviously, many student-athletes are excluded from the benefit of the new rule simply because they came to college at the wrong time. Athletes who came to college in 2022, as part of the four-year class that would graduate in 2026, are the only ones of their cohort who are limited by the NCAA to four

years of competition. Athletes who came to college in 2021 and graduated in 2025 received an extra "COVID" season, and those who came to college in 2023 and will graduate in 2027 receive the benefits of the new five-year rule.

65. There are also student-athletes who will foreseeably be prevented from the benefit of a fifth year of competition because of circumstances outside of their control. These include athletes whose five-year eligibility is interrupted for sports-related reasons (like those who need to take time off from college to train or participate in Olympic and international competition); those who lose a season to injury; those who are mistreated or abused by coaches to the point that they cannot play or must transfer; those who are victimized by roster manipulation or losing playtime to force a transfer; or those who lose eligibility due to administrative factors beyond their control such as compliance errors, bad institutional advice, or other school or coach misconduct. All will lose seasons of competition and athletic performance alongside academic opportunity, as a result of the Rules.

66. The Rules' arbitrary and discriminatory implementation will harm student-athletes who need to transfer but cannot timely and freely access the Transfer Portal (for example, athletes at service academies who decide to resign and pursue their degrees at civilian institutions). Their eligibility clock will keep running, but due to the interplay between the new NCAA rule imposing draconian budgetary and coach discipline penalties for accepting Ghost Transfers and the Rules, such athletes will be forced to sit out a season of competition (and will likely suffer loss of conditioning and personal development at the same time) and only be able to compete for four seasons rather than their peers' five seasons.

67. Finally, student-athletes who lose a season because of events completely outside their control, such as a school closure, post-portal program shutdown or mid-season program cancellation, university bankruptcy, natural disaster confined to a single region, or conference disruption will also be harmed by the inflexibility of the Rules. Under the current procedure, waivers to help athletes achieve their athletic and academic objectives could at least be sought—but here the arbitrary new rules will make relief unattainable.

68. To the extent relevant to the antitrust claims asserted herein, the NCAA's practices are not reasonably necessary to achieve any cognizable procompetitive or legitimate business justification. There is no inherent difference between Plaintiffs and the Classes, on the one hand, and their colleagues who receive the largesse of five years under the Rule on the other hand, other than they completed four years of eligibility straight in a row. Their talent, age, size, experience, susceptibility to cause or suffer injury, or any other metric is indistinguishable from their peers who received the extra year. When examined in the broader context, where the NCAA is fine with its athletes going forward receiving five years of eligibility, but not those who fall into the class, there is no justification to deny Plaintiffs and the Classes the opportunity to compete for one additional year.

**D. The *Wisne* Decision**

69. On July 8, 2026, a group of plaintiffs filed a class action lawsuit against the NCAA in the District of Colorado, styled *Wisne, et al. v. NCAA*, No. 1:26-cv-03063 (D. Colo.).

70. The *Wisne* plaintiffs sought the same types of relief that Plaintiffs seek here. Except, the *Wisne* plaintiffs sought to enjoin the NCAA from enforcing the Division I Rule as to student-athletes who had already competed for four years at a Division I school and wished to compete a fifth year at a Division I school. Their proposed class did *not* include the student-athletes that Plaintiffs seek to represent here, *viz.*, Division II or Division III student-athletes in the Transfer Portal looking to transfer to a Division I school, or separately student-athletes looking to compete for a Division II school, and play what would be their fifth year of competition.

71. On July 31, 2026, the *Wisne* court certified the *Wisne* class under Federal Rule of Civil Procedure 23(b)(2). *See* 1:26-cv-03063 (D. Colo.), at ECF 37.[16] The same day, the *Wisne* court issued a detailed 50-page opinion and order enjoining the NCAA from enforcing the Five-Year Eligibility Rule against the *Wisne* class. *Id.*at ECF 38, *clarified* at ECF 41.

[16] The class was defined as: "All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule."

72. Among other things, the *Wisne* court found that it had personal jurisdiction over the NCAA (ECF 38 at 8-14); that the plaintiffs had a likelihood of success on the merits (*id.* at 18); that NCAA eligibility rules are commercial restraints for Section 1 purposes (*id.* at 18-20); that the plaintiffs adequately demonstrated a relevant antitrust labor market for Division I college athletes in the United States (*id.* at 21-33); that the NCAA's conduct had a substantial, anticompetitive effect that was not outweighed by purported competitive benefits (id. at 33-41); that less restrictive means existed to achieve the NCAA's purported competitive benefit (*id.* at 41-44); that the class would suffer irreparable harm (*id.* at 45-47); and that the balance of equities and the public interest favored plaintiffs and the class (*id.* at 47-50). A few days later, on August 2, 2026, the court clarified its ruling "lest the result of the order be misconstrued" by the NCAA, continuing that "the Court reiterates that the NCAA is enjoined from prohibiting plaintiffs from competing in a fifth season of collegiate athletics under the Rule (as defined in the preliminary injunction order) or any NCAA Bylaw." 1:26-cv-03063 (D. Colo.), at ECF 41.

73. The NCAA appealed the district court's decisions on August 2, 2026 (*id.* at ECF 42), and sought a stay of the injunction (*id.* at ECF 43). The district court denied NCAA's requested stay on August 10, 2026 (*id.* at ECF 56). The Tenth Circuit has since stayed the injunction. Expedited briefing is currently underway in the Tenth Circuit.

74. This case addresses the gap left by *Wisne*, namely, (i) student-athletes who are *not yet* at a Division I school, but who are in the Transfer Portal looking to transfer to a Division I school, and (ii) student-athletes already at and looking to remain at a Division II school. By barring the Classes from transferring to a Division I school for a fifth year, or from competing at a Division II school for a fifth year, the NCAA has unilaterally extinguished the only way for Plaintiffs and the Classes to access the benefits, opportunities, scholastics, and monetary accolades attendant with Division I or Division II play.

**E. Division II and Division III Student-Athletes, and the Transfer Portal**

75. The NCAA's "Transfer Portal" is the NCAA's centralized database where student-athletes who intend to transfer are listed. It covers all three NCAA divisions—Division I, Division II, and Division III.

76. Student-athletes must request that their existing school enter them into the portal. Once in the Transfer Portal, student-athletes are eligible to transfer to another NCAA institution, and to compete with that institution's athletics teams.

77. The Transfer Portal is the only way a student-athlete at a Division II or Division III school can transfer to, and compete with a Division I school.

78. Transferring to a Division I school is a highly coveted and fiercely competitive undertaking due to the athletic, scholastic, and monetary implications of competing for a Division I school. It is well-publicized that many Division I schools heavily rely on the Transfer Portal to identify and recruit student-athletes from Division II or Division III schools.

79. The NCAA imposes very particular requirements for student-athletes to enter the Transfer Portal and transfer via the portal.

80. By arbitrarily applying the Rules to Plaintiffs and the Classes, the NCAA has foreclosed this discrete group's ability to transfer to a Division I school, or to another Division II school.

**F. Plaintiff Moore's Experience**

81. Plaintiff Moore's experience and the irreparable harm she stands to suffer are indicative of those for the Division II Class as a whole.

82. As noted *supra*, Plaintiff Moore graduated high school in Colorado in the spring of 2022, and began at Colorado Christian University in fall of 2022. Plaintiff Moore's skill, determination, and effort earned her valuable playing time her freshman year.

83. Plaintiff Moore then transferred to Colorado Mesa University, another Division II school in Colorado, for the following three years. She accrued substantial individual statistics as

discussed above, and ultimately contributed to her team's winning the RMAC tournament championship in her fourth year of collegiate athletic competition.

84. Due to her contributions and talent, Plaintiff Moore had both scholarship support and NIL compensation while competing for Colorado Mesa University.

85. Plaintiff Moore should be able to play a fifth year of collegiate basketball. She would like to continue her efforts on behalf of Colorado Mesa University. The school has indicated she would be welcomed back to compete for a fifth year of eligibility but for the NCAA's Division II Rule.

86. Plaintiff Moore and the Division II Class are now unable to compete in a fifth year of eligibility because of the NCAA's anticompetitive enforcement of its Division II Rule. The NCAA's anticompetitive conduct also has impacted Plaintiff Moore's (and the rest of the Division II Class's) ability to receive the financial benefits of a fifth year of scholarships or NIL compensation.

**G. Plaintiff Gomes's Experience**

87. Plaintiff Gomes's experience and the irreparable harm she stands to suffer are indicative of those for the Division I Transfer Class as a whole.

88. As noted *supra*, Plaintiff Gomes graduated high school in the spring of 2022, and began at Florida Southern College in the fall of 2022. Plaintiff Gomes's dedication, ability, work ethic, and acumen helped her attain numerous academic and athletic achievements noted *supra.* She received scholarship support during her four years at Florida Southern College.

89. She currently is pursuing my MBA at the University of Tampa and is currently on an athletic scholarship in the hopes that she is granted eligibility to compete in a fifth year. If not granted eligibility, she will no longer be able to attend the University of Tampa because the cost of attendance is over significant without her scholarship. She would then have to unenroll from the MBA program and take a gap year before continuing her education at a later semester. This would put her behind in what matters most to her, which is her education.

90. Plaintiff Gomes should be eligible to play for a fifth year of collegiate basketball. Indeed, she felt doing so would be an important personal and professional achievement, and better position her for future opportunities.

91. Her strong performance on and off the court has earned her considerable interest. She entered the NCAA Transfer Portal, and has been contacted by multiple schools in Division I and Division II alike about playing for them in what would be Plaintiff Gomes's fifth year. This includes at least five Division I schools.

92. There is little doubt that playing for a Division I school would be an amazing opportunity for Plaintiff Gomes, or for any student-athlete for that matter. Division I schools have significant education opportunities, which is her main goal. Additionally, Division I competition is the pinnacle of collegiate athletics, and Division I schools tend to offer more lucrative grants, scholarships, and post-collegiate prospects.

93. The data bear this out. Division I sports generate more revenue and have much higher attendance numbers than any other divisional, associational, or professional counterpart. Simply put, as a matter of commercial realities, Division I sports stand apart.

94. The notoriety and fierce competition of Division I sports opens doors for post-collegiate endeavors as well. Statistically speaking, post-college, Division I athletes, e.g., enjoy many more professional opportunities, earn higher wages, and have higher NIL and other collateral earning potential than their Division II, Division III, or other collegiate-level athletic peers.

95. None of this is to say Plaintiff Gomes would not remain at a Division II school. She would be glad to do so, in order to pursue her primary goal of her education and also to compete in women's basketball. If she were to remain in Division II, Plaintiff Gomes would still earn substantial benefits from a fifth year of eligibility, including scholarship support, which as noted above is very important to her continued enrollment in her current MBA program.

96. Plaintiff Gomes, like the rest of the Division I Transfer Class, is now in limbo. She properly entered the Transfer Portal; she garnered interest from Division I schools; she was

extended invitations of interest to play a fifth year at Division I schools (and Division II schools); and the NCAA, without reason or justification, pulled the rug out from under her (and others).

**H. Plaintiff Moon's Experience**

97. Plaintiff Moon's experience and the irreparable harm he stands to suffer are indicative of those for the Division I Transfer Class as a whole.

98. As noted *supra*, Plaintiff Moon graduated from a Colorado high school in 2022, and began his collegiate career later that year at Colorado State University Pueblo, where he played football as a kicking specialist. As a freshman, he led the team in scoring 80 points as he was 10-for-15 on field goals and was 50-for-51 on his extra-point attempts, and recorded 27 kickoffs for 1,615 yards and averaged 59.8 yards per kickoff.[17] After two years at CSU-Pueblo, he transferred to Colorado Mesa. While there, aside from studying as a finance major, his hard work and focus on the football field helped him to accumulate notable statistics in punting (3,845 total yards, with a long of 74 yards) and kickoffs (5,695 yards, with a 60.6 yard average).[18]

99. Plaintiff Moon's strong performance in a football specialist position attracted attention from multiple other schools. In fact he was invited to play with the University of Arizona, a Division I school, and has been practicing with their football team this summer. If he continues to practice and is able to play for Arizona this season, he would be in line for significant opportunities. This includes the opportunity to play Division I football, as well as scholarship and other support from Arizona, as well as potential NIL compensation. Moreover, playing for a Division I school best positions Plaintiff Moon for potential post-collegiate opportunities, including professional football.

100. As noted *supra*, there is little doubt that playing for a Division I school would be an amazing opportunity for any student-athlete. Division I competition is the pinnacle collegiate athletics, and Division I schools tend to offer more lucrative grants, scholarships, and post-collegiate prospects. Again, the data bear this out. Division I sports generate more revenue and

[17] https://gothunderwolves.com/sports/football/roster/sullivan-moon/8571.
[18] https://cmumavericks.com/sports/football/roster/sullivan-moon/23384.

have much higher attendance numbers than any other divisional, associational, or professional counterpart. Simply put, as a matter of commercial realities, Division I sports stand apart.

101. The notoriety and fierce competition of Division I sports opens doors for post-collegiate endeavors as well. Statistically speaking, post-college, Division I athletes, e.g., enjoy many more professional opportunities, earn higher wages, and have higher NIL and other collateral earning potential than their Division II, Division III, or other collegiate-level athletic peers.

102. Plaintiff Moon, like the rest of the Division I Transfer Class, is now in limbo. He properly entered the Transfer Portal; he garnered interest from Division I schools; he is informally practicing with a Division I school ahead of the imminent start of the 2026 football season in what would be his fifth year of eligibility; and the NCAA, without reason or justification, pulled the rug out from under him (and others).

**I. Plaintiff Hara's Experience**

103. Plaintiff Hara's experience and the irreparable harm he stands to suffer are indicative of those for the Division II Class as a whole.

104. As noted *supra*, Plaintiff Hara graduated from a Hawaii high school in 2022, and began his collegiate career later that year at Colorado Mesa University. He played baseball for Colorado Mesa's Division II baseball team for four years, including at least half of that time as a starter. While competing, he received scholarship and other support.

105. Plaintiff Hara is still a student at Colorado Mesa. This also would be his fifth year of eligibility. He would very much like to compete in what should be his fifth year of eligibility with Colorado Mesa, and has been informed that the team would be very interested in his doing so. Unfortunately, much like Plaintiff Moore, Plaintiff Hara's ability to compete for a fifth year at Colorado Mesa, and eligibility to receive the attendant benefits or support were he to do so, have been foreclosed by virtue of the NCAA's Division II Rule.

**J. Plaintiff Harman's Experience**

106. Plaintiff Harman's experience and the irreparable harm he stands to suffer are indicative of those for the Division II Class as a whole.

107. As noted *supra*, Plaintiff Harman graduated from high school in 2022, and began his collegiate career later that year at a junior college before transferring to two Division II schools, first the University of Tampa and then Georgia Southwestern University. He has continuously competed on collegiate baseball teams for four years. While competing, he received scholarship support.

108. Plaintiff Harman has an open invitation to play for a fifth year at Georgia Southwestern; if he did so, he would receive scholarship or related support. Yet, Plaintiff Harman's ability to compete for a fifth year, and eligibility to receive the attendant benefits or support were he to do so, have been foreclosed by virtue of NCAA's Division II Rule.

**K. Plaintiff Okorougo's Experience**

109. Plaintiff Okorougo's experience and the irreparable harm he stands to suffer are indicative of those for the Division I Transfer Class as a whole.

110. As noted *supra*, Plaintiff Okorougo graduated from high school in 2022. He competed for four years at Trinity College with their Division III basketball team. He received scholarship or related support. He has entered the Transfer Portal and has interest and opportunity to play potentially for a Division I school in what would be his fifth year of eligibility and to continue his education. Yet, the NCAA has arbitrarily foreclosed Plaintiff Okorougo's ability to do so.

**L. Plaintiff Zielinski's Experience**

111. Plaintiff Zielinski's experience and the irreparable harm he stands to suffer are indicative of those for the Division I Transfer Class as a whole.

112. As noted *supra*, Plaintiff Zielinski graduated from high school in 2022. He has competed in collegiate men's golf for four years, first at a junior college, and then with Lee University, a Division II school. He is in the Transfer Portal and has received interest to transfer to a Division I school, with the attendant support, benefits, and potential NIL compensation. However, Plaintiff Zielinski cannot avail himself of any such opportunity because of the NCAA's Division I Rule.

## CLASS ALLEGATIONS

113. Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following Classes:

> **The Division I Transfer Class.** All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division II or Division III sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are in the NCAA's Transfer Portal, and are therefore barred from transferring to a Division I school at which to compete for a fifth season due to the NCAA's adoption and implementation of the Division I Rule.
>
> **The Division II Class**. All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division II sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are therefore barred from competing with a Division II school for a fifth season due to the NCAA's adoption and implementation of the Division II Rule.

114. Excluded from the Classes are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

115. Plaintiffs reserve the right to modify or expand the definition of the Classes to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.[19]

116. Numerosity (Rule 23(a)(1)). The members of each Class are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendant's records. Hundreds, if not thousands, of Division II and Division III student-athletes are currently

[19] It is possible if not likely that the equitable relief sought here may require some alteration of the Transfer Portal rule.

in the NCAA Transfer Portal, and many more have competed for a Division II school. Class members may be notified of the pendency of this action by mail, email, and/or publication.

117. Commonality and Predominance (Rules 23(a)(2), 23(b)(3)). Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members, including:

a. Whether Defendant violated the antitrust laws;

b. Whether Defendant engaged in anticompetitive conduct;

c. Whether Defendant engages in interstate commerce;

d. Whether Plaintiffs and the Classes were harmed and suffered antitrust injury as result of Defendant's conduct;

e. Whether Defendant breached any contractual obligations;

f. Whether Plaintiffs and the Classes are entitled to injunctive and declaratory relief, and the nature of same; and

g. Whether Plaintiffs and the Classes are entitled to damages, and the nature and extent of same.

118. Typicality (Rule 23(a)(3)). Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all other members of the Classes, are subject to the Rules. Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Class.

119. Adequacy (Rule 23(a)(4)). Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes. Plaintiffs have retained counsel experienced in class action litigation and they intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel. Neither Plaintiffs nor their counsel has any interest adverse to the Classes.

120. Superiority (Rule 23(b)(3)). A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Class treatment will conserve judicial resources, avoid inconsistent adjudications, and present no unusual manageability difficulties, as liability turns on Defendant's uniform conduct, and members of the Classes are identifiable from Defendant's records. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also represents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

121. Injunctive Relief (Rule 23(b)(2)). Defendant has acted or refused to act on grounds that apply generally to the Classes so that final injunctive and declaratory relief is appropriate respecting the Classes as a whole.

## CAUSES OF ACTION

### COUNT I: Violation of the Sherman Act – 15 U.S.C. § 1

### Unreasonable Restraint of Trade

### (Per Se or Rule of Reason or Quasi Rule of Reason)

122. Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

123. Section One of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade or commerce within interstate commerce. This Court is vested with jurisdiction to restrain and enjoin violators of the Sherman Act.

124. Here, the anticompetitive effects of the NCAA's decision to foreclose certain student-athletes from the modern intercollegiate athletics market far outweigh any procompetitive benefits. Eligibility is a prerequisite for student-athletes both receiving athletic scholarships and earning NIL and other compensation. Therefore, rules that restrict who can play are inextricably

tied to an athlete's academic and economic opportunities—both those attained merely by competing in college, such as NIL compensation, and those that accrue over a lifetime from earning advanced degrees during a fifth year of competition. A student-athlete who is declared ineligible by the NCAA is categorically excluded from the modern intercollegiate athletic market and unable to receive those economic opportunities.

125. The NCAA's Rules are arbitrary, capricious, and unreasonable restraints on trade under the Sherman Act. There is no meaningful difference between Plaintiffs and the Classes, on the one hand, and those who are afforded five years of eligibility by the implementation of the Rules. The NCAA indicates as much by allowing athletes to claim the eligibility afforded to them under the most favorable interpretation of either the old rules or the new rule—except for the Classes.

126. As a result, the NCAA's Rules in the nationwide market for student-athletes in the Transfer Portal looking to transfer to Division I schools, and the nationwide market for student-athletes to compete at Division II schools, constitute an unreasonable restraint on trade. Specifically, the rule produces anticompetitive effects, including but not limited to reduced labor supply, diminished quality of competition, exclusion of athletes due to numerous circumstances beyond their control, and foreclosure of a college athlete's academic, scholarship, revenue sharing, and NIL opportunities tied to eligibility.

127. Courts have consistently found that the NCAA's procompetitive justifications for its eligibility rules are applied inconsistently and undermine any argument that they exceed the devastating anticompetitive effects to college athletes, universities, and consumers. The arbitrary design of the Rules, the inflexibility, the barriers to competition erected, and the capricious choices made by the NCAA both in limiting exemptions and in categorically depriving virtually all 2022 high school graduates, but no other class of graduates, of a fifth year of competition undermine the NCAA's procompetitive justifications even more. As a result, the NCAA can no longer plausibly invoke these supposed justifications to enforce the Rules.

128. Less restrictive alternatives exist within the NCAA's own bylaws. As noted before, the NCAA is already giving athletes who may have different eligibility formulations under the old and new rules the option to apply the rule that is most favorable to the athlete. The NCAA can do so here by granting the same fifth year of competition to class members who elect to return to campus.

129. The NCAA exercises direct market power evidenced by its ability to foreclose participation in Division I sports, and the Transfer Portal.

130. Alternatively, Plaintiffs allege a relevant antitrust market, the geographic dimension of which is the United States, and the "product" dimension of which is the Division I sports labor market. Division I sports is a unique labor market with identifiable boundaries informed by commercial realities, and includes student-athletes in the NCAA's Transfer Portal. No reasonable product/labor substitutes exist. The NCAA exercises monopsony power over the relevant antitrust market evidenced by, e.g., its market share, its direct control over labor, and by its adoption and implementation of the Division I Rule in such a way that completely forecloses Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinski and the Division I Transfer Class from transferring to and competing for a Division I school in one's fifth year.

131. Additionally, the NCAA exercises direct market power, as evidenced by its ability to foreclose participation in Division II sports.

132. Alternatively, Plaintiffs allege a relevant antitrust market, the geographic dimension of which is the United States, and the "product" dimension of which is the Division II sports labor market. Division II sports is a unique labor market with identifiable boundaries informed by commercial realities. No reasonable product/labor substitutes exist. The NCAA exercises monopsony power over the relevant antitrust market evidenced by, e.g., its market share, its direct control over labor, and by its adoption and implementation of the Division II Rule in such a way that completely forecloses Plaintiff Moore, Plaintiff Hara, Plaintiff Harman, and the Division II Class from competing for a Division II school in one's fifth year.

133. Plaintiffs and the Classes have been injured and suffered antitrust injury by the NCAA's anticompetitive conduct, including but not limited to by being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring. NCAA's conduct as alleged herein has also injured competition in the ways and market described above.

**COUNT II: Breach of Contract; Third-Party Beneficiary**

**(Obligation to provide equal opportunity to compete to all athletes)**

134. Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

135. The NCAA Constitution and Bylaws constitute a binding contract between the NCAA and its member institutions across the United States.

136. The NCAA determines the eligibility of any college athlete to compete in NCAA Division I, Division II, and Division III sports.

137. Under any interpretation of applicable state law, Plaintiffs and the Classes are intended third-party beneficiaries of the contractual relationship between the NCAA and their respective member institutions, and not merely incidental beneficiaries of that relationship. As intended third-party beneficiaries, Plaintiffs and the Classes are entitled to enforce the NCAA's obligations under the NCAA Constitution and Bylaws.

138. The NCAA breached its obligations to Plaintiffs and the Classes by adopting and implementing the Rules as described herein, thus excluding the former from the opportunity for an additional season which other student-athletes are receiving. This exclusion is inconsistent with the reasonable expectations by Plaintiffs and the Classes of fairness and equity of opportunity between student-athletes who are third party beneficiaries of (and subject to the enforcement of) the NCAA Constitution and Bylaws.

139. Plaintiffs and the Classes have been injured by the NCAA's breach of contract, including, but not limited to, being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring.

**COUNT III: Declaratory Judgment**

140. Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

141. Plaintiffs seek a declaration that the NCAA's enforcement of the Rules is unlawful and unenforceable under the Sherman Act and violates Plaintiffs' and the Classes' rights.

142. A real controversy exists because the resolution of this dispute will potentially confer rights upon Plaintiffs and the Classes.

143. The dispute is justiciable because Plaintiffs and the Classes are suffering harm based on the NCAA's enforcement of the Rules against them.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all members of the proposed Classes, respectfully request the Court grant the following relief against Defendant:

a. For an order certifying the Classes pursuant to Federal Rule of Civil Procedure 23, and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the members of the Class;

b. For an order declaring that Defendant's conduct violates the laws and principles referenced herein;

c. For an injunction similar to that in *Wisne v. NCAA* that enjoins Defendant from enforcing the Rule against Plaintiffs, the Classes, and the teams on which the Plaintiffs and the Classes play, or enforcing roster limits or other rules that would prevent Plaintiffs and the Classes from playing in the 2026-2027 season, or enforcing against Plaintiffs and the Classes a cap on compensation limits otherwise laid out in the settlement stemming from the *House v. NCAA* and similar litigation;

d. For actual damages in amounts to be determined by the Court and/or jury;

e. For treble damages pursuant to 15 U.S.C. § 15;

f. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit;

g. For prejudgment and post-judgment interest on all amounts awarded;

h. For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims and causes of action so triable.

DATED: August 28, 2026

Respectfully submitted,

By: */s/ Ruben Honik*

HONIK LLC
Ruben Honik
David J. Stanoch
1515 Market St., Suite 1100
Philadelphia, PA 19102
Tel: 267-435-1300
Email: ruben@honiklaw.com
Email: david@honiklaw.com

MORITT HOCK & HAMROFF LLP
Daniel Lust*
Lauren Bernstein*
400 Garden City Plaza
Garden City, NY 11530
Tel: 516-873-2000
Email: dlust@moritthock.com
Email: lbernstein@moritthock.com

M. Ryan Casey (Colorado Bar No. 45939)
THE CASEY LAW FIRM, LLC
P.O. Box 1055
Silverthorne, CO 80498
Tel: 970-372-6509
Email: ryan@rcaseylaw.com

Max S. Roberts
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 646-837-7150
mroberts@bursor.com

* *Admission pending*

*Attorneys for Plaintiffs and the Proposed Classes*

**CERTIFICATE OF SERVICE**

On this 28th day of August, 2026, I caused a true and correct copy of the foregoing to be filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ David J. Stanoch*
David J. Stanoch