**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03837-RMR-NRN

MYKAELA MOORE,
SYDNEY GOMES,
SULLIVAN MOON,
KENNEDY HARA,
DRAKE HARMAN,
JARREL OKOROUGO, and
ANDREW ZIELINSKI,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR RULE 23(b)(2) CLASS CERTIFICATION**

---

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... i

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The NCAA Has Metastasized into an Anticompetitive Monopsony ..... 2

B. The NCAA's New Five-Year Eligibility Rule for Division I ..... 5

C. The NCAA's New Five-Year Eligibility Rule for Division II ..... 6

D. The Harm to Plaintiffs and Class Members ..... 7

III. LEGAL STANDARD ..... 8

IV. LAW AND ARGUMENT ..... 8

A. Class Definitions ..... 8

B. The *Wisne* Class Certification Order Provides a Direct Roadmap in This Case ..... 9

C. Both Classes Satisfy Rule 23(a) ..... 11

1. The Proposed Classes are So Numerous That Joinder is Impracticable ..... 11

2. Members of the Classes Have Common Questions of Law and Fact ..... 13

3. The Plaintiffs' Claims Are Typical of Class Members' Claims ..... 14

4. Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Proposed Classes ..... 16

D. Both Classes Satisfy Rule 23(b)(2) ..... 17

E. Membership in Each Class Is Determined by Objective Criteria Drawn from the NCAA's Own Records ..... 19

V. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Alcantar v. Hobart Serv.*,
800 F.3d 1047 (9th Cir. 2015) ....13

*Cline v. Sunoco, Inc. (R&M)*,
159 F.4th 1171 (10th Cir. 2025) ....11

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014) ....11, 14

*Cook v. Rockwell Int'l Corp.*,
151 F.R.D. 378 (D. Colo. 1993) ....12

*D.B.U. v. Trump*,
349 F.R.D. 228 (D. Colo. 2025) ....10, 14, 17, 18

*DG ex rel. Stricklin v. Devaughn*,
594 F.3d 1188 (10th Cir. 2010) ....15

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ....8

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....14

*Hill v. Aspen Contracting, Inc.*,
No. 20-0149, 2021 WL 2662296 (D.N.M. Feb. 22, 2021) ....16

*In re HomeAdvisor, Inc. Litig.*,
345 F.R.D. 208 (D. Colo. 2024) ....14

*Law v. Nat'l Collegiate Athletic Ass'n*,
134 F.3d 1010 (10th Cir. 1998) ....4

*Law v. Nat'l Collegiate Athletic Ass'n*,
108 F. Supp. 2d 1193 (D. Kan. 2000) ....4

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ....14

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) ....13, 14

*Milonas v. Williams*,
691 F.2d 931 (10th Cir. 1982) ....................13

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)....................3

*Neiberger v. Hawkins*,
208 F.R.D. 301 (D. Colo. 2002) ....................11, 12

*Rex v. Owens ex rel. Okla.*,
585 F.2d 432 (10th Cir. 1978) ....................11

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)....................8

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
543 F.3d 597 (10th Cir. 2008) ....................8, 17

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
2006 WL 1801379 (D. Colo. June 28, 2006)....................13

*Trejo v. Safeway Servs., LLC*,
No. 16-0024, 2017 WL 11688840 (D. Colo. Dec. 15, 2017) ....................12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................8, 13, 17

*White v. Gen. Motors LLC*,
No. 21-410, 2023 WL 3278460 (D. Colo. May 5, 2023) ....................19

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n ("Wisne I")*,
No. 26-3063, 2026 WL 2211840 (D. Colo. July 31, 2026) .................... *passim*

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n ("Wisne II")*,
No. 26-3063, 2026 WL 2214234 (D. Colo. July 31, 2026) ....................1

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n ("Wisne III")*,
No. 26-3063, 2026 WL 2214320 (D. Colo. Aug. 2, 2026)....................1

**RULES**

FED. R. CIV. P. 23 .................... *passim*

## I. INTRODUCTION

On July 31, 2026, a Court in this District certified a Rule 23(b)(2) class of Division I college athletes whom the National Collegiate Athletic Association ("NCAA") had banned from competing for a fifth year of eligibility under the NCAA's new Division I Five-Year Eligibility Rule (the "Division I Rule"), simply because the athletes began collegiate competition in the 2022-2023 season. *Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063, 2026 WL 2211840, at *1 (D. Colo. July 31, 2026) (*Wisne I*).[1] The same day, the *Wisne* court enjoined the NCAA from enforcing the Division I Rule against the *Wisne* class[2]—but the NCAA continues to enforce that same rule against their peers. Plaintiffs ask the Court to close that gap and certify two discrete, readily identifiable classes of student-athletes, consisting of Division II and Division III athletes seeking to transfer to Division I for a fifth season, and Division II athletes seeking to compete for a fifth season at the Division II level.

As described below, this case is perfectly suited for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2). Each Class is numerous: the Rules operate nationwide and affect an entire enrollment cohort drawn from more than 126,000 Division II athletes and hundreds of Division II and Division III athletes in the Transfer Portal. Declaration of Joel G. Maxcy, filed concurrently herewith ("Maxcy Decl."), at ¶¶ 7, 21, 38. Each Class presents a common question capable of a common answer—whether the NCAA may lawfully extend a fifth season of eligibility

[1] The class was defined as: "All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule." *Id.* at *7.

[2] *Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063, 2026 WL 2214234, at *1 (D. Colo. July 31, 2026) (*Wisne II*), *opinion clarified*, 2026 WL 2214320 (D. Colo. Aug. 2, 2026) (*Wisne III*).

to every enrollment cohort except one, and deny it to the cohort that happens to have started college in 2022. Plaintiffs' claims are typical of the Classes they seek to represent—each claim arises from the same rule, is based on the same legal theory, and seeks the same relief as the claims of the class members they seek to represent. And no Plaintiff nor their counsel holds any interest adverse to the Classes. Rule 23(b)(2) is likewise satisfied: the NCAA has acted on grounds that apply generally to each Class, and a single decree per Class—barring the NCAA from applying the Rules to deny a fifth season on the basis of a 2022 enrollment date—would afford complete relief to every member at once.

## II. FACTUAL BACKGROUND

### A. The NCAA Has Metastasized into an Anticompetitive Monopsony

The United States is unique in the world with its highly commercialized, multibillion-dollar sports industry as an integrated part of its colleges and universities. The NCAA is the governing body for the vast majority of college athletics programs, with approximately 1,100 member colleges and universities throughout the United States. Founded in 1906, the NCAA's Mission and Priorities state that the organization is "guided by its commitment to college athlete well- being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions."[3] Indeed, the Preamble to the NCAA's "Constitution" provides that the opportunity to participate and compete in collegiate sports "is a vital part of the educational experience."[4]

The NCAA was born out of a desire to regulate the safety of collegiate football after a 1905 season that produced 18 deaths and 149 serious injuries.[5] Its founders could not have foreseen it

---

[3] *NCAA Mission and Priorities*, NCAA (last accessed on Aug. 27, 2026), https://www.ncaa.org/about-us/mission-and-priorities/.

[4] NCAA DIVISION I 2025-2026 Manual, Exhibit 2 to Plaintiffs' Motion for Preliminary Injunction (hereinafter "NCAA 2025–26 Bylaws"), at p.1 (cleaned up).

[5] *The History of the NCAA*, NCAA (last accessed on Aug. 27, 2026), https://www.

growing from that noble cause to what is now a monster bureaucracy controlling virtually every aspect of college sports, existing to reap billions of dollars in revenue every year off the labor of young adults, dispensing much of that money into the pockets of its administrators and the administrators of its member institutions.[6]

In *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, the Supreme Court found that the NCAA had violated Section 1 of the Sherman Act in its exclusive licensing of broadcasting deals for the televising of college football games. 468 U.S. 85, 88 (1984). The Supreme Court's ruling opened up unlimited opportunities for the televising of games and birthed the commercialism that lives today. What was once a small nonprofit intended to organize safety regulations for a few schools now consists of almost 1,100 organizations governing over 500,000 athletes.[7] The NCAA has grown into a behemoth, reporting approximately $1.56 billion in revenue in the 2024–2025 season alone.[8] That revenue is driven by the competitive performance of the collegiate athletes who make up the teams at the NCAA's member institutions; labor that had long been restricted by NCAA rules from sharing fairly in the economic success they primarily produce.

As part and parcel of the NCAA's governance over college athletics, it has long maintained

---

ncaa.org/about-us/history/ (hereinafter "NCAA History").

[6] For instance, in its Form 990 for the fiscal year ending in August 2023, the NCAA reported employment of 591 individuals with a prior year compensation of nearly $75 million, more than $126,000 per employee. *National Collegiate Athletic Association: Full text of 'Full Filling' for fiscal year ending Aug. 2023,* PROPUBLICA (Jun. 22, 2026), https://projects.propublica.org/nonprofits/organizations/440567264/202401799349300305/full.

[7] *WHO WE ARE: Three Divisions. One Shared Purpose.*, NCAA (last accessed on Aug. 27, 2026), https://www.ncaa.org/about-us/.

[8] *NATIONAL COLLEGIATE ATHLETIC ASSOCIATION: CONSOLIDATED FINANCIAL STATEMENTS*, Crowe LLP (Jan. 12, 2026), https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024-25NCAAFIN_FinancialStatement.pdf.

an absolute monopsony on its participating athletes. The first NCAA rules for competition in collegiate athletics were implemented in the 1920s, with limits on eligibility for freshmen, limits on playing for non-college teams, and limits on years of participation in college sports.[9] In 1948 the NCAA began to regulate financial aid, recruiting practices, and academic standards. Later, under the leadership of Walter Byers, the NCAA would coin the term "student-athlete," a construction intended to defend the association and its members from workers' compensation liability.[10] The organization has long struggled to find the right formula or even definition for what it means to be both student and athlete.[11]

While *Board of Regents* was unquestionably ground-breaking, it was not the Association's last contact with the antitrust laws. In *Law v. Nat'l Collegiate Athletic Ass'n*, the Tenth Circuit found that the Association was violating antitrust laws by restricting earnings for coaches in a number of sports (principally men's basketball). 134 F.3d 1010, 1012 (10th Cir. 1998). The cases concluded in a settlement of $54 million. *Law*, 108 F. Supp. 2d 1193, 1195 (D. Kan. 2000). The Association has also settled cases involving limitations on opportunities for walk-on athletes, limitations on the use of athletes' names, images, and likeness, and limitations on education-related benefits. Time and time again it has become clear to federal and state courts throughout the nation

---

[9] *See NCAA History*, *supra* n.5.

[10] Liz Clarke, *The NCAA coined the term 'student-athlete' in the 1950s. Its time might be up.*, THE WASHINGTON POST (Oct. 28, 2021), https://www.washingtonpost.com/sports/2021/10/27/ncaa- student-athlete-1950s/.

[11] *See e.g.,* Sara Ganim and Devon Sayers, *UNC report finds 18 years of academic fraud to keep athletes playing*, CNN (Oct. 23, 2014), https://www.cnn.com/2014/10/22/us/unc-report-academic- fraud/index.html; *Richard Sherman: Student Athlete Education*, YOUTUBE (May 17, 2015), https://www.youtube.com/watch?v=eP0FYeO1N2A; Johnny Smith, *The Job is Football: The Myth of the Student Athlete*, ORGANIZATION OF AMERICAN HISTORIANS, https://www.oah.org/tah/august-3/the-job-is-football-the-myth-of-the-student-athlete/ (last accessed Aug. 27, 2026).

that while the NCAA is willing to concede it is the only employer in town, it is unwilling to wield that power consistent with antitrust jurisprudence.

### B. The NCAA's New Five-Year Eligibility Rule for Division I

Under NCAA Bylaw 12.6, an NCAA Division I college athlete has a five-year window that begins upon full-time enrollment at any collegiate institution in which to complete their intercollegiate competition. Prior to June 23, 2026, each athlete was—on paper—only permitted four seasons of competition in those five years.[12] Notably, for any NCAA Division I sport other than football, an athlete could not play a single minute of a game without consuming a season of competition, unless he or she sustained a season-ending injury after playing in fewer than 30 percent of the team's games and subject to timing restrictions.[13] In actuality, many college athletes received fifth, sixth, even seventh and eighth years of eligibility through a waiver process.[14]

On June 23, 2026, the NCAA adopted its new five-in-five-year rule, which grants all athletes five seasons of competition within their five-year eligibility window, demonstrating a policy preference for five seasons of competition within a five-year window for all athletes (the "Division I Rule"). Yet the only students to whom the NCAA has said this rule will not apply are those who graduated from high school in 2022 and have completed four seasons of athletic competition.[15]

---

[12] NCAA 2025–26 Bylaw 12.6, at p. 46.

[13] NCAA 2025–26 Bylaw 12.6, at p. 46; Bylaw 12.02.3, at p. 35.

[14] *See, e.g.*, Declaration of Mykaela Moore, filed concurrently herewith ("Moore Decl."), at ¶ 6; Declaration of Kennedy Hara, filed concurrently herewith ("Hara Decl."), at ¶ 5.

[15] *Guide for Four-Year Transfers 2025–2026*, NCAA, p. 13 (last accessed Aug. 27, 2026), http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf.

**Transition Rules: Who Is Affected?**

The transition to the age-based rule will depend on the student-athlete's status and enrollment timeline.

| Group | How eligibility will be reviewed |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025-26 academic year. | Either the previous rules OR the new age-based rule, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026-27. | Either the previous rules OR the new age-based rule, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based rule only. |

*Figure 1. NCAA-Published Chart Concerning Implementation of Five-Year Eligibility Rule*[16]

For Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinski, and the Division I Transfer Class, the impact of this rule is arbitrary and cruel. Virtually all athletes in the five high school classes before 2022 received extra seasons of eligibility due to COVID, while all athletes in high school classes after 2022 receive an extra season of eligibility under the new rule. While the NCAA allows the benefit of either the old rules or the new rule, "whichever is most beneficial" to the college athlete, to all others, Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinski, and the Division I Transfer Class receive nothing.

### C. The NCAA's New Five-Year Eligibility Rule for Division II

On August 5, 2026, just a few days after the *Wisne* court issued its injunction as to the Division I Rule, the NCAA boldly implemented a substantively identical rule for Division II (the "Division II Rule"). Per the NCAA itself, the Division II Rule "mirror[s]"

[16] *NCAA Division I Age-Based Eligibility Rules*, NCAA (last accessed Aug. 27, 2026), https://www.ncaa.org/eligibility-center/division-i-age-based-eligibility-rules/.

the Division I Rule.[17] Parenthetically, the NCAA also currently has a proposal to adopt a substantively identical rule for Division III as well.

**D. The Harm to Plaintiffs and Class Members**

Plaintiffs Gomes, Moon, and Zielinski completed four years of collegiate athletic competition at Division II schools, and Plaintiff Okorougo did the same at a Division III school. *See* Declaration of Sydney Gomes, filed concurrently herewith ("Gomes Decl."), at ¶ 2 (women's basketball); Declaration of Sullivan Moon, filed concurrently herewith ("Moon Decl."), at ¶¶ 2-3 (men's football); Declaration of Jarrel Okorougo, filed concurrently herewith ("Okorougo Decl."), at ¶ 2 (men's basketball); and Declaration of Andrew Zielinski, filed concurrently herewith ("Zielinski Decl."), at ¶ 2 (men's golf). Each of them entered the Transfer Portal, and attracted interest from multiple Division I (and Division II) schools. *See* Gomes Decl. at ¶¶ 7-9; Moon Decl. at ¶¶ 4-7; Okorougo Decl. at ¶¶ 4-6; Zielinski Decl. at ¶¶ 3-4. However, each is now unable to pursue the fifth season of collegiate competition to which he or she would otherwise be entitled. *See* Gomes Decl. at ¶ 9; Moon Decl. at ¶¶ 6-8; Okorougo Decl. at ¶¶ 5-6; Zielinski Decl. at ¶ 4.

Similarly, Plaintiffs Moore, Hara, and Harman completed four years of collegiate competition at Division II schools, and each would be interested to continue their educations and compete for a fifth season but for the NCAA's Division II Rule. *See* Moore Decl. at ¶¶ 2-3, 5-6; Hara Decl. at ¶¶ 2, 4-5; and Declaration of Drake Harman, filed concurrently herewith ("Harman Decl."), at ¶¶ 2-6.

Plaintiffs thus face the same harm as the Classes they seek to represent: after investing four years of their lives in collegiate athletics, they are being arbitrarily denied the opportunity to

[17] Division II Adopts Age-Based Eligibility Model (Aug. 5, 2026), https://www.ncaa.org/division-ii-adopts-age-based-eligibility-model/ (last accessed Aug. 26, 2026).

compete for the fifth year the NCAA now affords their peers.

## III. LEGAL STANDARD

Rule 23 provides a straightforward path to class treatment when its requirements are met. As the Supreme Court has explained, a plaintiff whose action satisfies Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (quotations omitted).

Those requirements are well established. Plaintiffs must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and must also demonstrate that the proposed class falls within one of Rule 23(b)'s categories. *Shady Grove*, 559 U.S. at 398. Plaintiffs satisfy each of the Rule 23(a) requirements here, and Rule 23(b)(2) is independently satisfied because the NCAA "has acted or refused to act on grounds that apply generally to the class," making classwide injunctive and declaratory relief appropriate. Fed. R. Civ. P. 23(b)(2). Indeed, where "a single injunction or declaratory judgment would provide relief to each member of the class," certification under Rule 23(b)(2) is appropriate. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *see also Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008).

## IV. LAW AND ARGUMENT

### A. Class Definitions

Plaintiffs hereby move, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), and District of Colorado Local Rule 7.1, for an order certifying the following Classes:

> **The Division I Transfer Class.** All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division II or Division III sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are in the NCAA's Transfer Portal, and are therefore barred from transferring to a Division I school at which to compete for a fifth season due to the NCAA's adoption and implementation of the Division I Rule.
>
> **The Division II Class**. All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division II sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from competing with a Division II school for a fifth season due to the NCAA's adoption and implementation of the Division II Rule.

Am. Compl. ¶ 113. Excluded from the Classes are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

### B. The *Wisne* Class Certification Order Provides a Direct Roadmap in This Case

The Rule 23 analysis in *Wisne* provides a direct roadmap for certification here. Like this case, *Wisne* involved student-athletes challenging the NCAA's five-year eligibility rule,[18] and the court certified a class after finding that the Rule 23(a) requirements and Rule 23(b)(2) were satisfied. *See generally Wisne I*, 2026 WL 2211840.

[18] Though not overlapping, the Division I Transfer Class mirrors the *Wisne* class in all material respects. They each include student-athletes who graduated high school in 2022, and who have already completed four years of collegiate competition. The only difference is that the *Wisne* class includes student-athletes who are already at Division I schools, whereas the Division I Transfer Class is composed of student-athletes at a Division II or Division III school who seek to transfer to a Division I school for a fifth year of eligibility. The NCAA's Division I Rule forecloses both classes from competing a fifth year at a Division I school. Thus, the Division I Transfer Class will suffer the same irreparable harm as the *Wisne* class. The other discrete group here, the Division II Class, is just like the *Wisne* class, but is composed of students already at Division II schools, not Division I schools.

The *Wisne* court found each of Rule 23(a)'s requirements satisfied. On numerosity, the court held that the NCAA's own participation data, combined with common sense assumptions, established well over the forty members ordinarily sufficient to make joinder impracticable. *Id*. at *2-3. On commonality, the court identified a single question capable of classwide resolution—"whether the Rule's limitation on their eligibility to play a fifth season is anticompetitive as an antitrust matter"—and held that the individualized eligibility variations the NCAA pointed to among class members did not defeat commonality, because they left that common question untouched. *Id*. at *3-4. On typicality, the court held that factual differences among the named plaintiffs—some had suffered injuries, others had competed outside Division I—did not defeat typicality, because every plaintiff's claim rested on the same legal theory: that the Rule is an unlawful restraint of trade harming every class member the same way. *Id*. at *4-5. And on adequacy, the court found no conflict between the named plaintiffs (or their counsel) and the class, rejecting the NCAA's argument that divergent circumstances among members created an intraclass conflict, because the requested relief did not benefit some members at others' expense. *Id*. at *5-6.

Turning to Rule 23(b)(2), the court held both requirements met. First, the court found the "general applicability" requirement satisfied "[f]or substantially the same reason that Plaintiffs have shown commonality and typicality": all class members "face ineligibility to play a fifth season because the NCAA is subjecting them all to the same Rule[.]" *Id.* at *6 (quotations omitted). Second, the court found the "class wide relief" requirement satisfied because class members' injuries were "sufficiently similar to be remedied by a single injunction." *Id.* (citing *D.B.U. v. Trump*, 349 F.R.D. 228, 241 (D. Colo. 2025)) (quotations omitted).

Defendant will be hard-pressed to identify any material distinction between this case and

Wisne that would justify a different result under Rule 23. Plaintiffs here rely largely on the same evidence and argument presented in *Wisne*, and incorporate by reference (or request the Court to take judicial notice of) all briefing in the *Wisne* action in support of this Motion to grant the same injunctive relief to the Division I Transfer Class and the Division II Class. Where the class-certification issues here differ from those in *Wisne* (e.g., numerosity), Plaintiffs have supplemented the record with additional evidence, including a new expert declaration. *See generally* Maxcy Decl.

In short, *Wisne* has already answered the Rule 23 questions presented here, and the same analysis supports certification of both Classes in the instant matter.

### C. Both Classes Satisfy Rule 23(a)

#### 1. The Proposed Classes are So Numerous That Joinder is Impracticable

Rule 23(a)(1) asks whether "the class is so numerous that joinder of all members is impracticable[.]" The Tenth Circuit has declined to reduce that question to arithmetic: "[t]here is no set formula to determine if the class is so numerous that it should be so certified." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1215 (10th Cir. 2014) (*citing Rex v. Owens ex rel. Okla*., 585 F.2d 432, 436 (10th Cir. 1978)). Exactitude is not required; "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002). "Usually, a total of 40 or more class members raises a presumption of impracticability of joinder based on numbers alone." *Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1185 n.3 (10th Cir. 2025) (quotations omitted).

Both Classes readily clear that threshold. The Rules reach nationwide and operate on an entire enrollment cohort. Division II alone fields more than 126,000 athletes across over 290 institutions, and hundreds—likely thousands—of Division II and Division III athletes are presently listed in the Transfer Portal. *See, e.g.*, Am. Compl. ¶¶ 5, 51, 116; *see also* Maxcy Decl. at ¶¶ 21,

38. The challenged Rules apply categorically to the entire cohort of athletes who began playing in 2022 and were deemed to have completed four years of competition under the prior Five-Year Rule. Maxcy Decl. at ¶ 34. The NCAA's own published participation figures, combined with the common-sense assumptions Neiberger permits, establish by a preponderance that each Class contains far more than forty members. *See Neiberger*, 208 F.R.D. at 313. The court in *Wisne* found materially similar public NCAA data sufficient to carry the numerosity burden. *Wisne I*, 2026 WL 2211840, at *2-3.

"While 'class size is the most important factor in determining impracticability of joinder,' other factors for the Court to consider include: '(1) judicial economy arising from avoiding multiple actions; (2) the geographic dispersion of the class members; (3) the financial resources of the class members and their ability to institute individual suits; [and] [4] requests for prospective and injunctive relief that could affect future class members.'" *Trejo v. Safeway Servs., LLC*, No. 16-0024, 2017 WL 11688840, at *3 (D. Colo. Dec. 15, 2017) (quoting *Neiberger*, 208 F.R.D. at 313).

Here, class members are scattered across hundreds of campuses nationwide; their identities are known to the NCAA but not to one another; and each faces the same closing window, as rosters, scholarships, and NIL budgets for 2026–2027 are being committed now. Am. Compl. ¶¶ 5, 116; Maxcy Decl. at ¶ 38. Requiring several hundred college athletes—most without the resources to fund federal antitrust litigation—to appear individually would impose precisely the "strong litigational hardship" Rule 23(a)(1) exists to prevent. *See Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 384 (D. Colo. 1993).

In short, both Classes easily satisfy Rule 23(a)(1), as their size, geographic dispersion, and the practical burden of individual litigation make joinder plainly impracticable.

### 2. Members of the Classes Have Common Questions of Law and Fact

Rule 23(a)(2) requires "questions of law or fact common to the class[.]" The requirement is "disjunctive"—either suffices. *Wisne I*, 2026 WL 2211840, at *3 (citing *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982)). And a single shared question will carry it. *Id.* at *3 (citing *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018); *Dukes*, 564 U.S. at 359).

The question should yield a common answer: the claims must "'depend upon a common contention...capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Dukes*, 564 U.S. at 350). "A common contention need not be one that will be answered, on the merits, in favor of the class." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quotations omitted).

Each Class is united by a discrete act of NCAA rulemaking—the sort of "single policy, custom, procedure or alleged administrative deficiency" that "unites the claims of the plaintiffs or the putative class members." *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 2006 WL 1801379, at *9 (D. Colo. June 28, 2006), *aff'd*, 543 F.3d 597 (10th Cir. 2008); *see also* Maxcy Decl. at ¶¶ 38-39. For the Division I Transfer Class, that act is the NCAA's decision to apply the Division I Rule so as to bar 2022 enrollees who have used four seasons from transferring into Division I. For the Division II Class, it is the parallel decision under the Division II Rule. In each instance the operative question is identical in form and purely legal: "whether the Rule's limitation on their eligibility to play a fifth season is anticompetitive as an antitrust matter." *Wisne I*, 2026 WL 2211840, at *3 (finding this question as sufficient to establish commonality).

Commonality here does not depend on athlete-by-athlete eligibility determinations. Each Class is defined to include only athletes who began collegiate competition in the 2022-2023 season and completed four years of eligibility under the prior framework by the end of the 2025-2026

season. For those athletes the NCAA has already made the eligibility determination; what remains is a legal question about the validity of the rule that produced it. And the ordinary variation among class members—different sports, different institutions, different reasons for wanting a fifth year—leaves the common contention untouched. As the court in *Wisne* observed, "even if some class members have different factual circumstances that attend their claims does not change the common question that drives those claims—i.e., whether the Rule and its implementation is anticompetitive and violative of federal antitrust law." *Id.* at *4 (citing *D.B.U.*, 349 F.R.D. at 238).

Accordingly, the Classes satisfy Rule 23(a)(2) because their claims turn on the same central legal question: whether the NCAA's uniform application of its Five-Year Eligibility Rules unlawfully forecloses these athletes from competing for a fifth season.

### 3. The Plaintiffs' Claims Are Typical of Class Members' Claims

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class[.]" The requirement protects absent members by ensuring that a representative, in pursuing his or her own claim, necessarily advances theirs. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Typicality exists "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re HomeAdvisor, Inc. Litig.*, 345 F.R.D. 208, 223 (D. Colo. 2024) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "Rule 23(a)'s typicality requirement 'do[es] not require that every member of the class share a fact situation identical to that of the named plaintiff.'" *Wisne I*, 2026 WL 2211840, at *4 (quoting *Colo. Cross Disability*, 765 F.3d at 1216). "'[D]iffering fact situations of class members do not defeat typicality...so long as the claims of the class representative and class members are based on the same legal or remedial theory.'" *Id.* (quoting *Menocal*, 882 F.3d at 914).

*Plaintiffs Gomes, Moon, Okorougo, Zielinski, and the Division I Transfer Class*. Plaintiffs

Gomes, Moon, Okorougo, and Zielinski's claims follow the same path as the claims of the rest of the Division I Transfer Class. Each of them graduated high school in 2022; began collegiate competition in the 2022-2023 season; has competed four seasons outside of Division I; is in the Transfer Portal; and is now barred by the Division I Rule from transferring to a Division I institution for a fifth season, in spite of invitations of interest to do just that. *See* Gomes Decl. at ¶¶ 2, 7, 9; Moon Decl. at ¶¶ 2-4, 6-7; Okorougo Decl. at ¶¶ 2, 4-6; Zielinski Decl. at ¶¶ 2-4. That is the class definition, item for item. Their legal theory—that applying the Rule to the 2022 cohort is an unreasonable restraint of trade—is the theory every member must prove, and the remedy they seek is the remedy every member needs.

*Plaintiffs Moore, Hara, Harman, and the Division II Class*. Plaintiff Moore, Hara, and Harman's claims are typical for the Division II Class for the same reasons. Each of them graduated high school in 2022; began collegiate competition in the 2022-2023 season; played four Division II seasons; and is now barred by the Division II Rule from competing for a fifth season at a Division II institution which would have each of them back but for the Division II Rule. *See* Moore Decl. at ¶¶ 2, 5-6; Hara Decl. at ¶¶ 2, 4-5; and Harman Decl. at ¶¶ 2-6. Every member of the Division II Class occupies the same position, and each will establish the NCAA's liability with the same evidence and the same arguments. *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010) ("typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances"). [19]

As the *Wisne* court concluded, "[i]n sum, the claims of Plaintiffs and putative class

[19] Because each Plaintiff represents only the Class corresponding to his or her own division, none is asked to advance a claim he or she does not personally hold. Plaintiffs Gomes, Moon, Okorougo, and Zielinski share an identical interest with the Division I Transfer Class in invalidating the NCAA's application of the Division I Rule; Plaintiffs Moore, Hara, and Harman share an identical interest with the Division II Class in invalidating its Division II counterpart.

members stem fundamentally from the Rule and its purported, anticompetitive effects…Thus, Plaintiffs have met their typicality burden." *Wisne I*, 2026 WL 2211840, at *4 (citations omitted).

**4. Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Proposed Classes**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Two questions control: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Wisne I*, 2026 WL 2211840, at *5 (quoting *Hill v. Aspen Contracting, Inc.*, No. 20–0149, 2021 WL 2662296, at *5 (D.N.M. Feb. 22, 2021)).

Plaintiffs seek nothing for themselves that they do not seek for their Classes. Each asks the Court to declare the corresponding Rule unlawful as applied to the 2022 cohort and to enjoin its enforcement; none seeks a preference, a carve-out, or any advantage over absent members, and none has an incentive to trade class relief for individual gain.

Nor does the relief sought set class members against one another. The requested injunction removes a categorical bar to eligibility; it does not distribute a finite fund, and no member's recovery is computed by a method that would disadvantage another. Here, every class member seeks the same declaration and the same decree, and each obtains the full benefit of the relief the moment it issues.

The two Classes are likewise compatible. They challenge different rules, seek relief in different divisions, and proceed through separate representatives: the Division I Transfer Class asks the Court to open a door into Division I, while the Division II Class asks it to keep a door open within Division II. Neither request comes at the other's expense.

Proposed class counsel are experienced in complex antitrust and class litigation, have been

appointed class counsel in other complex actions, and have already devoted substantial resources to this case—investigating the claims, drafting and filing the Complaint and Amended Complaint, and moving concurrently for preliminary injunctive relief on the Classes' behalf. *See* Declaration of Ruben Honik, filed concurrently herewith ("Honik Decl."), at ¶¶ 3, 5-8.

The conclusion of the *Wisne* court applies with equal force here: "From an adequacy perspective, neither Plaintiffs nor class counsel have conflicts with any putative class members. Plaintiffs assert the same claims as class members, and those claims are premised on the same legal theory. They do not seek unique relief relative to class members. This makes Plaintiffs adequate class representatives under Rule 23(a)(4)… As for class counsel, Plaintiffs have put forth evidence demonstrating counsel's experience and competency." *Wisne I*, 2026 WL 2211840, at *5.

**D. Both Classes Satisfy Rule 23(b)(2)**

Rule 23(b)(2) permits maintenance of a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." What defines such a class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation omitted). Subdivision (b)(2) carries no predominance requirement. *D.B.U.*, 349 F.R.D. at 240. The Tenth Circuit reads the rule to impose two requirements: the defendant's "actions or inactions must be based on grounds generally applicable to all class members," and "final injunctive relief [must] be appropriate for the class as a whole." *Shook*, 543 F.3d at 604 (emphasis omitted). Both are met, for both Classes.

*General applicability*. The first requirement is satisfied on the face of the Rules. The

NCAA made no individualized judgment about any one of the Plaintiffs, or anyone else. It adopted rules of general application and drew a line at a single enrollment year. Every member of the Division I Transfer Class is foreclosed from Division I competition by the same provision, applied the same way, for the same stated reason; every member of the Division II Class is foreclosed from Division II competition by its mirror image. As the *Wisne* court observed, the first requirement is met because NCAA was "subjecting [all class members] to the same Rule[.]" *Wisne I*, 2026 WL 2211840, at *6.

*Relief appropriate for each Class as a whole*. The second requirement is satisfied because a single decree per Class would resolve that Class's injury completely. For the Division I Transfer Class, the Court would enjoin the NCAA from applying Bylaw 12.6 to bar a class member from competing in Division I athletics during the 2026–2027 academic year on the ground that the member began collegiate competition in the 2022–2023 season and completed four seasons of competition by the conclusion of the 2025–2026 season. For the Division II Class, the Court would enter the corresponding order as to the Division II Rule and Division II competition. Relief would extend as well to the Rule of Restitution, Bylaw 12.9.4.2, which otherwise permits the NCAA to punish athletes, their teammates and coaches, and their institutions retroactively should an injunction later be disturbed. Am. Compl. ¶¶ 52, 55-56; *see also generally* Plaintiffs' Motion for Preliminary Injunction (filed concurrently herewith).

The injuries within each Class are, moreover, "sufficiently similar" to be remedied together. *D.B.U.*, 349 F.R.D. at 241. Every member of the Division I Transfer Class has been deprived of the same thing—access to Division I competition in 2026–2027—and every member of the Division II Class of access to Division II competition that year. Lifting the bar restores that access to all of them simultaneously and identically; no member requires a different or tailored

injunction.

These Classes are what Rule 23(b)(2) was written for. Their members are dispersed and individually under-resourced; the conduct they challenge is a rule rather than a course of individualized dealing; and the relief they need is one order directed at one defendant. Resolving that question once is far more efficient than leaving several hundred college athletes to litigate it piecemeal.

### E. Membership in Each Class Is Determined by Objective Criteria Drawn from the NCAA's Own Records

Each Class definition turns on facts that are recorded, verifiable, and external to the merits. Membership in the Division I Transfer Class depends on four data points: the season in which the athlete began collegiate competition (2022-2023); the division in which the athlete competed (Division II or Division III); whether the athlete completed four years of eligibility under the prior framework by the close of the 2025-2026 season; and whether the athlete is listed in the Transfer Portal. Membership in the Division II Class depends on the first three, with Division II substituted for the second. The NCAA maintains all of that information: it operates the Portal itself as a centralized, division-spanning database, and it keeps participation and eligibility records for every athlete at every member institution. Am. Compl. ¶¶ 75-77; *see also* Maxcy Decl. at ¶ 38. A class is ascertainable where its members are "capable of being determined" from such criteria and identification is "administratively feasible." *White v. Gen. Motors LLC*, No. 21-410, 2023 WL 3278460, at *6-7 (D. Colo. May 5, 2023) (quotations omitted). Both definitions meet that standard. *See also Wisne I*, 2026 WL 2211840, at *2 ("the Court agrees with Plaintiffs that the usage of NCAA records and data provide objective criteria from which class members may be identified").

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify both Classes

under Federal Rules of Civil Procedure 23(a) and 23(b)(2); appoint Plaintiffs Gomes, Moon, Okorougo, and Zielinski as representatives of the Division I Transfer Class and Plaintiffs Moore, Hara, and Harman as representatives of the Division II Class; and appoint the undersigned as class counsel.

DATED: August 28, 2026

Respectfully submitted,

By: */s/ Ruben Honik*

HONIK LLC
Ruben Honik
David J. Stanoch
1515 Market St., Suite 1100
Philadelphia, PA 19102
Tel: 267-435-1300
Email: ruben@honiklaw.com
Email: david@honiklaw.com

MORITT HOCK & HAMROFF LLP
Daniel Lust*
Lauren Bernstein*
400 Garden City Plaza
Garden City, NY 11530
Tel: 516-873-2000
Email: dlust@moritthock.com
Email: lbernstein@moritthock.com

M. Ryan Casey (Colorado Bar No. 45939)
THE CASEY LAW FIRM, LLC
P.O. Box 1055
Silverthorne, CO 80498
Tel: 970-372-6509
Email: ryan@rcaseylaw.com

Max S. Roberts
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 646-837-7150
Email: mroberts@bursor.com

* *Admission pending*

*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF SERVICE

On this 28th day of August, 2026, I caused a true and correct copy of the foregoing to be filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ David J. Stanoch*
David J. Stanoch