**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03837-RMR-NRN

MYKAELA MOORE,
SYDNEY GOMES,
SULLIVAN MOON,
KENNEDY HARA,
DRAKE HARMAN,
JARREL OKOROUGO, and
ANDREW ZIELINSKI,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 3

A. The NCAA Has Metastasized into an Anticompetitive Monopsony ..... 3

B. The NCAA's New Five-Year Eligibility Rule for Division I ..... 6

C. The NCAA's New Five-Year Eligibility Rule for Division II ..... 7

D. Plaintiffs and the Harm They Face ..... 8

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 11

A. Plaintiffs Are Likely to Succeed on the Merits ..... 11

1. The Legal Framework for the Challenged Rules ..... 13

2. The Implementation of the Challenges Rules is Presumptively Unlawful ..... 13

B. Plaintiffs Face Imminent Irreparable Harm ..... 19

C. The Balance of Equities Tilts Sharply in Plaintiffs' Favor ..... 20

D. The Public Interest Favors Plaintiffs' Requested Injunctive Relief ..... 21

V. CONCLUSION ..... 22

## TABLE OF AUTHORITIES

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) .......... 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......... 12

*California v. Am. Stores Co.*, 495 U.S 271 (1990) .......... 12

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) .......... 13

*Deslandes v. McDonald's USA, LLC*, 81 F.4th 699 (7th Cir. 2023) .......... 18

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001) .......... 20

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) .......... 12

*Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804 (N.D. Cal. 2021) .......... 18

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) .......... 18

*Lackey v. Stinnie*, 604 U.S. 192 (2025) .......... 11

*Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998) .......... 5

*Law v. Nat'l Collegiate Athletic Ass'n*, 108 F. Supp. 2d 1193 (D. Kan. 2000) .......... 5

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .......... 13

*M.G. ex rel. Garcia v. Armijo*, 117 F. 4th 1230 (10th Cir. 2024) .......... 11

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) .......... 12, 13, 14, 15

*Nat'l Soc'y of Prof. Eng. v. United States*, 435 U.S. 679 (1978) .......... 12

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ.y of Oklahoma*, 468 U.S. 85 (1984) .......... 4

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) .......... 13, 14, 15

*Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583 (N.D.W.Va. 2023) .......... 15, 19, 22

*Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024) .......... 14, 15, 16, 19, 22

*S.A. v. Sioux Falls Sch. Dist.*, No. 23-CV-04139-CBK,
2023 WL 6794207 (D.S.D. Oct. 13, 2023) .................... 19

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015).................... 12

*Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756 (E.D. Tenn. 2024) .................. 14

*Winter v. Nat. Res. Def Council, Inc.*, 555 U.S. 7 (2008).................... 11

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063,
2026 WL 2211840 (D. Colo. July 31, 2026) (*Wisne I*).................... 1

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063,
2026 WL 2214234 (D. Colo. July 31, 2026) (*Wisne II*) .................... 1

*Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063,
2026 WL 2214320 (D. Colo. Aug. 2, 2026) (*Wisne III*).................... 1

**Statutes**

15 U.S.C. § 1.................... 4, 12, 19

15 U.S.C. § 26.................... 12

**Other Authorities**

*Patterson et al. v. Nat'l Collegiate Athletic Ass'n*, Response in Opp. re Mot. for Preliminary
Injunction, No. 25-cv-00994, ECF No. 50, p. 25 (M.D. Tenn. Nov. 24, 2025)........................ 17

# I. INTRODUCTION

On July 31, 2026, a Court in this District certified a Rule 23(b)(2) class of Division I college athletes whom the National Collegiate Athletic Association ("NCAA") had banned from competing for a fifth year of eligibility under the NCAA's new Division I Five-Year Eligibility Rule (the "Division I Rule"), simply because the athletes began collegiate competition in the 2022-2023 season. *Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063, 2026 WL 2211840, at *1 (D. Colo. July 31, 2026) (*Wisne I*).[1] The same day, the *Wisne* court enjoined the NCAA from enforcing the Division I Rule against the *Wisne* class.[2]

The *Wisne* class only included student-athletes who *already* competed at a Division I school, and wanted to compete for a fifth year. This case seeks the same injunctive relief for two nearly discrete groups of athletes who were *not* included in the *Wisne* class: (i) student-athletes from Division II or Division III schools in the Transfer Portal wishing to transfer to a Division I school for what would be a fifth year of collegiate competition ("the Division I Transfer Class"); and (ii) student-athletes already at a Division II school looking to compete for a Division II school for a fifth year ("the Division II Class").[3]

Plaintiffs here rely on the same evidence and argument presented in *Wisne*, and incorporate same here. Plaintiffs also present additional evidence and argument, which can be generally summarized as follows:

---

[1] The class was defined as: "All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule."

[2] *Wisne et al. v. Nat'l Collegiate Athletic Ass'n*, No. 26-3063, 2026 WL 2214234, at *1 (D. Colo. July 31, 2026) (*Wisne II*), *opinion clarified*, 2026 WL 2214320 (D. Colo. Aug. 2, 2026) (*Wisne III*).

[3] The two classes are set forth in Plaintiffs' motion for class certification, filed simultaneously herewith.

*First*, the *Wisne* class and the Division I Transfer Class are virtually identical. They each include student-athletes who graduated high school in 2022, and who have already completed four years of collegiate competition. The *only* difference is that the *Wisne* class includes student-athletes who are *already* at Division I schools, whereas the Division I Transfer Class is comprised of student-athletes at a Division II or Division III school who seek to *transfer* to a Division I school for a fifth year of eligibility. The NCAA's Division I Rule forecloses both classes from competing a fifth year at a Division I school. Thus, the Division I Transfer Class will suffer the same irreparable harm as the *Wisne* class.

*Second*, the other discrete group here, the Division II Class, is just like the *Wisne* class, but is comprised of students already at Division II schools, not Division I schools. Remarkably, just days after the *Wisne* court enjoined the NCAA's Division I Rule, the NCAA boldly implemented a *substantively identical rule* for Division II sports (the "Division II Rule"). Same anticompetitive conduct (foreclosing ability to compete in sports, restricting labor output, etc.), different group of student-athletes (those in Division II). Because the Division II class implicates a different relevant market than *Wisne* or the Division I Transfer Class, Plaintiffs here not only rely on the *Wisne* evidence and argument, but also submit herewith the declaration of an economist, Professor Joel Maxcy, Ph.D. Dr. Maxcy opines on the commercial realities showing that, just as Division I athletes (or would-be transferees to Division I) comprise a relevant antitrust market, so, too, do Division II athletes.

*Finally*, both classes here—Division I Transfer Class and the Division II Class—urgently need injunctive relief to avoid irreparable harm. Absent such relief, both classes will be deprived of an opportunity to compete for a fifth and final year of collegiate eligibility. They stand to lose

academic and reputational benefits of a fifth year of collegiate competition, scholarships and other financial support, and Name, Image, and Likeness ("NIL") compensation.

This Court, like the *Wisne* court, has the power to prevent these irreparable harms to competition and to student-athletes by issuing equitable relief enjoining the NCAA from implementing the Division I Rule and the Division II Rule (collectively the "Challenged Rules") to foreclose the Division I Transfer Class and the Division II Class from competing for a fifth year of eligibility. Accordingly, Plaintiffs respectfully request, on behalf of themselves and the Classes, that this Court prevent the NCAA from illegally barring Classes from competing, to hold the NCAA accountable for its anticompetitive conduct, and to prevent the otherwise irreparable harms to the Classes.

## II. FACTUAL BACKGROUND

### A. The NCAA Has Metastasized into an Anticompetitive Monopsony

The United States is unique in the world with its highly commercialized, multibillion-dollar sports industry as an integrated part of its colleges and universities. The NCAA is the governing body for the vast majority of college athletics programs, with approximately 1,100 member colleges and universities throughout the United States. Founded in 1906, the NCAA's Mission and Priorities state that the organization is "guided by its commitment to college athlete well- being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions."[4] Indeed, the Preamble to the NCAA's "Constitution" provides that the opportunity to participate and compete in collegiate sports "is a vital part of the educational experience."[5]

The NCAA was born out of a desire to regulate the safety of collegiate football after a 1905

[4] *NCAA Mission and Priorities*, NCAA (last accessed on Aug. 27, 2026), https://www.ncaa.org/about-us/mission-and-priorities/.

[5] NCAA DIVISION I 2025-2026 Manual, Exhibit 2 hereto (hereinafter "NCAA 2025–26 Bylaws") at p.1 (cleaned up).

season that produced 18 deaths and 149 serious injuries.[6] Its founders could not have foreseen it growing from that noble cause to what is now a monster bureaucracy controlling virtually every aspect of college sports, existing to reap billions of dollars in revenue every year off the labor of young adults, dispensing much of that money into the pockets of its administrators and the administrators of its member institutions.[7]

In *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*,the Supreme Court found that the NCAA had violated Section 1 of the Sherman Act in its exclusive licensing of broadcasting deals for the televising of college football games. 468 U.S. 85, 88 (1984). The Supreme Court's ruling opened up unlimited opportunities for the televising of games and birthed the commercialism that lives today. What was once a small nonprofit intended to organize safety regulations for a few schools now consists of almost 1,100 organizations governing over 500,000 athletes.[8] The NCAA has grown into a behemoth, reporting approximately $1.56 billion in revenue in the 2024–2025 season alone.[9] That revenue is driven by the competitive performance of the collegiate athletes who make up the teams at the NCAA's member institutions; labor that had long been restricted by NCAA rules from sharing fairly in the economic success they primarily produce.

As part and parcel of the NCAA's governance over college athletics, it has long maintained

---

[6] *The History of the NCAA*, NCAA (last accessed on Aug. 27, 2026), https://www.ncaa.org/about-us/history/ (hereinafter "NCAA History").

[7] For instance, in its Form 990 for the fiscal year ending in August 2023, the NCAA reported employment of 591 individuals with a prior year compensation of nearly $75 million, more than $126,000 per employee. *National Collegiate Athletic Association: Full text of 'Full Filling' for fiscal year ending Aug. 2023,* PROPUBLICA (Jun. 22, 2026), https://projects.propublica.org/nonprofits/organizations/440567264/202401799349300305/full.

[8] *WHO WE ARE: Three Divisions. One Shared Purpose.*, NCAA (last accessed on Aug. 27, 2026), https://www.ncaa.org/about-us/.

[9] *NATIONAL COLLEGIATE ATHLETIC ASSOCIATION: CONSOLIDATED FINANCIAL STATEMENTS*, Crowe LLP (Jan. 12, 2026), https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024-25NCAAFIN_FinancialStatement.pdf.

an absolute monopsony on its participating athletes. The first NCAA rules for competition in collegiate athletics were implemented in the 1920s, with limits on eligibility for freshmen, limits on playing for non-college teams, and limits on years of participation in college sports.[10] In 1948 the NCAA began to regulate financial aid, recruiting practices, and academic standards. Later, under the leadership of Walter Byers, the NCAA would coin the term "student-athlete," a construction intended to defend the association and its members from workers' compensation liability.[11] The organization has long struggled to find the right formula or even definition for what it means to be both student and athlete.[12]

While *Board of Regents* was unquestionably ground-breaking, it was not the Association's last contact with the antitrust laws. In *Law v. Nat'l Collegiate Athletic Ass'n*, the Tenth Circuit found that the Association was violating antitrust laws by restricting earnings for coaches in a number of sports (principally men's basketball). 134 F.3d 1010, 1012 (10th Cir. 1998). The cases concluded in a settlement of $54 million. *Law*, 108 F. Supp. 2d 1193, 1195 (D. Kan. 2000). The Association has also settled cases involving limitations on opportunities for walk-on athletes, limitations on the use of athletes' names, images, and likeness, and limitations on education-related benefits. Time and time again it has become clear to federal and state courts throughout the nation that while the NCAA is willing to concede it is the only employer in town, it is unwilling to wield

---

[10] *See NCAA History*, *supra* n.6.

[11] Liz Clarke, *The NCAA coined the term 'student-athlete' in the 1950s. Its time might be up.*, THE WASHINGTON POST (Oct. 28, 2021), https://www.washingtonpost.com/sports/2021/10/27/ncaa- student-athlete-1950s/.

[12] *See e.g.,* Sara Ganim and Devon Sayers, *UNC report finds 18 years of academic fraud to keep athletes playing*, CNN (Oct. 23, 2014), https://www.cnn.com/2014/10/22/us/unc-report-academic- fraud/index.html; *Richard Sherman: Student Athlete Education*, YOUTUBE (May 17, 2015), https://www.youtube.com/watch?v=eP0FYeO1N2A; Johnny Smith, *The Job is Football: The Myth of the Student Athlete*, ORGANIZATION OF AMERICAN HISTORIANS, https://www.oah.org/tah/august-3/the-job-is-football-the-myth-of-the-student-athlete/ (last accessed Aug. 27, 2026).

that power consistent with antitrust jurisprudence.

**B. <u>The NCAA's New Five-Year Eligibility Rule for Division I</u>**

Under NCAA Bylaw 12.6, an NCAA Division I college athlete has a five-year window that begins upon full-time enrollment at any collegiate institution in which to complete their intercollegiate competition. Prior to June 23, 2026, each athlete was—on paper—only permitted four seasons of competition in those five years.[13] Notably, for any NCAA Division I sport other than football, an athlete could not play a single minute of a game without consuming a season of competition, unless he or she sustained a season-ending injury after playing in fewer than 30 percent of the team's games and with timing restrictions.[14] In actuality, many college athletes received fifth, sixth, even seventh and eighth years of eligibility through a waiver process.[15]

On June 23, 2026, the NCAA adopted its new five in five-year rule, which grants all athletes five seasons of competition within their five-year eligibility window, demonstrating a policy preference for five seasons and five years of competition for all athletes (the "Division I Rule"). Yet the only students to whom the NCAA has said this rule will not apply are those who matriculated from high school in 2022 and have completed four seasons of athletic competition.[16]

---

[13] NCAA 2025–26 Bylaw 12.6, at p. 46.
[14] NCAA 2025–26 Bylaw 12.6, at p. 46; Bylaw 12.02.3, at p. 35.
[15] *See, e.g.*, Decl. of Mykaela Moore (Ex. 3), at ¶ 6; Decl. of Kennedy Hara (Ex. 6) at ¶ 5.
[16] *Guide for Four-Year Transfers 2025–2026*, NCAA, p. 13 (last accessed Aug. 27, 2026), http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf.

## Transition Rules: Who Is Affected?

The transition to the age-based rule will depend on the student-athlete's status and enrollment timeline.

| Group | How eligibility will be reviewed |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025-26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025-26 academic year. | Either the previous rules OR the new age-based rule, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026-27. | Either the previous rules OR the new age-based rule, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based rule only. |

*Figure 1. NCAA-Published Chart Concerning Implementation of Five-Year Eligibility Rule*[17]

For Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinksi, and the Division I Transfer Class, the impact of this rule is arbitrary and cruel. Virtually all athletes in the five high school classes before 2022 received extra seasons of eligibility due to COVID, while all athletes in high school classes after 2022 receive an extra season of eligibility under the new rule. While the NCAA allows the benefit of either the old rules or the new rule, "whichever is most beneficial" to the college athlete, to all others, Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinksi, and the Division I Transfer Class receive nothing.

### C. <u>The NCAA's New Five-Year Eligibility Rule for Division II</u>

On August 5, 2026, just a few days after the *Wisne* court issued its injunction as to the Division I Rule, the NCAA boldly implemented a substantively identical rule for Division II (the "Division II Rule"). Per the NCAA itself, the Division II Rule "mirror[s] the Division I Rule.[18] Parenthetically, the NCAA also currently has a proposal to adopt a substantively identical rule for Division III as well.

[17] *NCAA Division I Age-Based Eligibility Rules*, NCAA (last accessed Aug. 27, 2026), https://www.ncaa.org/eligibility-center/division-i-age-based-eligibility-rules/.

[18] Division II Adopts Age-Based Eligibility Model (Aug. 5, 2026), https://www.ncaa.org/division-ii-adopts-age-based-eligibility-model/ (last accessed Aug. 26, 2026).

### D. Plaintiffs and the Harm They Face

Each Plaintiff has completed just four years of collegiate sports. By an equitable implementation of the NCAA's own Challenged Rules, each Plaintiff should be entitled to a fifth season.

Plaintiff Mykaela Moore is a native Coloradoan and women's basketball guard. She graduated high school in 2022, and has competed at two different Colorado Division II schools for a total of four years. She attended Colorado Christan University, a Division II school, in the Rocky Mountain Athletic Conference ("RMAC") her freshman year. As a freshman, she played in all 28 games of the season. Thereafter, she transferred to Colorado Mesa University, another Division II school in the RMAC. *See generally* Moore Decl. (Ex. 3).

Plaintiff Moore should be able to pay for a fifth year of collegiate basketball. She would like to continue her efforts on behalf of Colorado Mesa University. The school has indicated she would be welcome back to compete for a fifth year of eligibility but for the NCAA's Division II Rule. But she is unable to do so because the NCAA's Division II Rule bans her from competing for a fifth year, which also forecloses here receipt of the financial benefits of a fifth year of scholarships or NIL compensation. *Id.*

Plaintiff Sydney Gomes is a women's basketball guard. She graduated high school in 2022, and was named her team's all-time leading scorer. After high school, she studied at and competed for four years with Florida Southern College, a Division II school. Aside from making academic honor roll four years, she also played for four years at Florida Southern, earning several career accolades. *See generally* Gomes Decl. (Ex. 4).

Her strong performance on and off the court has earned her considerable interest. She timely entered the NCAA "Transfer Portal." The portal is the NCAA's centralized database where student-athletes who intend to transfer are listed. It covers all three NCAA divisions—Division I,

Division II, and Division III. Student-athletes must request that their existing school enter them into the portal. Once in the Transfer Portal, student-athletes are eligible to transfer to another NCAA institution, and to compete with that institution's athletics teams. The Transfer Portal is the only way a student-athlete at a Division II or Division III school can transfer to, and compete with a Division I school.

Plaintiff Sydney Gomes should be eligible to transfer and play for a fifth year of collegiate basketball with a Division I school. Indeed, multiple Division I and Division II schools alike schools have had contact with Plaintiff Gomes about her transferring and playing for them in his fifth year. Now, though, Plaintiff Gomes and the rest of the Division I Transfer Class are in limbo, unable to compete at a Division I school, because of the NCAA's anticompetitive conduct. *Id.*

Plaintiff Sullivan Moon graduated from Cheyenne Mountain High School in Colorado Springs, Colorado in 2022. He first enrolled at Colorado State University Pueblo, a Division II school, and then transferred to Colorado Mesa University. He competed on the men's football team as a kicking specialist. Plaintiff Moon's strong performance in a football specialist position attracted attention from multiple other schools. In fact he was invited to play with the University of Arizona, a Division I school, and has been practicing with their football team this summer. If he continues to practice and is able to play for Arizona this season. He will not be able to do this because of the NCAA's Division I Transfer Rule. *See generally* Moon Decl. (Ex. 5).

Plaintiff Kennedy Hara is a class of 2022 high school graduate from Hawaii who has competed on the men's baseball team for four years at Colorado Mesa University. While at Colorado Mesa, he was recognized multiple times for academic and athletic achievements. Plaintiff Hara is still a student at Colorado Mesa. This would be his fifth year of eligibility. He would very much like to continue his studies and compete in what should be his fifth year of eligibility with Colorado Mesa, and has been informed that the team would be very interested in

his doing so. Unfortunately, much like Plaintiff Moore, Plaintiff Hara's ability to compete for a fifth year at Colorado Mesa, and eligibility to receive the attendant benefits or support were he to do so, have been foreclosed by virtue of the NCAA's Division II Rule. *See generally* Hara Decl. (Ex. 6).

Plaintiff Charles "Drake" Harman graduated from high school in 2022. He began his collegiate academic and athletic journey at Santa Fe College, a junior college, where he played baseball, for two years. He started 45 games in both freshman and sophomore seasons. He then transferred to the University of Tampa, a Division II school, for a year. Then, he transferred to Georgia Southwestern University for his fourth year of eligibility, where he achieved multiple single-game statistical highs. Plaintiff Harman has an open invitation to play for a fifth year at Georgia Southwestern; if he did so, he would receive scholarship or related support. Yet, Plaintiff Harman's ability to compete for a fifth year, and eligibility to receive the attendant benefits or support were he to do so, have been foreclosed by virtue of NCAA's Division II Rule. *See generally* Harman Decl. (Ex. 8).

Plaintiff Jarrel Okorougo is a men's basketball guard and forward. He graduated from high school in 2022. Later in 2022, he enrolled in Trinity College – Hartford, a Division III school. He has competed with the Trinity College basketball team for four years. Year over year, Plaintiff Okorougo put in the work to continually improve his contributions to the team. By his fourth year, he delivered season career-highs in fields goals (199), points (467), and scoring (15.6).[19] Earlier this year, he became the seventh player in his school's history to receive two or more National Association of Basketball Coaches ("NABC") All-District selections. He received scholarship support. He has entered the Transfer Portal and has interest and opportunity to play potentially for

[19] https://bantamsports.com/sports/mens-basketball/roster/jarrel-okorougo/13878

a Division I school in what would be his fifth year of eligibility. Yet, the NCAA has arbitrarily foreclosed Plaintiff Okorougo's ability to do so. *See generally* Okorougo Decl. (Ex. 7).

Plaintiff Andrew Zielinski graduated from high school in 2022. He has competed in collegiate men's golf for four years, first at a junior college, and then with Lee University, a Division II school. He was the first-ever Division II golfer to earn a PGA Tour exemption. He is in the Transfer Portal and has received interest to transfer to a Division I school, with the attendant support, benefits, and NIL compensation. However, Plaintiff Zielinski cannot avail himself of any such opportunity because of the NCAA's Division I Rule. *See generally* Zielinksi Decl. (Ex. 9).

## III. LEGAL STANDARD

The standard for a preliminary injunction is the same as the standard for a temporary restraining order. *See D.B.U. v. Trump*, 779 F. Supp. 3d 1264, 1273 (D. Colo. 2025) (Sweeney, J.). To prevail, a movant must show "(1) they are 'likely to succeed on the merits,' (2) they are 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [their] favor,' and (4) 'an injunction is in the public interest.'" *M.G. ex rel. Garcia v. Armijo*, 117 F. 4th 1230, 1238 (10th Cir. 2024) (quoting *Winter v. Nat. Res. Def Council, Inc.*, 555 U.S. 7, 20 (2008)). Crafting interim relief is an "exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). With each passing day more roster spots are filled and more scholarship and NIL money is spent. Plaintiffs' opportunity to obtain a roster spot and to continue their educations is fleeting, and the NCAA's compliance with the law requires only the temporary suspension of a rule it has already changed for all other athletes, favoring relief for Plaintiffs.

## IV. ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claim that the NCAA's implementation of the

Division I Rule and Division II Rule violates Section 1 of the Sherman Act. Under Section 1, "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The Sherman Act reflects the "legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Prof. Eng. v. United States*, 435 U.S. 679, 695 (1978). Plaintiffs are entitled to seek judicial relief to enforce Section 1 of the Sherman Act. 15 U.S.C. § 26.

The antitrust laws are "intended to arrest anticompetitive tendencies in their incipiency," *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (applying the Clayton Act), and Congress's "concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). In evaluating potential anticompetitive effects portending future harms, courts look to the "reasonable probability of anticompetitive effect." *See e.g.*, *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984); *California v. Am. Stores Co.*, 495 U.S 271, 282–283 (1990) (finding that in the context of a violation of antitrust laws "the literal text of § 16 is plainly sufficient to authorize injunctive relief . . . that will prohibit that conduct from causing that harm."); *see also id.* at 283 (collecting cases).

Here, the anticompetitive effects of the NCAA's Challenged Rules are far more than reasonably probable; they are presumed and obvious. The NCAA's implementation of these rules summarily removes two entire groups of athletes from the market for collegiate sports, and without quick intervention that group of athletes will lose their ability to compete in at least the 2026–2027 academic year, and perhaps for all time. Relatedly, it jeopardizes the ability to finance further education, and implicates scholarship support and NIL compensation. As Justice Kavanaugh noted in his concurrence in *Alston*, "the NCAA's remaining compensation rules also raise serious questions under the antitrust laws." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 108

(2021) (Kavanaugh, J., concurring). The implementation of the Challenges Rules raises those exact serious questions and fails to resolve them; it will lead to those exact anticompetitive effects the Sherman Act and Clayton Acts were intended to prevent.

### 1. *The Legal Framework for the Challenged Rules*

The NCAA's . . . compensation rules should receive ordinary rule of reason scrutiny under the antitrust laws." *Alston*, 594 U.S. at 108 (Kavanaugh, J., concurring). The rule of reason requires courts to conduct a "fact specific assessment of 'market power and market structure… to assess the [restraint]'s actual effect' on competition." *Ohio v. Am. Express* Co., 585 U.S. 529,541 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). The goal is to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and those with procompetitive effect that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

A three-step, burden-shifting framework applies under the rule of reason. *Alston*, 594 U.S. at 96. The plaintiff has "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 585 U.S. at 541. If the plaintiff carries its burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. *See id.* If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

### 2. *The Implementation of the Challenges Rules is Presumptively Unlawful*

Following this rule of reason approach, it patently obvious that the implementation of the Challenges Rules violates the antitrust laws. The Rules have a substantial anticompetitive effect on the market for college athletes, there is no true procompetitive benefit to either rule, and there

are less restrictive alternatives to each rule In sum, the implementation of the Challenged Rules is presumptively unlawful, and Plaintiffs are likely to succeed on the merits.

**a) <u>The Implementation of the Challenged Rules Has a Substantial Anticompetitive Effect on the Labor Market for College Athletes</u>**

Even aside from direct evidence of the NCAA's ability to reduce output and excluded competition, the substantial anticompetitive effect of the implementation of the Challenges Rules is obvious from evaluation of indirect evidence. *See Am. Express Co.*, 585 U.S. at 542 (stating that plaintiffs can demonstrate a substantial anticompetitive effect either directly or indirectly). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition" in the relevant market. *Id.*.

There are two relevant markets here: the nationwide labor market for Division I college athletes (for the Division I Transfer Class), and the nationwide labor market for Division II college athletes (for the Division II Class).

The labor market for Division I college athletes has been widely accepted by those courts evaluating antitrust challenges to NCAA eligibility rules. *See e.g.*, *Alston*, 594 U.S. at 90 ("market for student athlete services"); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 761 (E.D. Tenn. 2024) ("market of Division I athletics"). The "eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements." *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024). In fact, there is no question that the NCAA and its members hold monopsony power over the labor market for college athletics. *See Alston*, 594 U.S. at 90 ("The NCAA accepts that its members collectively enjoy monopsony power in the market for [college athlete] services, such that its restraints can (and in fact do) harm competition."). Sports economists have long viewed Division I athletics as a distinct market, in addition to the courts, finding that "Division I is economically unique, and

NCAA eligibility rules function as gatekeeping conditions on entry to this specific labor market." *See* Maxcy Decl. (Ex. 2) at ¶¶ 28-29. The NCAA has monopsony power over this market. *Id.* ¶ 37.

Similarly, the NCAA enjoys the same monopsony power in the labor market for Division II college athletes. *See, e.g.*, *Alston*, 594 U.S. at 90 (NCAA "enjoy[s] monopsony power in the market for student-athletes services"). The Division II Rule, which per the NCAA "mirror[s]" the Division I Rule, implicates the same type of "eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements." *Pavia*, 760 F. Supp. 3d at 539. As Dr. Maxcy explains, the economic data for and commercial realities of Division II athletics establish defined contours of a labor market for Division II athletes that is distinct from other potential markets. *See, e.g.*, Maxcy Decl., at ¶¶ 37, 48, 57.

The Challenged Rules would harm athletes in both relevant labor markets. While NCAA member institutions must coordinate on some level for Division I, II, or III athletics to exist, that *some* restraints "are necessary to create or maintain a league sport does not mean *all* 'aspects of elaborate interleague cooperation are.'" *Alston*, 594 U.S. at 90 (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 199 n.7 (2010)). In granting a similar temporary restraining order against the NCAA concerning transfer restrictions, the Federal District Court for the Northern District of West Virginia noted, "[h]ere these [NCAA] bylaws are essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 591 (N.D. W.Va. 2023).[20] That court further held that "[t]he sole difference between this case and *Alston* is

[20] This case involved a lawsuit brought by Attorneys General of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia, who were eventually joined by the (Biden-era) Department of Justice Antitrust Section. The NCAA ultimately settled the dispute by agreeing not to enforce the anticompetitive labor transfer restriction. *Ohio et al. v. National Collegiate Athletic Association (NCAA)*, No. 1:23-cv-00100 (N.D. W.V. Dec. 7, 2023), NATIONAL ASSOCIATION OF ATTORNEYS GENERAL (last accessed Aug. 27, 2026),

that *Alston* involved compensation provided to athletes while Plaintiff here challenges an even more direct restraint on trade: the NCAA's transfer rules which prohibit a student from playing immediately following their second transfer." *Id.* Like *Ohio*, the restraint on trade imposed by the NCAA's Challenged Rules is even more direct than that of *Alston*: limiting the eligibility of the entirety group of 2022 high school students in the Division I Transfer Class and the Division II Class. This is a clear restraint of trade and a suppression of the labor markets for any athlete who hoped to have a fifth season of eligibility, had already used four seasons of eligibility, and happened to matriculate from high school in 2022. By removing the Classes from the corresponding labor markets, the NCAA is quite obviously restricting competition within those labor markets.[21]

Further, in evaluating the NCAA Division I eligibility rules for college athletes who attended junior college, the Federal District Court for the Middle District of Tennessee recognized that the "disparate treatment of these two groups also results in a distortion of the labor market for NCAA [athletes]," harming college athletes by imposing significant costs upon them for attending the schools best suited to meet their needs "academically or athletically." *Pavia*, 760 F. Supp. 3d at 539. The arbitrary exclusion of the two Classes here from the benefits of the Challenged Rules similarly distorts Plaintiffs' and Class Members' decisions regarding where to attend school. Indeed, Plaintiffs and Class Members may be unable to continue their education at all, due to the NCAA's arbitrary decision to exclude them from having the five seasons of eligibility that are now available to all other collegiate athletes. *See, e.g.,* Gomes Decl. (Ex. 4) at ¶ 6; Harman Decl. (Ex. 8) at ¶ 4.

---

https://www.naag.org/multistate-case/ohio-et-al-v-national-collegiate-athletic-association-ncaa-no-123-cv-00100-n-d- w-v-dec-7-2023/ ("The states and DOJ reached a settlement that ensures a permanent ease of restrictions on Division I college athletes who transfer schools multiple times and otherwise enhances their rights and opportunities.").

[21] *See, e.g.*, Maxcy Decl., ¶ 38; *see also id.*, ¶ 71 ("the rules restrict output").

Those effects on the labor market also cause "downstream effects for consumers of collegiate athletics." *Pavia*, 760 F. Supp. 3d at 540. The NCAA's anticompetitive conduct necessarily diminishes the value of the college athletics product and the competitiveness of teams by removing established players with both high levels of skill and established fan appeal from the labor market. *See* Maxcy Decl., at ¶ 69.

**b) <u>There Are No Procompetitive Justifications for the Current Implementation of the Challenged Rules</u>**

The burden falls to the NCAA to offer a procompetitive justification for its implementation of the Challenged Rules. It cannot carry it. From reviewing public statements and court filings, one would have to be a mind-reader to presume what such argument could possibly be. In fact, in response to a 2025 lawsuit challenging the NCAA's prior four seasons and redshirt rules, the NCAA insisted that four years of eligibility maintained the sole procompetitive benefit of:

> "preserv[ing] for high school student's the ability to participate in DI sports. High school athletics are completed on a four-year track. For a class of graduating high school senior student-athletes to have the opportunity to ***enter*** NCAA D1 rosters, there must be a corresponding ***exiting*** class of graduates to open up opportunities."

*Patterson et al. v. Nat'l Collegiate Athletic Ass'n*, Response in Opp. re Mot. for Preliminary Injunction, No. 25-cv-00994, ECF No. 50, p. 25 (M.D. Tenn. Nov. 24, 2025) (emphasis original). Merely six months later, the NCAA announced the Challenged Rules and offered the directly contradictory justification that the rule would "***protect*** opportunities for high school student-athletes to access the benefits only college sports can provide, while delivering predictable outcomes for student-athletes and our schools."[22]

---

[22] NCAA Staff, *DI Board of Directors directs Cabinet to advance age-based eligibility rules*, NCAA (Apr. 27, 2026), https://www.ncaa.org/media-center-di-board-of-directors-directs-cabinet-to-advance-age-based-eligibility-rules/.

Were the NCAA to offer some purported procompetitive justification, it must be in the damaged market which is, in this case, the labor market for Division I athletes. *See Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 813 (N.D. Cal. 2021) (citing *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1271 (9th Cir. 2020) (Smith, J. concurring)). Benefits in the market for consumers of college athletic events cannot counterbalance harms in the distinct markets for labor – this would treat "benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). "That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise." *Id.*

**c) <u>Any Potential Procompetitive Justification Could be Accomplished by Less Restrictive Means</u>**

Treating Plaintiffs and Class Members like every other student-athlete under the Challenged Rules would eliminate the harm and is a feasible, less restrictive alternative to the more restrictive four-seasons-in-five-years rule the NCAA seeks to impose on Plaintiffs and Class Members. The NCAA cannot dispute feasibility: it adopted the exact framework Plaintiffs seek. Having chosen five seasons of eligibility for everyone else, the NCAA cannot now claim that extending the same rule to Plaintiffs and the Classes is unjustifiable or harmful to competition.

Thus, the Challenged Rules could be implemented to offer those college athletes who matriculated from high school in 2022, who have completed four years of athletics one additional year of competition, and seek either (i) to transfer to a Division I school for a fifth year of competition, or (ii) to continue on at a Division II school for a fifth year of competition. That the NCAA chose to single out the class of 2022 rather than simply apply its new rule to all current

college athletes shows that its implementation is arbitrary and anticompetitive, prohibiting certain college athletes from having agency and choice rather than bolstering competition in sport.

The NCAA's own conduct confirms the feasibility of the requested relief. Following the issuance of a preliminary injunction in *Pavia*, 760 F. Supp. 3d at 538, the NCAA responded to the court's decision by granting a "*Pavia* waiver" that offered an additional year of eligibility to all similarly-situated college athletes.[23]

This rule of reason analysis reveals that the NCAA's decision to single out the class of 2022 by barring that class (and, more specifically for this case, the Division I Transfer Class and the Division II Class) from the markets is the exact kind of unreasonable restraint of trade within labor markets that the antitrust laws prohibit. Thus, Plaintiffs have a strong likelihood of success on the merits of their Sherman Act Section 1 claim.

### B. Plaintiffs Face Imminent Irreparable Harm

Courts have routinely concluded that college students "suffer irreparable harm when they are denied the opportunity to play sports." *Ohio*, 706 F. Supp. 3d at 597; *see also Pavia*, 760 F. Supp. 3d at 543–44; *S.A. v. Sioux Falls Sch. Dist.*, No. 23-CV-04139-CBK, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023). The NCAA has already implemented the Challenged Rule to bar both Classes from a fifth year of competition. The 2026-27 season is set to begin. Rosters are being finalized, academic scholarships and related decisions are being made, and student-athletes at Division I and Division II schools are heading to college campuses to start practices. Without timely injunctive relief, schools holding spots open in the hope that Plaintiffs or the Classes will be able to play will fill those spots with other players, eliminating any chance for Plaintiffs and Class

[23] Eli Lederman, *NCAA grants waiver to ex-JUCO players while appealing Pavia ruling*, ESPN (Dec. 23, 2024), https://www.espn.com/college-football/sto ry/_/id/43131557/ncaa-division-board-grants-waiver-former-juco-players-appealing-diego-pavia-injunction.

Members to return for a fifth season. Every day of delay compounds this harm and the risk of loss of a season and all that comes with it. *See, e.g.*, Moore Decl. (Ex. 3) at ¶¶ 5-6; Gomes Decl. (Ex. 4 at ¶¶ 6-9; Moon Decl. (Ex. 5) at ¶¶ 4-8; Hara Decl. (Ex. 6) at ¶¶ 4-5; Okorougo Decl. (Ex. 7) at ¶¶ 4-6; Harman Decl. (Ex. 8) at ¶¶ 3-6; Zielinski Decl. (Ex. 9) at ¶¶ 3-4.

Entities offering NIL deals have already begun to exhaust their marketing budgets for the coming year, meaning that every day without a stay of the Challenged Rules decreases the likelihood of monetary compensation and future NIL deals for Plaintiffs and Class Members, a cognizable and irreparable harm. NIL contracts further offer non-monetary benefits, allowing athletes to build a personal brand and reputation that can benefit them outside of potential professional athletics careers. Given the nearly immediate pendency of the implementation of the Challenged Rules, immediate judicia action is necessary to maintain the status quo that existed prior the NCAA's adoption and implementation of the Challenged Rules.

### C. The Balance of Equities Tilts Sharply in Plaintiffs' Favor

Absent injunctive relief, Plaintiffs will permanently lose their final season of collegiate athletic competition. This opportunity cannot be restored by a subsequent judgment on the merits once the season has passed. Money cannot fully make up for this loss of opportunity. Plaintiffs and Class Members will lose vital educational opportunities. An injunction that preserves Plaintiffs' eligibility during the pendency of this litigation imposes a minimal burden on the NCAA; it would simply mean that, for one season and for two defined classes of student-athletes, the same eligibility framework applies to them as to their teammates. Equality is not harmful to the NCAA. Whatever interest the NCAA has in its unfair immediate enforcement of its Challenged Rules is significantly outweighed by the irreversible harm Plaintiffs and the Classes face and by the public interest in preserving competition and access to the substantial, lifelong benefits of college while the merits are adjudicated. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149,

1157 (10th Cir. 2001) (the balance of harms favors the movant where the enjoined party "will suffer only monetary damages from the injunction," while movant "will suffer irreparable harm").

The NCAA has already permanently changed the rule for all athletes matriculating from high school in 2023 or later to receive five seasons of eligibility. It routinely allowed players to compete for a fifth season, or more, of eligibility through its previous more expansive waiver rules or redshirt status. Allowing Plaintiffs to compete on the same terms would present no administrative burden to the NCAA, an asymmetry of harm that strongly favors Plaintiffs. *See Ohio*, 706 F. Supp. 3d at 600 ("A prohibition on enforcing [an NCAA eligibility bylaw] causes no harm to the NCAA or any other entity or individual" as relief allows athletes to compete in games already scheduled.).

**D. The Public Interest Favors Plaintiffs' Requested Injunctive Relief**

The public interest strongly supports granting this injunction. Courts and the public have a substantial interest in ensuring that the NCAA, a powerful regulatory body that governs both the competitive and academic futures of over 500,000 college athletes across the United States, is forced to comply with federal law. Moreover, it serves the public to ensure that the commercialization of college sports, which has produced billions of dollars in revenue for the NCAA and its member institutions, does not occur at the expense of the individual college athletes who create that value.

The public is also served by affording opportunities and incentives for young people to stay in college, to complete their degrees and obtain graduate degrees, and to enhance their chances of obtaining professional careers as well as their preparation for future non-athletic endeavors. Granting injunctive relief would preserve open competition during the pendency of this litigation, and would serve the public interest in promoting free and fair competition in labor markets guaranteed by the antitrust laws. Such relief would also enhance access to collegiate education and

career-building opportunities for two discrete Classes that will otherwise be inequitably harmed by an arbitrary rule barring them from the benefits of five years of collegiate competition.

The scope of the relief requested by Plaintiffs is narrow – to preclude the NCAA from arbitrarily implementing a single facet of its bylaws and instead allow athletes who have competed in four seasons of college athletics and matriculated from high school in 2022 to play a fifth season in their fifth year, as their teammates will be allowed to do.

The public interest particularly favors implementing this restraining order in a manner that voids the impact of the "Rule of Restitution," NCAA Bylaw 12.9.4.2, a regulation stating that "'if a [college] athlete who is ineligible under the terms of the bylaws or other [NCAA] legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative … and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified," the NCAA may take actions that punish the institution. NCAA 2025–26 Bylaw 12.9.4.2, at p. 57. In other words, the Rule of Restitution allows the NCAA to retroactively punish an athlete, their coaches, teammates and opponents, and their institution if a court-ordered injunction is later overturned on appeal. That punishment is a severe one and should be avoided in any equitable scheme that seeks to grant relief to Plaintiffs and the Classes. Courts have recognized this dynamic and regularly enjoined enforcement of the Rule of Restitution alongside eligibility injunctions. *See Pavia*, 760 F. Supp. 3d at 538 (enjoining Rule of Restitution alongside eligibility relief); *Ohio*, 706 F. Supp. 3d at 583 (same).

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order:

(1) Enjoining the Defendant from enforcing Bylaw 12.6, or any other Bylaw, to preclude Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinksi,

and the Division I Transfer Class from participating in Division I athletics in the 2026– 2027 academic year on the basis that they have already competed in four seasons of competition as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season;

(2) Enjoining the Defendant from enforcing Bylaw 12.6, or any other Bylaw, to preclude Plaintiff Moore, Plaintiff Hara, Plaintiff Harman, and the Division II Class from participating in Division II athletics in the 2026– 2027 academic year on the basis that they have already competed in four seasons of competition as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season;
(3) Enjoining the Defendant from preventing Plaintiff Gomes, Plaintiff Moon, Plaintiff Okorougo, Plaintiff Zielinksi, and the Division I Transfer Class from playing for any NCAA Division I school because they did not enter the NCAA Transfer Portal;
(4) Enjoining the Defendant from preventing Plaintiff Moore, Plaintiff Hara, Plaintiff Harman, and the Division II Class from playing for any NCAA Division II school because they did not enter the NCAA Transfer Portal;
(5) Enjoining the Defendant from enforcing Bylaw 12.11.4.2 (the Rule of Restitution) against Plaintiffs and Class Members, any NCAA member institution for which Plaintiffs and Class Members choose to play in 2026–2027 academic year, or any institution that competes against Plaintiffs and Class Members in the 2026–2027 academic year.
(6) Enjoining the Defendant from enforcing roster limits or other rules that would prevent Plaintiffs and Class Members from playing in the 2026–2027 season, or enforcing against Plaintiffs and Class Members a cap on compensation limits otherwise laid out in the settlement stemming from the *House v. NCAA* and similar litigation; and
(7) Ordering any other relief that this Court deems just and equitable.

DATED: August 28, 2026

Respectfully submitted,

By: */s/ Ruben Honik*

HONIK LLC
Ruben Honik
David J. Stanoch
1515 Market St., Suite 1100
Philadelphia, PA 19102
Tel: 267-435-1300
Email: ruben@honiklaw.com
Email: david@honiklaw.com

MORITT HOCK & HAMROFF LLP
Daniel Lust*
Lauren Bernstein*
400 Garden City Plaza
Garden City, NY 11530
Tel: 516-873-2000
Email: dlust@moritthock.com

Email: lbernstein@moritthock.com

M. Ryan Casey (Colorado Bar No. 45939)
THE CASEY LAW FIRM, LLC
P.O. Box 1055
Silverthorne, CO 80498
Tel: 970-372-6509
Email: ryan@rcaseylaw.com

Max S. Roberts
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 646-837-7150
mroberts@bursor.com

* *Admission pending*

*Attorneys for Plaintiffs and*
*the Proposed Classes*

**CERTIFICATE OF SERVICE**

On this 28th day of August, 2026, I caused a true and correct copy of the foregoing to be filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ David J. Stanoch*
David J. Stanoch