# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03837-RMR-NRN

MYKAELA MOORE,
SYDNEY GOMES,
SULLIVAN MOON,
KENNEDY HARA,
DRAKE HARMAN,
JARREL OKOROUGO, and
ANDREW ZIELINSKI,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

---

**DECLARATION OF JOEL G. MAXCY, PH.D.**

---

I, Joel G. Maxcy, declare under penalty of perjury as follows:

# I. Introduction

## A. Qualifications

1. I am over the age of eighteen and competent to make this declaration. My curriculum vitae is attached to this declaration as Exhibit A. The materials I considered in connection with declaration are attached as Exhibit B.

2. I am an economist with expertise in the fields of sports business, industrial organization, and labor economics. I hold a Ph.D. in economics from Washington State University. I am currently Professor of Sport Business in the LeBow College of Business at Drexel University in Philadelphia, PA. I am, since 2015, the President of the International Association of Sports Economists (IASE). I have previously held full-time academic positions at Temple University, The University of Georgia, and Ithaca College, and I have held visiting faculty positions at CDES—Limoges University (France), Executive Masters in European Sports Governance (EU), and the Russian International Olympic University (Russia).

3. My research expertise includes labor relations in sports, antitrust economics, industrial organization, and sport finance. I am regarded by my research peers in economics as an expert in the economics of sports. I have conducted significant economic research specific to college sports and the National Collegiate Athletic Association ("NCAA"). I have researched topics including coaches pay, investment in on-campus stadiums, and the reorganization of the NCAA. I co-authored a 2023 book on intercollegiate athletics, *The NCAA and the Exploitation of College Profit Athletes*, publisher: University of South Carolina Press. The research completed for this book, which relies heavily on data and the economic analysis of that data, significantly informed my work on this declaration.

3. My work on college sports has attracted national attention. I was invited to deliver a keynote presentation "The Economics of College Sports" to the Federal Reserve Bank of Atlanta's prestigious Public Affairs Forum in October 2016. I also delivered a Research Seminar to Federal Reserve Bank of Atlanta Economists, titled "The Law and Economics of College Sports". I am a signer and co-author of a Brief of Amici Curiae, Sports Economists in Support of Respondents regarding National Collegiate Athletic Association (Petitioner) v. Shawne Alston et al. (Respondents), to the Supreme Court of the United States. I also co-wrote Brief of Amici Curiae in support of The Northwestern University Football players petition to the National Labor Relations Board. In addition, I frequently review articles submitted for publication in academic

journal and currently serve on the editorial board of the *International Journal of Sport Finance* and *Journal of Global Sport Management.*

4. I teach courses at the graduate and undergraduate levels in sports economics, labor relations, intercollegiate athletics, and related topics. At Drexel, Temple, and the University of Georgia, I taught upper-level undergraduate courses and graduate courses in Sports Economics, Sports Finance, and Labor Relations in Sports. These courses cover topics such as pricing in sports ticket markets, sports media, models of competitive balance, antitrust cases in sports leagues, price discrimination, and monopsony and labor unions. The NCAA and its relationship with its "student-athletes" is central to lectures and discussions in my classes. At Drexel, I developed and teach a class on NCAA Compliance. Evaluation of the NCAA manuals and its bylaws are central to the course content.

5. I have served as an economics expert and consultant on numerous legal cases, most often involving labor and antitrust issues in the sport industry and NCAA sports. I also submitted expert Declarations in *Pavia v. NCAA, Elad v. NCAA, Brzovic v. NCAA, Zeigler v. NCAA, and Coley v. NCAA*, and others pending. I testified in-person at hearings for *Wheeler & Allen v. NCAA*, *Elad v. NCAA*, *Brzovic v. NCAA*, *Moore v. NCAA*, *Agee v. NCAA, and Pavia et al. v. NCAA.* I submitted two oral depositions in *Fourqurean v. NCAA*.

## 2. Assignment

6. I am retained by Ruben Honik, Esq. and David J. Stanoch, Esq., Honik LLC, counsel for the Plaintiffs, to amplify and contextualize the economic allegations presented in the Class Action Complaint filed in United States District Court District of Colorado from an economic perspective.

7. Plaintiffs seek urgent injunctive and related relief on behalf of two very discrete group of collegiate student-athletes affected by the NCAA's eligibility restraints under its new age based Five-Year Rules, described below, and the related eligibility NCAA Bylaws for both Division I and Division II ("Challenged Rules"). Plaintiffs' Complaint identifies the proposed Classes as follows:

> **The Division I Transfer Class.** All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division II or Division III sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are in the NCAA's Transfer Portal, and are therefore barred from transferring to a Division I school at which to compete for a fifth season due to the NCAA's adoption and implementation of the Division I Challenged Rule.

> **The Division II Class**. All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division II sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are therefore barred from competing with a Division II school for a fifth season due to the NCAA's adoption and implementation of the Division II Challenged Rule.

The NCAA does not maintain a transfer portal date page for Division III. However, their Division II page shows that of the more the 5,000 athletes across all DII sports entered the portal in 2025, approximately 25% of them transferred (1250) to DI schools.[1] Players do transfer from DIII to DI. We would expect both the total entrants and the percentage of transfers to DI to be somewhat smaller in DIII than DII. In Division II women's sports, a total of 1563 athletes enter their sport's transfer portal in 2025. Basketball with 383 entrants led the way but several sports showed more than 100 entrants into the portal last year.[2]

8. Specifically, the Classes complain of immediate, irreparable harm because of the NCAA's unlawful enforcement of a new eligibility rule, the "Age-Based Eligibility Rules," which were implemented on June 24, 2026 in Division I, and August 5, 2026 in Division II. The revised rules replaced the NCAA's Bylaws which defined an eligibility policy of four allowed seasons of athletic competition in five-years. However, those athletes entering college in the fall of 2022 as represented by the Plaintiffs are not eligible to compete in the upcoming 2026-27 academic year. They remain subject to the prior Bylaws, which permit four years of competition within a five-year period, and are not granted the updated latest age-based condition, which would allow them another season of competition.

9. I have reviewed the Complaint. I have also reviewed documents from prior eligibility challenge cases, including complaints, NCAA filings, expert declarations, and other legal documents from recent cases challenging NCAA eligibility rules. Additionally, I have reviewed the relevant economic literature and publicly available documents and data. The materials I have relied upon in completing this assignment are listed in Exhibit B.

10. The purpose of this declaration is to explain and support the underlying economics of the allegations and legal claims raised by the Plaintiffs. The NCAA has argued in similar cases that a detailed economic analysis—such as a market definition with elasticity data—should be provided at the preliminary injunction stage. As a preliminary measure, this declaration aims to provide a high-level economic framework to support the likelihood of anticompetitive harm, while reserving the opportunity to make a fuller market analysis when discovery is available.

---

[1] NCAA Division II Transfer Portal Dashboard https://www.ncaa.org/what-we-do/research/student-athlete-transfer-research/#dII-portal (last visited August 26, 2026)

[2] Ibid.

11. I also respond to the NCAA's standard contention that claims arising under the Federal antitrust statute, *Sherman Antitrust Act*—must be premised upon a commercial restraint's anticompetitive effects on a defined relevant market and not the unique personal circumstances faced by one participant within that market, and that the procompetitive nature of the Challenged Rules outweighs any anticompetitive effects on the market.

12. I am compensated for my work at my consulting rate of $600 per hour. My compensation is not contingent on my opinion on this matter, the outcome of this injunction decision, or any other issue.

13. My work and research in antitrust economics and labor relations often overlays the intersection of the two disciplines of economics and the law. I write here on the to the economic substance of the arguments presented by the Plaintiffs and the Defendant from an economist's perspective. I offer no opinion on the law.

## 3. Case Background

12. Plaintiff Sydney Gomes ("Plaintiff Gomes" or "Ms. Gomes") graduated from high school in 2022. Following high school graduation, she enrolled at Florida Southern College, an NCAA Division II institution. She played basketball for four consecutive seasons at Florida Southern. She was a successful and highly awarded basketball player at Florida Southern who attained numerous statistical records there.

13. Plaintiff Gomes's success created interest in obtaining her services from NCAA Division I institutions (and Division II institutions). She entered the NCAA's Transfer Portal, which is the only way under NCAA rules that a student-athlete can transfer from a Division II or Division III school to a Division I school.

14. Multiple Division I schools conveyed to the Plaintiff Gomes they were interested in her transferring to basketball for them in the upcoming 2026-27 season. This would be her fifth year of collegiate eligibility were she to transfer to a Division I school. Were Plaintiff Gomes to transfer and compete for a Division I school, she would be eligible for additional scholarships, greater NIL earning potential, and an enhanced post-collegiate salary.

16. The NCAA has arbitrarily decided that student-athletes who graduated from high school in 2022, like Plaintiff Gomes, can no longer compete at a Division I school if they already competed in college competition for four years. Moreover, she cannot return to Florida Southern, or the institution at which she is now pursuing a graduate degree (University of Tampa, another Division II school) for a fifth year under NCAA's rules. None of the benefits of competing for an additional year, as described above, are possible for Plaintiff.

17. Plaintiff Mykaela Moore is a Windsor Colorado native and graduated from Windsor high school in 2022. After graduating she played two seasons of Division II basketball for Colorado Christian University (2022-23 and 2023-24) followed by two seasons at Colorado Mesa University (2024-25 and 2025-26).

18. Plaintiff Moore was a consistent player at the guard position at Colorado Mesa University She played in all 31 of the team's games in 2025-26 games and accumulated important statistics in points, assists, and rebounds.[3] She would be welcomed back to Colorado Mesa University for a fifth year of competition, but for the NCAA's arbitrary implementation of its Division II Rule.

17. The other Plaintiffs face similar foreclosures due to the Challenged Rules, as they also fall within the Division I Transfer Class or the Division II Class. The NCAA's conduct in both instances restrict labor output and curtail economic and related earnings or benefits. These economic restrictions are consistent with restraints of trade found by courts to be unreasonable under Section 1 of the Sherman Act.

18. Indeed, in August 2026, the US District Court, Colorado District, enjoined the NCAA from enforcing its Five-Year Eligibility Rule as to a class of existing Division I student-athletes who had already completed four years of play and wished to play a fifth year at a Division I school (*Wisne v. NCAA)*. This injunction was since stayed by the 10th Circuit appeals Court on August 21, 2026.

19. The *Wisne* class includes student-athletes who *already* competed at a Division I school and wish to compete a fifth year. It did not include the Classes here, those athletes from Division II or Division III schools who are now in the Transfer Portal and investigating a transfer to an NCAA Division I school for a fifth year of collegiate competition and those athletes wishing to continue their careers at a Division II school.

## II. NCAA GOVERNANCE AND THE CHALLENGED RULES

### A. NCAA Governance

20. The NCAA is a voluntary association composed of more than eleven-hundred-member institutions.[4] The members are independent economic actors. The organization's Bylaws are jointly adopted and enforced by those institutions and consequently constitute horizontal agreements among competitors in the market for potential athletes' labor.[5] These agreements regulate the terms of participation in NCAA sports—including eligibility, recruitment,

---

[4] Nat'l Collegiate Athletic Ass'n, *Membership Directory*, NCAA, https://www.ncaa.org/sports/2021/5/3/membership-directory.aspx (last visited Aug. 19, 2026).
[5] *NCAA v. Alston*, 594 U.S. 69, 83 (2021).

compensation, and transfer—thereby standardizing the conditions under which institutions compete for athletes.

21. The NCAA comprises three Divisions. Division I is home to universities that desire to participate at the most competitive level. For the sport of football Division I is further subdivided, based on level of competition. Division II & Division III are comprised of those institutions choosing respectively lower levels of investment and athletic competition. Since 1997 each of the three divisions are responsible for their own governance and act as independent legislative associations making their own rules and bylaws.[6] Approximately three-hundred-sixty (360) schools compete in NCAA Division I, two-hundred-ninety (290) in Division II, and four-hundred-twenty (420) in Division III.[7]

22. The governance structure underscores the collective nature of these restraints. By means of councils and rulemaking bodies, and at their Annual Convention, the NCAA member schools coordinate for the purpose of adopting uniform bylaws that bind all participants in each respective Division.[8] Of note, the new age-based rule was adopted by the Division I Cabinet in June 2026 and not a membership wide vote of Division I.[9]

23. Likewise, the NCAA Division II Executive Board, not the full membership, adopted emergency legislation to establish an age-based eligibility model as recommended by the Management Council in July 2026. The NCAA Division II age-based eligibility rules mirror the legislation adopted by Division I and establish a five-year period of eligibility.[10]

### B. Overview of NCAA Eligibility Issues

24. Because institutions compete for the same pool of athletes, the coordinated rules function as agreements that limit rivalry for the market supply of labor along key dimensions of competition, including the duration of, and availability of, athlete services. As a practical matter, an academic institution that wishes to participate in the highest and most popular level of intercollegiate athletics must maintain membership in the NCAA and must likewise abide by the rules and regulations endorsed by the NCAA and its members. Failure to abide by the organization's rules risks punitive measures from the NCAA.[11]

---

[6] See Joel G. Maxcy, Analyzing the Changes in the Institutional Framework of the NCAA: A Transaction Costs Approach, in *Economics of College Sports* 11 (Rodney Fort & John Fizel eds., Praeger Publishers 2004).

[7] Nat'l Collegiate Athletic Ass'n, *Our Division 1 Members*, NCAA, https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx (last visited Aug. 19, 2026).

[8] Nat'l Collegiate Athletic Ass'n, *How the NCAA Works*, NCAA, https://www.ncaa.org/sports/2015/10/28/how-the-ncaa-works.aspx (last visited Aug. 19, 2026).

[9] Nat'l Collegiate Athletic Ass'n, *Division I adopts age-based eligibility model*, NCAA, https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/ (last visited Aug. 19, 2026).

[10] Evans, Ahsa. August 5, 2026. Division II adopts age-based eligibility model. *NCAA News*. (last visited Aug. 24, 2026)

[11] See Nat'l Collegiate Athletic Ass'n, *Enforcement Process: Penalties*, NCAA (Nov. 27, 2013), https://www.ncaa.org/sports/2013/11/27/enforcement-process-penalties.aspx. (last visited Aug. 24, 2026)

25. Eligibility rules are among the most consequential of the NCAA's mandated constraints. The NCAA Division I and Division II Bylaws that previously limited athletes to four seasons of competition within a five-year window ("Five-Year Rule") began upon full-time enrollment at any defined collegiate institution.[12] Critically, in addition to participation in any NCAA Division, the NCAA counts participation at non-NCAA institutions—such as junior college ("JUCO") and National Association of Intercollegiate Athletics ("NAIA") institutions—toward this limit. As a result, athletes who begin college outside Division I enter the NCAA market with fewer remaining NCAA seasons than those who enroll directly at Division I institutions. These rules operate to shorten effective careers for athletes at the most commercially valuable level of college athletics.

26. From an antitrust economic perspective, the eligibility bylaws do not simply structure the manner of competition; they determine exactly who may compete and for how many years. By imposing uniform limits that disproportionately burden athletes with prior non-NCAA Division I participation, the NCAA excludes a defined class of labor from full participation in the Division I labor market.

27. There are no close substitutes for NCAA Division I sports or NCAA Division II sports, respectively. To illustrate this, I focus on NCAA Division I Men's basketball and NCAA II Women's Basketball, the latter being the specific sport that Plaintiffs Gomes and Moore have played in the past (and which Plaintiff Moore, and possible Plaintiff Gomes, would compete in but for the NCAA's Challenged Rules). However, as described more below, both of these sports are submarkets within the labor markets for NCAA Division I sports and NCAA Division II sports. This is because the economic evidence and commercial realities show that the NCAA controls the labor market that all (or virtually all) college athletes can participate in, i.e., NCAA college sports.

28. There are no close substitutes for NCAA Division I Men's basketball and this fact amplifies the effect. Alternative systems— including the two lower NCAA divisions, plus junior colleges and the NAIA, do not provide comparable exposure, NIL opportunities, or professional pathways. Consequently, access to Division I is economically unique, and NCAA eligibility rules function as gatekeeping conditions on entry to this specific labor market. Nor do legitimate opportunities exist in major league professional basketball, e.g., the NBA or in minor league basketball (e.g., NBA G-League or international leagues) markets.

29. Likewise, Division II Women's basketball is a unique system and labor market. The level of competition is greater than in Division III and the non-NCAA colleges. NIL opportunities and exposure are less than in Division I, but NIL is allowed in Division II and regulated as of 2022 in the Division II Bylaws (14.02.13).[13] More importantly the limits imposed by the Challenged Rules deny athletes the educational benefits offered by their institutions, including the opportunity to complete a degree, earn another undergraduate degree, or enroll in a graduate program. As a result, access to Division II is economically unique, and NCAA eligibility rules function as gatekeeping

[12] See Nat'l Collegiate Athletic Ass'n, *2025–26 NCAA Div. I Manual* 34 (2025).
[13] *NCAA Division II Manual*, 2026-27, at 110.

conditions on entry to this specific labor market. Other opportunities (e.g., NCAA Division III, JUCO and the NAIA, are not substitutes. Likewise, neither are professional leagues such as the WNBA and international women's leagues.

30. NCAA eligibility rules are best understood as coordinated economic restraints that restrict the labor supply, constrain athlete mobility, and shape competitive conditions among schools. They set the stage for the economic antitrust analysis that follows by converting what might appear to be administrative limits into market-wide restrictions on labor market participation.

**C. The Challenged Rules**

31. Plaintiffs on behalf of the Division I Transfer Class challenge the amended NCAA Division I Bylaws 12.6, the Five-Year Rule, now amended to the Age-Based Eligibility Rule. The original rule, as delineated in the current Division I Manual, establishes that student-athletes "shall not engage in more than four seasons of intercollegiate competition in any one sport." The five-year window has exceptions, including time spent "in the armed services" or "on official religious missions."[14]

32. Plaintiffs on behalf of the Division II Class challenge the same and amendment Bylaws in Division II, Bylaw 14.4.3. As noted above, the NCAA Division II age-based eligibility rules mirror the legislation adopted by Division I and establish the same a five-year period of eligibility.

33. As of June 23, 2026, in Division I and August 5, 2026, in Division II, the NCAA updated the "Age-Based Eligibility Rule" for each division, collectively called the Challenged Rules in this lawsuit.[15] The amended rule states that Division I and II athletes will be given "up to five years of eligibility if they enroll in college no later than the academic year after their high school graduation or their 19th birthday." NCAA athletes can now compete for one additional (fifth) year in each sport provided they do not exceed the age limit of 19+5 = 24 years of age.

34. However, the new rule does not apply to those athletes who began playing in 2022 and were deemed by the NCAA to have already completed their four years of competition under the existing Five-Year Rule. The entire class of athletes entering college in 2022 are not given a fifth year of eligibility. Of note, virtually all athletes in the five high school classes before 2022 received an extra season of eligibility due to COVID, while all athletes in high school classes after 2022 receive an extra season of eligibility under the Challenged Rules.

35. The District Court's order in *Wisne v. NCAA* granted those Plaintiffs a preliminary injunction motion so that the specified class of NCAA athletes entering in 2022-23, are eligible, pending appeal, for the 2026-27 season. However, this injunction applies only to those athletes

[14] *NCAA Division I Manual*, 2025-26, at 54.
[15] https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/

currently enrolled or permitted to transfer from a Division I institution. Plaintiff, as a Division III player last season does not qualify for this class. Moreover, the injunction is stayed by the 10th circuit as of August 21, 2026.

36. From an economic perspective, there is no pro-competitive justification for a rule that takes away one year of Division I basketball competition (and corresponding NIL compensation opportunities) from students who chose to attend a lower division school before transferring to a Division I school, as compared with athletes who enroll directly in a Division I member of the NCAA monopoly.

37. The monopsony power of the organization is revealed, because the NCAA can arbitrarily decide who is able to participate in their respective labor markets. This declaration will provide evidence that each NCAA sport represents a unique labor market. Whether evaluating revenue, attendance, and exposure Division I is distinct from other college divisions, minor league professional sports, and major league professional sports. Similarly, Division II is distinct from other NCAA divisions and professional sport options. The declaration will establish that Division I and II college sports is unique relative to each other college sports division. The declaration will also present evidence that Division I and II college sports is unique relative to professional minor and major sports.

38. The Challenged Rules operate nationwide on an entire enrollment cohort drawn from populations of the thousands of Division II athletes alone and the hundreds of Division II and Division III athletes in the transfer portal.[16] The identities of the athletes are known to the NCAA, and each athlete in the transfer portal faces the same restrictions and procedures for participating in the portal. The underlying factors pertinent to transfer through the portal, such as closing windows, rostering, scholarships, NIL budgets, are the similar for all portal participants; indeed, many of these decisions or commitments have been made and are being now, or will be very soon, for the 2026-2027 season. The NCAA maintains all portal-related information as a centralized, division-spanning dataset, and maintains records of athletes' participation and eligibility at every NCAA-member institution.

39. Each of the Classes alleged in this case is united by a discrete act of NCAA rulemaking, which equates to a single policy, procedure, or practice that applies to the Classes on the whole.

## III. REFUTATION OF THE NCAA'S STANDARD ARGUMENTS

### A. Overview

[16] See ¶ 7 above.

40. The Challenged Rules constitute an economic restraint that is consistent with restraints that courts have found to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, which provides: "Every contract, combination . . ., or conspiracy in restraint of trade or commerce among the several states . . . is hereby declared to be illegal." 15 U.S.C. § 1. I support the following conclusions:

a. The Challenged Rules function as a horizontal agreement among competitors—NCAA member institutions—to restrict output in the labor market for student-athlete services.

b. In the current post-*Alston*, NIL-compensation, post-*House* revenue sharing era, the eligibility rules are commercial and have significant impact by systematically removing the most experienced and valuable participants from the relevant labor markets, those are the labor market for NCAA Division I Men's basketball[17], and NCAA Division II women's basketball. The commercial nature of the NCAA's eligibility rules was confirmed on November 25, 2025, by the *Elad v. NCAA* Appeals Court.[18] Such legal rulings are consistent with the economics of the current, real-world market realities.

c. The Challenged Rules create a substantial anticompetitive effect, including reduced output, suppressed compensation, and diminished consumer welfare.

d. There are minimal legitimate procompetitive justifications for the eligibility rules.

e. The NCAA argument that extending years of eligibility takes opportunities away from incoming players (freshmen) is specious. NCAA Bylaws have historically developed to deny freshman opportunities. The current sport roster limits imposed with the *House* settlement reflect exactly this practice.

f. Less restrictive alternatives are readily available that would achieve any legitimate objectives without the anticompetitive effects.

## B. The NCAA Monopsony and the House Settlement

41. On June 6, 2025, Judge Claudia Wilken of the U.S. District Court for the Northern District of California approved the settlement in *House v. NCAA*. The House Settlement reiterates the need for monopsonists to restrict the quantity of labor as entirely consistent with the need to control the relevant labor market. Unlike *Alston*, which does not address NIL, the House settlement approved

---

[17] *NCAA v. Alston,* 594 U.S. 69 (2021), and *House v. NCAA*. The House settlement was introduced in the April 2025 decision and finalized in June 2025. See McCann, M. The NCAA House Settlement Is Suddenly Unsettling at https://www.sportico.com/law/analysis/2026/ncaa-house-settlement-multimedia-rights-nil-dispute-1234892391/ (last visited August 28, 2026)

[18] On November 25, 2025, the Third Circuit Court of Appeals issued an opinion overturning the lower court's grant of the preliminary injunction, finding that the District Court Judge correctly found that the JUCO rule was commercial and subject to antitrust law.

"revenue sharing", which establishes direct payments from their schools to athletes. NCAA Division I FBS athletic departments directly distribute, through each university's athletic department up to $20.5 million to athletes beginning with the 2025-26 season.[19]

42. The House settlement requires compulsory roster limits for all NCAA sports. The roster limits replace sport-by-sport scholarship limits with a cap on the maximum roster size per team. Scholarship limits allowed for non-scholarship players ("walk-ons") to participate on team rosters. Walk-ons, while not receiving a grant-in-aid scholarship, could earn NIL payments. Unsurprisingly, as part of NIL is now to come directly from the NCAA universities, walk-ons, earning NIL moved from unpaid to compensated labor, were quickly eliminated by the cap rule from rosters. As schools pre-emptively prepared to comply with the new roster limits, they removed roster spots for thousands of non-scholarship athletes, particularly in football, and for partial scholarship athletes in other sports.[20] The economic argument that returning players take opportunities from freshman when in fact opportunities are directly denied by the agreed to roster limits is not consistent with economic principles and analysis.

43. When it became apparent that House would permit the direct compensation of NIL by universities, the NCAA FBS members moved to limit that compensation (to $20.5M in the first year, 2025-26). Before the House Settlement, eligibility rules determined who could play and limited those entitled to athletic scholarships and other educational based compensation. As applied to Division I basketball, this is the exact same relevant market as defined in Alston.[21]

44. There are relevant markets, one per sport/gender, in which athletes provide athletic services in exchange for a mix of money, goods, and services provided by the NCAA's Division I and II universities.

45. Roster limits clearly reduce the number of opportunities for entering athletes. Nonetheless, the NCAA hypocritically argues the relaxation of eligibility rules, allowing the retention of relatively few "upperclassmen players", removes opportunities for incoming players.

46. Restrictions on the labor supply, including roster limits and eligibility rules, are standard monopsony tactics. The concurrent limit of compensation and number of jobs is textbook monopsony theory, whereby the monopsonist restricts the number of jobs for the purpose of

[19] Russo, R., Mandell, S., & Williams, J. (2025). "Historic House v. NCAA settlement gets final approval, allowing schools to pay college athletes". *The Athletic* June 6. Retrieved from https://www.nytimes.com/athletic/6367741/2025/06/06/house-ncaa
[20] Ibid. Russo, Mandell, & Williams.
[21] See Libit, D. (2025) "Rise of the Roster Resistance: House v. NCAA's Unwelcome Underdogs"" *Sportico*, May 2. For a thorough discussion of the effects of House on non-scholarship athletes. Retrieved August 19, 2026 https://www.sportico.com/leagues/college-sports/2025/roster-limit-objectors-house-v-ncaa-settlement-1234850724/

suppressing worker wages.[22] Restricting the number of employees and at once limiting compensation are two sides of the same coin, and precisely analogous to a monopolist's limiting production output to increase a product's price. Moreover, because it is agreed compensation restrictions represent commercial activity, likewise the coupled eligibility restrictions do as well.

47. In fact, on cross-examination in *Elad v NCAA*, the NCAA's economics expert, Dr. Flyer, testified that "he did not object to defining the relevant market in this case as 'the labor market for college football athletes in general and NCAA Division I football players in particular." Dr. Flyer conceded that the Supreme Court's decision in *Alston*, and the NIL deals that have emerged after it, have introduced a commercial aspect to collegiate athletics. He agreed that Alston had changed the landscape and that NCAA rules on compensation and eligibility are commercial.[23]

### C. The Relevant Market

48. Contemporary analysis recognizes that direct evidence of anticompetitive effects—such as reduced output, exclusion of participants, or suppressed compensation—can establish liability without exhaustive market-definition exercises. Where a restraint demonstrably limits participation or wages, courts need not rely only on indirect measures of market power. Nonetheless, the NCAA has argued in prior eligibility cases that a detailed economic analysis—such as a market definition including price elasticity data—should be provided. I reserve the right to opine on the NCAA's direct exercise of market power, but at the present time I have been asked to comment on an indirect market analysis pertinent to Plaintiffs' allegations.

49. As a matter of economic practice and institutional access, a full competitive effects analysis cannot be responsibly conducted without data that is primarily in the NCAA's control. This includes internal information on JUCO, NAIA, and NCAA Lower Division (II &III) -to-NCAA Division I transfers, waiver grants and denials, and all athlete compensation. As a preliminary measure, this declaration aims to provide a high-level economic framework and direct evidence including illustration of the direct effects of NCAA monopsony to support the likelihood of anticompetitive harm, as well as analysis of the limited accessible data and information, some of which has been offered by myself and other economists in declarations submitted in relevant cases. I reserve the opportunity for a fuller market analysis including the indirect effects demanded by the NCAA as such evidence, through discovery, becomes available.

50. Based on commercial realities and the application of economic principles and analysis to available data, I define the relevant markets as the national labor market for NCAA Division I

[22] See for example, Ehrenberg et al. *Modern Labor Economics: Theory and Public Policy.* 14th ed. New York: Routledge, 2021.

[23] United States District Court of New Jersey, Civil Action No. 25-1981 "Elad Opinion" pp. 5.

athletes' services and the national labor market for NCAA Division II athletes' services. Each market as defined excludes other NCAA divisions, junior colleges, the NAIA, and all professional leagues. All these playing possibilities offer meaningfully different compensation, exposure, and advancement opportunities. Within each market are submarkets for each collegiate sport, including Division I Men's Basketball and Division II Women's Basketball.

51. There are no practical alternatives that can provide the unique combination of attributes offered by Division I and to a lesser degree Division II NCAA athletic schools including:

(i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board;
(ii) high-quality academic educational services;
(iii) top-of-the-line training facilities;
(iv) high-quality coaches that will best be able to launch players to professional careers;
(v) national publicity through national championships and nationwide broadcasting contracts;
(vi) opportunities to profit from NIL agreements; and
(vii) competition at the highest level of collegiate athletics.

52. The exclusivity of these labor markets is further supported by roster limits, scholarship constraints, and the high concentration of NIL activity in Division I programs.

53. The NCAA exercises substantial market power in the specifically defined relevant market for elite college basketball players. Through its member institutions' collective agreements on eligibility rules, the NCAA controls and limits exactly who may participate in Division I and Division II basketball, and under what conditions. Nobel Laureate Gary Becker in 1987 characterized the NCAA as a "cartel in sheepskin clothing."[24] Formal economic research since the early 1990s has consistently determined that the NCAA holds significant monopsony power over its labor markets. The largest revenue producing sports, football and men's basketball, are repeatedly expressed when specific sports are discussed in this considerable body of economic research.[25]

## C. Statistical Economic Evidence

### i. Comparison of revenue and expenses across levels of college sports

[24] Becker, G. S. (1987), The NCAA: A Cartel in Sheepskin Clothing, Business Week. (September 14): 24.
[25] See Blair, R. D., & Romano, R. E. (1990), Collusive Monopsony in Theory and Practice: The NCAA. *Antitrust Bulletin*, 42, 681–719; see also Fleisher, A. A., III, Goff, B. L., & Tollison, R. D. (1992), *The National Collegiate Athletic Association: A Study in Cartel Behavior*. The University of Chicago Press.

54. The United States Department of Education provides self-reported revenue and expense data for the vast majority of all college sports teams. The data are reported at the Equity in Athletics Data Analysis ("EADA") website.[26] I use these data to compare revenue across all three NCAA divisions, both NAIA divisions, and the several JUCO associations (NJCAA, CCCAA, USCAA) as derived from EADA reported data.[27]

**Table 1**

| Classification | Number of Schools | Average Revenue | Average Expenses |
|---|---|---|---|
| **NCAA Division I-FBS** | **128** | **$117,862,762** | **$114,556,709** |
| **NCAA Division I-FCS** | **131** | **$28,091,369** | **$27,809,189** |
| **NCAA Division I without football** | **99** | **$25,056,231** | **$24,731,543** |
| NCAA Division II with football | 156 | $9,470,204 | $9,237,611 |
| NCAA Division II without football | 138 | $7,512,315 | $7,387,266 |
| NAIA Division II | 59 | $7,084,335 | $6,992,775 |
| NAIA Division I | 166 | $6,603,285 | $6,453,313 |
| NCAA Division III with football | 235 | $5,333,130 | $5,144,544 |
| Independent | 9 | $4,912,685 | $4,911,879 |
| NCAA Division III without football | 169 | $3,141,761 | $3,047,371 |
| NJCAA Division I | 206 | $2,246,319 | $2,202,660 |
| Other | 62 | $2,218,058 | $2,172,582 |
| CCCAA | 113 | $2,073,241 | $2,013,262 |
| NJCAA Division II | 157 | $1,249,251 | $1,220,890 |
| NCCAA Division I | 9 | $1,157,920 | $1,142,339 |
| NWAC | 32 | $1,153,855 | $1,094,338 |
| NJCAA Division III | 92 | $672,552 | $654,458 |
| NCCAA Division II | 29 | $667,055 | $652,331 |
| USCAA | 47 | $568,765 | $561,216 |

55. The EADA separates NCAA Division I into three classifications on its website. Division I. The Football Bowl Subdivision (FBS) includes the largest conferences (the Power 4). The Power 4 includes the Big Ten, the Southeastern Conference, the Atlantic Coast Conference, and the Big 12 Conference. These schools in these conferences average more than $100 million per year in college sports revenue.[28]

[26] https://ope.ed.gov/athletics/

[27] I understand that these data were also presented in the declaration of David Berri, Ph.D. in *Wisne v. NCAA*, Exhibit 1. My opinions and work herein are my own, and I separately reviewed and analyzed the EADA data reported.

[28] FBS includes several other conferences (sometimes collectively referred to as the Group of 6) that are somewhat less remunerative than the Power 4, but the EADA does not separate the FBS data on this basis.

56. NCAA Division I also includes the Football Championship Subdivision ("FCS") and Division I football schools who compete in Division I men's basketball (the highest rank of men's college basketball) but do not compete in Division I football. These schools tend to be smaller than the NCAA Division 1-FBS. Nevertheless, the average college sports revenue for these schools exceeds $25 million.

57. The EADA data show that Division II generates less revenue than any level of Division I. However Division II schools generates significant revenue on average. And much more than and Division III schools. The range is from approximately $10.5 million for Division II schools with football to only about $3 million for Division III schools without football.

58. Moreover, JUCOs generate much less revenue annually than NCAA Division II. NJCAA Division I schools average lead the juco group with just over $2 million, and it drops from there to roughly $5-$6 for the lower-level JUCO classifications.

59. The revenue data for Division I sports and Division II sports support this. The revenue data in Table 2 show that Division I schools on average generate more than seven times that of Division II. Moreover, average revenues of Division II double those of Division III. Division I sports based on their revenue generation resources form a unique labor market. Likewise, this is true for Division II. there are no reasonably interchangeable substitutes.

**Table 2[29]**

| NCAA Division | Total Revenue | Average Revenue |
|---|---|---|
| DIVISION I FBS | $ 15,086,433,507 | $ 117,862,762 |
| DIVISION I FCS | $ 3,679,969,389 | $ 28,091,369 |
| DIVISION I Total | $ 21,246,969,740 | $ 59,349,077 |
| Division II | $ 2,537,320,064 | $ 8,590,517 |
| DIVISION III | $ 1,784,109,179 | $ 4,416,112 |

### ii. Attendance in Division I Men's Basketball & Division II Women's Basketball

60. The NCAA receives most of its annual revenue from two primary sources. For basketball, those are the media and marketing rights tied to the Division I Men's Basketball Championship, and championship ticket sales. Division I Men's basketball is quite important to the NCAA. Every school in Division I is eligible to participate in the Division I Men's Basketball Championship.

[29] Calculations for the figures shown in Table 2 are derived from EADA data from the latest reporting year, 2024.

Teams that are in Division II and Division III are not eligible and compete in their own divisional tournaments (NCAA, 2026)[30].

61. The top conferences in Division I basketball are the Power 4 football conferences (ACC, Big 10, Big 12, SEC) and the Big East. These conferences are more likely to be on national television and every national championship team since 1990 currently plays in one of these conferences.[31] Their average attendance is significantly higher than the average at the remaining Division I schools.[32] All but one Division conferences averaged at least 1,000 fans per game in 2024-25. In Division II, only one, the Mid-America Intercollegiate Conference, averaged more than 1,000 fans per game in 2024-25 at 1,041. No conference in Division III that averaged 1,000 fans per game in 2024-25.[33]

62. Information on attendance in NCAA Division II basketball is less prevalent. The NCAA does not report this information on their website. CollegeExpress.com reports that the Division II schools with the highest average women's basketball attendance draw 1,000 – 2,000 fans per game.[34] Comparably, only two schools in all of Division III averaged more than[35]1,000 fans per game.

63. The analysis of EADA data reveal that in 2024 Division II Women's basketball programs averaged $590,000 in reported revenue. The range was from $58,304 to $1,497,610. Meanwhile, Women's basketball programs in NCAA Division III reported average revenue of $190,631, with a range of $22,498 to $765,577. Clearly the Division II labor market generates significantly more value for its institutions.

64. Likewise, in our book (Nagle, et al., 2023) on the NCAA and college sports, it's revealed that major college football and men's basketball, and women's basketball are highly successful consumer products, and comparable in terms of paid attendance, corporate sponsorship and television viewership to American major league professional sports. College football and men's

[30] NCAA (2026) Revenue Sources: Where the Money Comes From. https://www.ncaa.org/what-we-do/finances/where-does-the-money-go/ (last visited August 26, 2026)
[31] *See* Table 1, *supra*.
[32] Men's Basketball Attendance Records Through 2024-2025, http://fs.ncaa.org.s3.amazon. (last visited August 26, 2026)
[33] Ibid. at ¶30-31
[34] Attendance at Women's Basketball Games: The Top 10 in Division II. CollegeExpress.com. https://www.collegexpress.com/lists/list/attendance-at-womens-basketball-games-the-top-10-in-division-ii/507/ (last visited August 25,2026).
[35] Attendance at Women's Basketball Games: The Top 10 in Division III. CollegeExpress.com https://www.collegexpress.com/lists/list/attendance-at-womens-basketball-games-the-top-10-in-division-iii/508/ (last visited August 25,2026).

basketball collectively draw millions of fans to see games in person each year, and millions more view games on television.[36]

### iii. Professional Sports Leagues as Labor Market Substitutes

65. Maxcy (2025) maintained that NIL payments are significant and reasonably reflect the value of Division 1 college players.[37] However, on average NIL pay is significantly less than that earned by National Football League "(NFL") first-year players (rookies). I disclosed the pay scale for the 2025 NFL Rookie Draft. The NFL Draft comprises seven rounds and a total of 257 players are chosen.[38] The top draft picks, those most likely to earn a roster spot on the NFL team earn several million dollars per year. Moreover, even the lowest picks, many of whom will not earn roster spots, earn at least $1Million per year. There were as of 2025 very few high-profile NCAA players compensated in that realm. One cannot look at these relative pay scales and consider these to be competing labor markets. Moreover, given that only the highest-level of NCAA players can compete for NFL rosters spots indicates NCAA football and the NFL are very separate markets.

66. In his Declaration in *Paterson et al v. NCAA* (2025), economist Daniel Rascher provides statistical evidence to show that the NFL is not a competitive buyer in the market for FBS athletic services. Furthermore, he shows that NCAA FCS and lower college divisions are not competitive buyers in the market for FBS football services.[39] I have reviewed the underlying data cited by Dr. Rascher and agree with his conclusions. As the NCAA's current president, Charlie Baker, has stated on multiple occasions, "98% of the 550,000 NCA student-athletes will go pro in something other than sports."[40] That data bear this out.

67. Cross-price elasticity can be used to establish whether two labor markets are substitutes. David Berri estimated cross price elasticity between college basketball and the National Basketball Association ("NBA").[41] The percentage of first year through third year college players (freshman, sophomores and juniors) declined between 2016-2020 and 2021-2025, as more players entered the NBA draft before completing NCAA eligibility. The percentage decline was from 76% to 73% of NCAA DI players or minus 3%.[42]

68. The complete data set of NIL payments is not available. But there are many players who receiving NIL payments in the range of $500, 000 to one million dollars. The scholarship payment

---

[36] Nagle, M., & Southall, R Staurowsky, E. J., Karcher, R., Maxcy, J. (2023) The NCAA and the Exploitation of College Profit Athletes. Columbia, SC: University of South Carolina Press. Chapter 7.
[37] Maxcy, *Fourqurean v. NCAA,* Declaration II, at ¶32 and Table 3.
[38] The initial contract terms for each draft choice is mandated though the Collective Bargaining Agreement ("CBA") between the NFL and the players' union ("NFLPA").
[39] Rascher Declaration at ¶31-38
[40] https://www.ncaa.org/Division-I-adopts-age-based-eligibility-model/
[41] Ibid. Berri declaration at ¶48-49.
[42] Ibid. Berri declaration at ¶50.

or grant-in-aid of attending college the "compensation" before NIL payments were possible was less than $100,000 per athlete. So, the percentage increase in compensation is at least 5-times, thus exceeds 500%. Given the revealed 3% decline in the labor market participation, the cross-price elasticity [%change in in quantity of labor divided by % change in labor price] 3%/500% = 0.006 or less than 1% is extremely low-essentially zero. There simply is no evidence that these two labor markets are substitutes."

69. Daniel Rascher provides indirect evidence, utilizing a SSNIP test on the effect of the NCAA eliminating the players' benefit of "laundry money' in the 1970s, which was a 7% cut in benefits and within the SSNIP range of an anticompetitive outcome.[43]

**D. Anticompetitive Effects**

70. NCAA eligibility rules generate substantial anticompetitive effects in the market for athlete labor. These effects manifest along three dimensions: output restriction, compensation suppression, and allocative distortion.

71. First, the rules restrict output. By limiting the number of seasons an athlete may compete and by counting participation at non-NCAA institutions toward that limit, the NCAA reduces the total quantity of labor available in Division I and Division II athletics. This reduction is not offset by alternative opportunities of comparable value; JUCO, NAIA, and lower-division programs do not provide equivalent exposure, NIL opportunities, or professional pathways. The exclusion of athletes from the top NCAA divisions therefore represents a net decrease in market output.

72. Second, the rules suppress compensation. As explained above, reducing labor supply in a monopsonistic market weakens competition among buyers and depresses compensation. Eligibility rules remove experienced, higher-productivity athletes—those most capable of commanding higher NIL and revenue-sharing compensation—from the market. The resulting turnover diminishes athletes' bargaining power and leads to compensation below competitive labor market levels. Furthermore, the CSC review oversight has no other purpose than to suppress the compensation paid via third party NIL payments.

73. The NCAA argues that its eligibility rules are a zero-sum or economically neutral game. So that, when one player's eligibility ends, a roster spot opens for a new player. Stated otherwise, one player's completion of his eligibility creates a roster opening for another player. The newly ineligible player's loss is offset as the entering player's gain. Thus, the net welfare benefit is exactly zero. Therefore, no overall welfare loss is imposed on the players' market given the NCAA's eligibility rule.

---

[43] Ibid. Rascher Declaration, at ¶17-18

74. The above argument proceeds from the assumption that anticompetitive harm arises only from a loss of output of the product and the associated higher pricing of that product to consumers. That assumption is wrong. There is quantifiable harm placed on the entire group of ineligible-by-rule athletes. As the Court recognized in *Alston*, the NCAA causes anticompetitive harms to the labor market for student-athletes by "depressing wages below competitive levels and restricting the quantity of student-athlete labor" through the exercise of monopsony power.

75. The restraints are problematic because they target precisely those most experienced athletes who command the highest market value. In effect, the NCAA and its member institutions have implemented a system that automatically removes their most expensive players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market.

76. Third, the rules distort allocation. Athletes adjust educational and athletic decisions in response to eligibility constraints. By penalizing participation at non-NCAA institutions, the rules discourage efficient developmental pathways. Athletes who would benefit from JUCO or other programs may instead enroll prematurely at NCAA institutions to preserve eligibility, more accurately reflecting a regulatory distortion than an efficient sorting of talent.

77. These distortions extend beyond individual choices to the structure of the market. Non-NCAA institutions function as developmental complements, yet NCAA rules treat their participation as equivalent to Division I competition for eligibility purposes. This misalignment impairs talent development and reduces overall welfare.

78. NCAA eligibility rules are not incidental constraints. They systematically reduce output, suppress compensation, and distort labor allocation—hallmarks of an unreasonable restraint of trade under Section 1 of the Sherman Act.

### E. The Eligibility Rules are Commercial

79. It is recognized that whether, or not, an antitrust violation exists depends on market certainties. The positions, based on prior arguments in antitrust cases, as expressed by the NCAA do not in my opinion, reflect current market realities. For instance, the NCAA's frequent contention that its eligibility rules are not "commercial" in nature, and therefore are not subject to the Sherman Act, do not reflect the current market realities whereby pursuant to the provisions of express contracts between the NCAA's member institutions and athletes, athletes now earn compensation from NIL compensation, which is typically administered through NIL collectives tied to their university's athletic departments.

80. With athletes now free to transfer from school to school, rules that arbitrarily limit a student-athlete to a set number of years of competition, even if the student was still enrolled in college and making progress towards obtaining a degree, and regardless of whether injuries and other extenuating circumstances prevented completion of a full season of competition, are without question commercial in nature.

81. Since United States Supreme Court's opinion in *Board of Regents v. Oklahoma*, it has been well accepted among economic experts that many NCAA's Bylaws directly restrain competition and thus affect interstate commerce. Therefore, the eligibility rules are subject to the Sherman Act. The United States Supreme Court in *Alston* repeated, "the NCAA and its member institutions are in fact organized to maximize revenues."[44] The commercial nature of eligibility rules was confirmed. My understanding is that the commercial nature of the eligibility rules have been confirmed by courts, which in my opinion is consistent with the economic evidence.

### F. Procompetitive Justifications and Alternatives

82. Under the rule-of-reason framework, once a plaintiff establishes that a restraint produces substantial anticompetitive effects, the burden shifts to the defendant to articulate procompetitive justifications and to demonstrate that the restraint is reasonably necessary to achieve them. The NCAA typically advances three justifications for its eligibility rules: (1) preserving amateurism, (2) promoting competitive balance, and (3) maintaining the educational character of intercollegiate athletics. None of these justifications is sufficient, from an economic perspective, as applied here.

83. First, the preservation of amateurism does not require categorical exclusion of athletes based on prior participation at lower-division NCAA institutions. As the Supreme Court made clear in *Alston*, the NCAA's conception of amateurism is not a free-standing defense to antitrust liability. Even if some limits on compensation or participation could be justified to maintain a distinct product, eligibility rules that penalize alternative developmental pathways do not meaningfully advance that objective. They do not preserve amateurism; they restrict access to a commercial marketplace.

84. Second, the NCAA's claim that eligibility rules promote competitive balance is not persuasive. Excluding experienced athletes does not equalize competition and may instead advantage programs with superior recruiting pipelines by forcing turnover among established players. More importantly, competitive balance—assuming it is a legitimate objective—can be pursued through less restrictive mechanisms, including revenue-sharing rules, and conference-level regulation, none of which require excluding athletes from participation.

---

[44] *NCAA v. Alston, 594 U.S. 69, 105 (2021).*

85. Third, the asserted goal of integrating athletics and education is weakly connected to the challenged restraint. Eligibility limit rules are tied to the passage of time and not to academic progress. Athletes may remain enrolled, in good standing, and advancing toward a degree, yet be barred from participation solely because their eligibility time has expired. A temporal, age-based restriction is poorly tailored to educational objectives.

86. Even if the NCAA's justifications were credible under economic principles, the existence of less restrictive alternatives is dispositive. Antitrust law requires that restraints be reasonably necessary—not merely convenient—to achieve their procompetitive aims. Here, multiple alternatives would preserve any legitimate interests while avoiding the substantial anticompetitive effects identified above.

87. For example, the NCAA could limit eligibility based solely on participation at Division I institutions rather than counting time spent at non-NCAA schools. It could adopt individualized waiver systems that account for academic progress or developmental circumstances. The NCAA could rely more directly on academic eligibility standards rather than rigid temporal limits. Each of these approaches would maintain the NCAA's stated objectives without excluding a defined class of athletes from the market.

88. The NCAA's failure to adopt such alternatives is probative. It suggests that the challenged rules are not narrowly tailored but instead reflect a preference for administratively simple restrictions that suppress the labor market. Under established antitrust principles, this failure supports the conclusion that the rules are unreasonable.

89. Accordingly, the NCAA's procompetitive justifications do not outweigh the substantial anticompetitive harms imposed by eligibility rules. The availability of less restrictive alternatives confirms that these rules constitute an unreasonable restraint of trade under Section 1 of the Sherman Act.

## IV. SUMMARY

90. As a matter of economics, NCAA eligibility rules are not neutral administrative provisions; they are coordinated restraints imposed by horizontal competitors that restrict output, suppress compensation, and exclude a defined class of labor from a commercial marketplace.

91. The NCAA membership benefits financially and from the churn of athletes entering and exiting their institutions. The turnover advanced by the eligibility rules also facilities the NCAA an excessive level of control and authority over its athletes that extends to the campus administrators of athletics. Forcing premature exits mitigates the influence of older athletes acquire

with experience and seniority.

92. In the post-*NCAA v. Alston* landscape, the commercial character of college athletics is settled. Student-athletes participate in markets for NIL compensation and, increasingly, direct revenue sharing with their institutions. Rules that determine who may access those markets-and for how long-therefore function as economic restraints similar to those which courts have found to be subject to Section 1 scrutiny.

93. Eligibility rules, including the challenged rule operate as output restrictions in a monopsonistic labor market. By limiting both the quantity of labor and the set of eligible participants, they depress compensation and distort the allocation of talent. Their effects are amplified by complementary policies-most notably roster limits and a compensation cap under the House settlement-that further constrain employment opportunities.

94. The NCAA's procompetitive justifications do not cure these defects. They neither explain the categorical exclusion of athletes based on prior participation nor demonstrate that such exclusion is reasonably necessary to, for example, differentiate the NCAA product from that of professional leagues. They argue this differentiation is critical to maintaining consumer demand for the college product. The availability of several less restrictive alternatives confirms that the current regime is not narrowly tailored.

95. The NCAA's supposed procompetitive benefits, to be weighed against the anticompetitive harms, are primarily that the eligibility rules in turn generates more opportunities for college athletes than would otherwise be the case. This argument has been largely debunked in legal challenges to NCAA amateurism rules and that same reasoning applies to their eligibility regulations based on the underlying economic principles; my economic analysis here is in accord.

96. Accordingly, courts should reconsider the reflexive application of rule-of-reason deference to NCAA eligibility rules. Where coordinated conduct excludes labor-market participants and reduces output, it bears the hallmarks of an unreasonable restraint of trade. Whether analyzed under a rigorous rule-of-reason framework or as a form of group boycott, NCAA eligibility rules bear all the economic hallmarks of restraints which courts have found to be unreasonable under Section 1 of the Sherman Act.

97. Recognizing this would do more than resolve the disputes at issue; it would align antitrust doctrine with the economic realities of modern, commercialized college athletics.

98. The preliminary injunction sought by Plaintiff serves the public interest by promoting competition in the market for NCAA athlete services and aligning athletic eligibility for all NCAA athletes rather than an arbitrary determination excluding a specific group of athletes from

intercollegiate competition.

99. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28th day of August 2026

____________________

Joel G. Maxcy

Exhibit A

# JOEL G. MAXCY

*Curriculum Vitae*
*April 2026*

**Address and Contact Information:**
LeBow College of Business
Drexel University
3220 Market Street
Philadelphia, PA 19104
Office: 215.895.2351; Cell 706.424.3177
jgm77@drexel.edu

**Home Office:**
7019 Mower St.
Philadelphia, PA 191119

**Citizenship: USA**

## I. EDUCATION

Washington State University, Pullman, Washington, Ph.D. Economics.
University of Maine, Orono, Maine, M.A. Economics.
University of Maine, Orono, Maine B.A. Economics.

## II. PROFESSIONAL APPOINTMENTS

### A. Organizational Leadership

President*, International Association of Sports Economists (IASE)*
Term 1: 2015 — 2018. Term 2: 2018 —2022. Term 3: 2022- current

### B. Administrative: Drexel University

Department Head, Department of Sport Business, Lebow College of Business Drexel University, Philadelphia, PA. August 1, 2018— June 2026.
Department Head, Department of General Business, Lebow College of Business Drexel University, Philadelphia, PA. September 1, 2018— June 2026.
Director, Center for Sport Management, Drexel University, Philadelphia, PA. July 1, 2017 — August 2018.
Head of Sport Management, Center for Hospitality and Sport Management, Drexel University, Philadelphia, PA. July 1, 2016 — June 30, 2017.
Interim Head of Sport Management, Center for Hospitality and Sport Management, Drexel University, Philadelphia, PA. July 1, 2015 — June 30, 2016.

a.

### C. Academic: Drexel University

Professor, Sport Business, Department of Sport Business, Drexel University, Philadelphia, PA. September 1, 2017—present. Tenured.
Associate Professor, Sport Management, Center for Hospitality and Sport Management, Drexel University, Philadelphia, PA September 20, 2014 — August 31, 2017.

### D. Other Current Academic Positions

Visiting Professor, Russian International Olympic University (RIOU) Sochi, Russia, 2023— present.

Visiting Professor, CDES (Center for Law and Economics of Sport), Limoges University, Limoges, France, 2009 — present.

Visiting Instructor, Executive Masters in European Sports Governance (MESGO). September 2010 — December 2017. First, Third and Fourth editions: Consortium of European Universities: Birkbeck, University of London, England; CDES, Limoges University, France; Johannes Gutenberg University Mainz, Germany; University of Lleida, Spain; Science Po, Paris, France.

### E. Academic Past Positions

Faculty Appointments

Associate Professor, School of Tourism and Hospitality Management, Temple University, Philadelphia, PA, August 2011— December 2014. Graduate faculty status.

Associate Professor, Department of Kinesiology, University of Georgia, Athens, GA, August 1, 2006 — July 31, 2011. Tenured, 2008. Graduate faculty status.

Associate Professor Department of Sport Management and Media, Ithaca College, Ithaca, New York, August 2003— July 2006. Tenured on appointment. Graduate faculty status.

Associate Professor of Economics, State University of New York, Cortland, New York. 2002—2003. Tenured 2002.

Assistant Professor of Economics, State University of New York, Cortland, New York, 1998—2002.

Assistant Professor of Economics, Meinders School of Business, Oklahoma City University, Oklahoma City, Oklahoma, 1997—1998.

Visiting Assistant Professor of Economics, Eastern Oregon University, La Grande, Oregon 1996—1997.

Instructor: Department of Economics, Washington State University, Pullman, Washington, 1993—1996.

Lecturer III, Economics: University of Southern Maine, College of Business and Economics, Portland, Maine, 1990.

Adjunct Professor of Economics, Saint Joseph's College, Windham, Maine, 1989—1991.

### F. Administrative Appointments

Sport Management Program Coordinator, Department of Kinesiology, University of Georgia, Athens, GA, August 1, 2006 — July 31, 2011. Chief Administrator of the Sport Management Program.

Head of the Graduate Program, Department of Sport Management and Media, Ithaca College, Ithaca, New York, 2005—2006.

Organizational Leadership

Vice President, *International Association of Sports Economists (IASE),* 2010 — 2014.

### G. Professional Non-Academic Positions

Principal, J.G. Maxcy Economic Consultants and Expert Testimony (The Maxcy Group) 1999 — present.

Associate Consultant. The Irland Group, Economics and Forestry Consultants, Augusta, Maine, 1989—1992.

## III. RESEARCH CONTRIBUTIONS

### A. Research Fields

Sports Economics, Law and Economics, Antitrust & Regulation, and Sport Labor Relations.

### B. Articles in Peer Reviewed Journals

1. **Maxcy, Joel G.** (Forthcoming, Fall 2026) The NCAA's Eligibility Rules as Unlawful Restraints of Trade. *Marquette Sports Law Review*, 37, (1).
2. Johannes Baumeister, J., **Maxcy, J.,** and Kurscheidt, M. (Forthcoming) Public Subsidies for Professional Football Clubs: A Conceptual Political Economy Analysis. *Frontiers in Sports and Active Living*.
3. **Maxcy J.** (2026) Sport Economics Research, Sport Economics and Sport Finance, *Sport Management Digest* 5 (1) (March). https://digestsm.com/digest/sport-economics-and-sport-finance-2025/
4. Butler, D., Butler, R., **Maxcy, J.** and Woodworth, S. (2024) Outcome Uncertainty and Viewer Demand for Basic Cable Boxing in the United States of America. *Journal of Sports Economics.* https://doi.org/10.1177/15270025231156052
5. **Maxcy J.** (2024) Sport Economics Research, *Sport Management Digest* 4 (1) (March). https://digestsm.com/digest/sport-economics-research-new-perspectives-on-the-demand-for-sport-24/
6. **Maxcy J.** (2023) Sport Economics Research: New Perspectives on the Demand for Sport. *Sport Management Digest* 3 (2) (November). https://digestsm.com/digest/sport-economics-research-new-perspectives-on-the-demand-for-sport/
7. **Maxcy J.** (2023) Sport Economics: The Demand for Sport. *Sport Management Digest* 3 (1) (March). https://digestsm.com/digest/sport-economics%201%202023/
8. **Maxcy, J.** (2022) Sport Economics. *Sport Management Digest* 2 (2) (November). https://digestsm.com/digest/sport-economics-2/
9. Butler, D., Butler, R., **Maxcy, J.** (2022) New insights on the Louis-Schmeling paradox: determinants of demand for subscription and pay-per-view boxing. *European Sport Management Quarterly*, 22 (4), 588-608.
10. Won, D. and **Maxcy, J.G**. (2021) University stakeholders' priorities 2 (1). concerning athletic budget allocations: An application of the contingent budget choice technique. *Journal for the Study of Sports and Athletes in Education*. 16 (3) 243-261.
11. Rascher, D. A., **Maxcy, J. G.** and Schwarz, A. (2021) The Unique Economic Aspects of Sports, *Journal of Global Sport Management*, 6:1, 111-138.
12. **Maxcy, J. and** Mondou,J . (2019) Le sport pro sous toutes les coutures: Amérique du Nord. *JuriSport: The Revue Juridique et Economique du Sport (Sport Law and*

*Economics Review*) 193, 17-33 (Lead Article)

13. **Maxcy J.**, Wicker, P., and Prinz, J. (2019). Happiness as a Reward for Torture: Is Participation in a Long-Distance triathlon a Rational Choice? *Journal of Sports Economics*. 20 (1) 177-197. https://doi.org/10.1177/1527002518758144.
14. **Maxcy J.** and Milwood, P. (2018). Regulation by taxes or strict limits: Managing profits in American professional team sport leagues. *Sport, Business and Management: An International Journal*, 8 (1) 52-66**.** https://doi.org/10.1108/SBM-11-2016-0069
15. Fort, R., **Maxcy, J.,** and Diehl, M. (2016). Uncertainty by Regulation: Is Rottenberg's Invariance Principle Subject to Policy and Circumstance? *Research in Economics*, 70, (3) 454-467.

13. Diehl, M., Drayer, J., and **Maxcy, J.** (2016). On the Demand for Live Sport Contests: Insights from the Secondary Ticket Market for National Football League Games. *Journal of Sport Management*, 30 (1), 82-94. (Lead Article).
14. Diehl, M., **Maxcy, J.,** and Drayer, J. (2015). Price Elasticity of Demand in the Secondary Market: Evidence from the National Football League. *Journal of Sports Economics*, 16 (6) 557-575.
15. **Maxcy J. G.** & Larson D.J. (2015). Reversal of Fortune or Glaring Misallocation: Is a New Stadium Worth the Cost to a University? With Daniel Larson. *International Journal of Sport Finance*, 10 (1), 62-86.
16. Steinmetz, J.L., **Maxcy, J.G.,** and Fesenmaier, D.R. (2015). Evaluating Destination Advertising. *Journal of Travel Research*, 54 (1), 22-35.
17. Larson, D. and **Maxcy, J.** (2014). Uncertainty of Outcome and Radio Policy in Pro Cycling. *Journal of Sport Management*, 28 (3), 311-323.
18. **Maxcy, J.** (2013). Sport universitaire. NCAA: une gouvernance qui maximise la création de valeur économique. (University Sport. The NCAA: A Governance Structure to Maximize Economic Value.) *JuriSport: The Revue Juridique et Economique du Sport (Sport Law and Economics Review*), 137, 42-46.
19. Larson, D. and **Maxcy, J.** (2013). The Industrial Organization of Coaches: Road Cycling as a Distinguished Case. *Journal of Sport Management*, 27 (September). 363-378.
20. **Maxcy, J.** (2013). Efficiency and Managerial Performance in FBS College Football: To the Employment and Succession Decisions, which Matters More, Coaching or Recruiting? *Journal of Sport Economics,* 14 (4) 368-388.
21. Larson, D. and **Maxcy, J.** (2011). Why the Master? Human Capital Development for Practicing U.S. Cycling Coaches. *International Journal of Sport Finance*, 6 (3), 265-280.
22. Baker, T.A., **Maxcy, J.G**., & Thomas. C. (2011). Whether the NCAA will continue to Circumvent Antitrust Regulation in the Wake of *White v. NCAA*. *Journal of Legal Aspects of Sport*, 21(1), 75-100.
23. Trandel, G. A. & **Maxcy, J.G.** (2011). Adjusting Winning Percentage Standard Deviations for Home Advantage. *Journal of Quantitative Analysis in Sports,* 7 (1), (Lead Article).
24. **Maxcy, J.G.** (2009). Progressive Revenue Sharing in MLB: The Effect on Player Transfers and Talent Distribution. *Review of Industrial Organization*, 35 (3), 275-297.
25. **Maxcy, J.** and Mondello, M. (2009). The Impact of Salary Dispersion and Performance Bonuses in NFL Organizations. *Management Decision,* 47 (1), 111-123.

26. Humphreys, B. and **Maxcy, J.** (2007).The Role of Sport Economics in the Sport Management Curriculum. *Sport Management Review*, 10 (2), 177-189.
27. **Maxcy, J**. and Mondello, M.J. (2006). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues. *Journal of Sport Management*, 20 (3), 345-365.
28. **Maxcy, J.G.** (2004). Contract Length as Risk Management When Labor is Not Homogeneous. *Labour: Review of Labour Economics and Industrial Relations*, 18(2), 177-189. (Lead Article)
29. Duncan, K.C., Krall, L., **Maxcy, J.G.** and Prus, M.J. (2004). Faculty Productivity and Eligibility for Seniority Based Equity Adjustments. *Eastern Economic Journal,* 30 (2), 293-310.
30. **Maxcy, J.** (2004). Motivating Long-Term Employment Contracts: Risk Management in Major League Baseball. *Managerial and Decision Economics*, 25 (2), 109-120.
31. Fort, R. and **Maxcy, J.** (2003). Competitive Balance in Sports Leagues: An Introduction. *Journal of Sports Economics*, 4 (2), 154-160.
32. **Maxcy, J.G.,** Krautmann, A.C., and Fort, R.D. (2002). The Effectiveness of Incentive Mechanisms in Major League Baseball. *Journal of Sports Economics*, 3 (3), 246-255.
33. **Maxcy, J.G.,** (2002). Rethinking Free Agency and Player Mobility in Major League Baseball. *Contemporary Economic Policy*, 20 (2), 145-159.
34. Fort, R. and **Maxcy, J.** (2001). A Rival League Explanation of the Demise of African- American Baseball Leagues. *Journal of Sports Economics*, 2 (1), 35-49.
35. Irland, L.C. and **Maxcy, J.** (1991). Maine's Wood Industry: Value-Added Relationships, 1982-1987. *Forest Products Journal*, 41 (9), 53-56.

### C. Books

1. Nagle, M., & Southall, R Staurowsky, E. J., Karcher, R., **Maxcy, J.** (2023) *The NCAA and the Exploitation of College Profit Athletes.* Columbia, SC: University of South Carolina Press.

### D. Articles in Edited Volumes of Scholarly Works

1. **Maxcy, J.G.** (Forthcoming) Uncertainty of Outcome: Allowing for Reference-Dependent Preferences. In *Guide to Key Theories in Sport Management*, Ed. Parent, M, Shannon, K., & Wicker, P. Edward Elgar Publishing Ltd: London, UK:
2. **Maxcy J (**Forthcoming) The Economics of Sustainability Programs in Sport Organizations: Do the Costs Justify the Benefits? In *Sustainability Strategy in Sport Organizations.* EASM Book Series. London, UK: Taylor and Francis.
3. **Maxcy J. & Levine, J. (**Forthcoming). Case Study 3A: *Subaru Park, Philadelphia Union, MLS: Chester, Pennsylvania, USA.* In *Sustainability Strategy in Sport Organizations.* EASM Book Series. London, UK: Taylor and Francis.
4. **Maxcy J.,** Gouget, J.J., & Thibaut, D. **(**Forthcoming). Case Study 3B: The French Golf Federation. In *Sustainability Strategy in Sport Organizations.* EASM Book Series. London, UK: Taylor and Francis.
5. Levine, J. **& Maxcy J. (**Forthcoming). Case Study 3C: *USA Sailing.* In *Sustainability Strategy in Sport Organizations.* EASM Book Series. London, UK: Taylor and Francis.

6. **Maxcy J.** (2025). The Economic Landscape in Sport Communication. (Chapter 11). In Pederson, P. M. (Ed.). *Communication in Sport Management*. London, UK: Routlegde, Taylor and Francis.
7. **Maxcy J.** (2024) Twenty-five years of Labor Relations in Major League Baseball: From the 1994-95 Strike to the 2021-22 Lockout. Principles and Paradoxes: Contributions in Honor of Rodney Fort. Stefan Szymanski (Ed.) New York, NY: Springer.
8. **Maxcy J.** (2019). Multi–Period Contracts as Risk Management in Professional Sports. In N. Longley (Ed.) *Personnel Economics in Sport*. Northampton, Massachusetts: Edward Elgar.
9. **Maxcy J.** (2017). From Strikes to Lockouts: Consequences of the Shift in the Balance of Power from the Players' Union to the Owners in the National Hockey League. (Chapter 1) In Frick B. (Ed.), *Breaking the Ice: The Economics of the National Hockey League: Sports Economics, Management and Policy Series*. New York, NY: Springer.
10. Larson, D.J. and **Maxcy, J.G.** (2016). Human Capital Development in Professional Cycling. (Chapter 7) In van Reeth, D. and Larson, D. (Eds.). *The Economics of Professional Road Cycling: Sports Economics, Management and Policy Series.* New York, NY: Springer.
11. **Maxcy J.** (2014). The American View on Financial Fair Play. In Budzinski, O. and Feddersen, A. (Eds.) *Contemporary Research in Sports Economics: Proceedings of the 5th ESEA Conference*. Oxford, UK: Peter Lang International Academic Publishers.
12. **Maxcy J.** (2013). Rapidly Advancing Technology and Policy Choice: Transforming the Economic Landscape of Sport Communication. (Chapter 47). In Pederson, P. M. (Ed.). *The Routledge Handbook of Sport Communication*. London, UK: Routledge.
13. **Maxcy, J. G.** (2012). Economics of the NFL Player Entry Draft System. (Chapter 10) In Quinn, K.G. (Ed.) *Economics of the National Football League: The State of the Art Sports Economics, Management and Policy Series*. New York, NY: Springer.
14. **Maxcy, J.** (2011) The Effect on Player Transfers of a Luxury Tax on Club Payrolls: The Case of Major League Baseball. (Chapter 5) In Andreff, W. (Ed.) *Sports Economics: Participation, Events, and Professional Team Sports*. Cheltenham, UK and Northampton, MA, US: Edward Elgar.
15. Darling, J. and **Maxcy, J.** (2007). Organization Specific Skills and Player Salaries: Evidence from the National Basketball Association. (Chapter 10) In Slack, T. and Parent, M. (Eds.), *International Perspectives on the Management of Sport*. Burlington, MA: Elsevier Inc.
16. **Maxcy, J. G.** (2004). Analyzing the Changes in the Institutional Framework of the NCAA: A Transactions Costs Approach. (Chapter 1) In Fort, R. and Fizel, J. (Eds.) *Economics of College Sports,* pp.11-34. Westport, CT: Praeger Publishers.
17. **Maxcy, J.G.** (1997). Do Long-Term Contracts Influence Performance in Major League Baseball? In Hendricks, W. (Ed.) *Advances in the Economics of Sport.* Volume 2, pp. 157-176. Greenwich, CT: JAI Press Inc.

## E. Book Reviews in Peer Reviewed Journals

1. **Maxcy, J.** (2008). Book Review of *The Economics of Sport in the Media*, Jeanrenaud, C. and Kesenné, S. (Eds.) *International Journal of Sport Communication* 1 (1) 130-134 (Invited).

## F. Articles in other Edited Volumes

1. **Maxcy, J.** (2011). Contracts, Coaches. *The Encyclopedia of Sports Management and Marketing*, Volume 1. pp. 284-85. Linda E. Swayne, Mark Dodds, Eds. New York, NY: Sage.
2. **Maxcy, J.** (2011). Labor Law. *The Encyclopedia of Sports Management and Marketing*, Volume 2. pp. 733-734. Linda E. Swayne, J. Mark Dodds, Eds. New York, NY: Sage.
3. **Maxcy, J.** (2011). Labor Stability. *The Encyclopedia of Sports Management and Marketing*, Volume 2. pp. 738-740. Linda E. Swayne, Mark Dodds, Eds. New York, NY: Sage.
4. **Maxcy, J.** (2011). Monopoly Power. *The Encyclopedia of Sports Management and Marketing*, Volume 2. pp. 921-922. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
5. **Maxcy, J.** (2011). Monopsony. *The Encyclopedia of Sports Management and Marketing*, Volume 2. pp. 922-923. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
6. **Maxcy, J.** (2011). Player Mobility. *The Encyclopedia of Sports Management and Marketing*, Volume 3. pp. 1130-1132. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage. **Maxcy, J.** (2011). Revenue Sharing. *The Encyclopedia of Sports Management and Marketing*, Volume 3. pp. 1288-1290. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
7. **Maxcy, J.** (2011). Salary Arbitration. *The Encyclopedia of Sports Management and Marketing*, Volume 3. pp. 1310-1311. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
8. **Maxcy, J.** (2011).TV Rights/Contracts. *The Encyclopedia of Sports Management and Marketing*, Volume 4. pp. 1598-1601. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
9. **Maxcy, J.** (2011). Uncertainty and Choice. *The Encyclopedia of Sports Management and Marketing*, Volume 4. pp. 1605-1606. Linda E. Swayne, Mark Dodds, Eds., New York, NY: Sage.
10. Thomas, C. & **Maxcy, J.** (2011). Contracts, athletes. *The Encyclopedia of Sports Management and Marketing*, Volume 1. pp. 282-283. Linda E. Swayne, Mark Dodds, Eds. New York, NY: Sage.
11. **Maxcy J.** (1990). Employment Trends in Maine's Manufacturing Sector: The Relationship to Value-added. *Maine Business Indicators*, Volume 35 (4)

## G. Papers in Preparation for Submission

1. Sport Organisations' Implementation of Sustainability Strategies. *Journal of Global Sport Management*. Under Review February 2026.
2. Monopsony Power, Wages, and Mobility in the National Basketball Association. *Review of Industrial Organization.* With Mark Diehl and Joris Drayer.
3. The Determinants of Earnings for U.S. Professional Road Cyclists: Individual Tournaments with Team Effects. With Daniel J. Larson & Rebecca D. Larson.
4. The Uncertainty of Outcome Hypothesis: Is it the whole story or simply the end? Development of a More Holistic Metric. With Daniel Larson.
5. Sports Tourism in Philadelphia: Evidence from Hotel Occupancy Data. With Frank Stephenson.

## H. Reports

1. Staurowsky, E. J., **Maxcy, J.**, Karcher, R., Southall, R., Berri, D., & Otto, K. (2015). College sport reform calls for a focus on college athletes' rights. Retrieve at http://www.care-fc.org
2. **Maxcy, J.** and Drayer, J. (2014). Sports Analytics: Advancing Decision Making through Technology and Data. *IBIT Report*, (March) Institute for Business and Information Technology, Fox School of Business, Temple University, Philadelphia, PA.
3. **Maxcy J.** (2012). Evaluation of Feasibility Study and CSL Financial Projections: Proposed CSU Football Stadium. Report. Prepared for SOS Hughes, Fort Collins CO.

## I. Research Papers Currently in Progress

1. Western Supremacy: The Salary Cap and Compensating Wage Differentials in the NBA. With Michael Leeds and Mark Diehl.

## J. Book Projects

1. Fort, R. & Maxcy J. *How Major League Baseball Killed the African-American Baseball Leagues*. (Proposal in progress.)

## K. Unpublished Manuscripts

1. Maxcy, J. Bilateral Monopoly or Competition Policy: A Comparison of Sport Labor Markets under the North American and European Models**.** Working Paper.
2. Maxcy, J. & Mondello, M. An Empirical Assessment to the Returns to Football Spending and Football Winning in the FBS.
3. Fort, R. and Maxcy, J. "The Economics of the Demise of African-American Baseball Leagues" Unpublished Manuscript, Baseball Hall of Fame Library, Cooperstown, NY.
4. Maxcy, J. The Economic Theory of Regulation: A Review of the Literature. Unpublished Manuscript
5. Irland, Murdoch, and Maxcy. Value Added Processing in Maine's Wood Industry: An Overview. University of Maine, College of Forest Resources Working Paper.

**L. <u>Popular Press Op-Eds. & Contributions to Professional Blogs (Selected Posts Listed)</u>**

Several articles at: Drexel News Blog: https://newsblog.drexel.edu/tag/joel-maxcy/

<u>Economist: Why the Comcast-TWC merger is bad for the public</u>. *Philadelphia Business Journal*. February 18, 2014.

*<u>The Sports Economist</u>*

*Ranking FBS Coaches.* August 30, 2014.

*<u>Sports Labor Relations</u>*

*A Comcast-TWC Merger will Matter to Sport Fans*. February 20, 2014.
*Antitrust Law & Live Streaming of Games over the Internet*. September 12, 2013.
*Is Baseball the New Football?* September 8, 2013.
*Broadcast Revenue and Competitive Balance in the NFL.* September 5, 2013.
*It's Time for the Courts to Recognize that NCAA Amateur Rules Contradict Antitrust Law* August 15, 2013.
*The Irony of Labor Law.* August 9, 2013.
*Judge Sotomayer and the NFL Draft-Eligibility Rule (Clarett v. NFL).* June 4, 2009.

## IV. CONSULTING AND LEGAL EXPERIENCE

### A. Expert Witness & Testimony Experience: Oral & Written

1. *Matthew L. Braslow, v. Guthrie-Packer Hospital et al.* Court of Common Pleas, Bradford County Pennsylvania. Declaration Executed August 5, 2026 and Expert Services TBD. Retained by Buchanan Ingersoll & Rooney, PC
2. *Cohen Fuller v. NCAA.* United States District Court, Nevada District. Affidavit, June 26, 2026. Retained by Geoffrey Tabor, Geoffrey A. Tabor, Glass & Tabor, LLP
3. *Diego Pavia et al. v. NCAA.* United States District Court, Middle District of Tennessee at Nashville. Retained by Ryan Downton, Texas Trial Group, Attorney for the Plaintiff
Written Report executed December 24, 2025: statistical analysis, market definition, market power, competitive effects, competitive equity, Rule of Reason Analysis.
Oral Testimony February 10, 2026.
4. *Brody Robinson v. NCAA.* State Of Michigan, 6th Circuit Court for the County of Oakland. Affidavit, April 2, 2026
5. *Akachi Onyedika Okereke v. NCAA*. Chancery Court for Davidson County, Tennessee. Affidavit April 9, 2026.
6. *Shannon Ray, et al. v. National Collegiate Athletic Association (NCAA)*US District Court, Eastern California, Sacramento Division Antitrust (Sherman Act)
Written Report: statistical analysis, market definition, market power, competitive effects, competitive equity, and financial implications regarding the NCAA Volunteer Coach rule.
Retained by Gustafson Gluek, PLLC; Kirby McInerney, LLP; and Fairmark Partners, LLP
7. *Rashaun Agee v. National Collegiate Athletic Association (NCAA)*
District Court, 472nd Judicial District Brazos County, Texas
Written Declaration executed October 7, 2025. Testified at hearing, October 13, 2025.
Retained by. West, Webb, Albritton & Gentry, 1515 Emerald Plaza, College Station TX 77845.
8. *Louis Moore v. National Collegiate Athletic Association (NCAA)*
US District Court Northern Texas
Antitrust case under State of Texas Antitrust Act

Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Lightfoot Law Birmingham AL Attorneys for the Plaintiff
Written Declaration executed August 22, 2025
Testified at hearing, September 24, 2025.

9. *Derrin Boyd v. National Collegiate Athletic Association (NCAA)*
US District Court, Middle Tennessee
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Baker Botts L.L.P., Washington DC, Attorneys for the Plaintiff
Written Declaration filed July 18, 2025.

10. *N. Fourqurean v. National Collegiate Athletic Association (NCAA)*
US District Court, Western Wisconsin
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by von Briesen & Roper, s.c., Milwaukee, WI
Written Declaration filed Julu 29, 2025
Written Declaration (2) filed August 30, 2025
Oral Deposition, September 3, 2025
Oral Deposition, September 16, 2025

11. *Walker v. National Collegiate Athletic Association (NCAA)*
US District Court, Middle Louisiana
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by David C. Fleshman, Esq., Breazeale, Sachse & Wilson, LLP, Attorneys for the Plaintiff
Written Declaration filed July 1, 2025.

12. *Zeigler v. National Collegiate Athletic Association (NCAA)*
US District Court, Eastern Tennessee
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by LITSON, LLC. Knoxville, TN
Written Declaration filed May 20, 2025
Written Response to NCAA declaration, filed June 3, 2025

13. *Ante Brzovic v. National Collegiate Athletic Association (NCAA)*
US District Court, South Carolina
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Peper Law Firm, PA Charleston, SC, Attorney for the Plaintiff
Written Declaration filed April 18, 2025
Testified at hearing, May 6, 2025, Charleston SC.

14. *Corey Coley v. National Collegiate Athletic Association (NCAA)*
US District Court, Eastern North Carolina

Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Shipman & Wright LLP, Raliegh, NC, Attorney for the Plaintiff
Written Declaration filed April 10, 2025
15. *Jett Elad v. National Collegiate Athletic Association (NCAA)*
US District Court, New Jersey
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Marino, Tortorella & Boyle, P.C., Chatham, NJ, Attorney for the Plaintiff
Written Declaration filed March 31, 2025
Testified at hearing, April 16, 2025, Trenton, NJ.
16. *Diego Pavia v. National Collegiate Athletic Association (NCAA)*
US District Court, Middle Tennessee
Antitrust (Sherman Act)
Written Testimony regarding market definition, market power, and competitive effects regarding NCAA eligibility rules
Retained by Ryan Downton, Texas Trial Group, Attorney for the Plaintiff
Written Declaration filed December 3, 2024.
17. *Williams v. Beemiller Inc.*
Court of Appeals, New York.
Report of Potential Lost Income for plaintiff Daniel Williams.
Retained by Connors LLP, Buffalo, NY, Attorney for the Plaintiff
Written Report filed January 8, 2020.
18. *Gordon and Sari Herbert v. Maple Leaf Sports & Entertainment (Toronto Raptors Basketball Club) & Matco Trading Inc. (Third Party)*
Ontario Superior Court of Justice, Toronto.
Expert Report: *An Analysis of the Job Market for NBA Coaches: Career Trajectories and Compensation.*
*And The Labor Market for NBA Head Coaches Reply to the Analysis and Critique of David Berri. Ph.D.*
Retained by Beard Winter LLP, Toronto, Ontario, Canada. Attorney for Matcao Trading Inc.
Expert Report filed July 25, 2017.
Reply filed December 18, 2019

### B. Amicus Briefs

1. Brief for Sports Economists as *Amici Curiae* in Support of Plaintiffs (2025) In RE: National Football League's "Sunday Ticket" Antitrust Litigation. On Appeal from the United States District Court for the Central District of California. **Joel Maxcy,** Rodney Fort, and others.
2. Brief of *Amici Curiae* (2022). City of Oakland (Petitioner) v. Oakland Raiders et al (Respondents) Supreme Court of the United States, Brief of *Amici Curiae* Sports Economists. Rodney Fort, **Joel Maxcy**, and others.
3. Brief of *Amici Curiae* (2021). National Collegiate Athletic Association (Petitioner) v. Shawne Alston et al. (Respondents). Supreme Court of the United States, Brief of *Amici Curiae* Sports Economists in Support of Respondents. Nos. 20-512 & 20-520. Rodney

Fort, Brad Humphreys, Victor Matheson, **Joel Maxcy,** John Siegfried, and Allen Sanderson.

4. Brief of *Amicus Curiae* (2014). "Brief of Sports Economists and Professors of Sport Management" (July). **Joel G. Maxcy,** Daniel A. Rascher, Andrew D. Schwarz, on Invitation by the National Labor Relations Board.

## V. FUNDED PROJECTS

### A. External

1. Researcher. European Commission ERASMUS Grant 1/2023-1/25. **Sustainable Sport Management**, Participants: KU Leuven (Vassil Girginov, Coordinator & Thomas Konecke, Project Manager); Drexel University (USA), (Researchers: Joel Maxcy, Jeffery Levine, Michael Wagner); CDES-Limoges University (France) (Researchers: JF Brocard, JJ Gouget, Thibaut Dussad); Malmoe University (Sweden) (Researcher: Karin Book), JMAK University of Applied Sciences (Finland), (Aila Ahonen): Brunel University (UK) (Coordinator: Vassil Girginov, Researcher: Tarryn Godfrey), University of Sterling (UK) (Researcher: David McCardle), Texas A&M University (USA) (Advisor: Brian McCullough). 400,000.00 €.
2. Co-investigator with Roehl, W, Fesenmaier, D., Lee S.K., Nichols, M., and Yang, Y., July 1—December 30, 2013. Wynn Philadelphia—STHM Partnership, Competitive Analysis and Impact of Wynn Philadelphia, $48,500.
3. Co- investigator with Fesenmaier, D. and Steinmetz, J., March 2013—. An in-depth study of visitors to Baltimore. Visit Baltimore. $27,000.
4. Co-investigator with Funk, D.C., Jordan, J.S., & Drayer, J., May 2012— May 2013. Big East Playbook: Examining the implications of Temple football transition to the Big East Conference. Temple University, Office of Institutional Advancement. $58,250.

### B. Internal

1. Temple University, Institute for Business and Information Technology, Fox School of Business. With Joris Drayer. Development of a report on sport analytics. $2500.
2. SUNY Cortland, Office of Sponsored Programs, Faculty Research Program (FRP); (To support continued research of the economics of the African-American baseball leagues).$2300.
3. SUNY Cortland, Title III Instructional Technology Workshop. $1,200
4. SUNY Cortland, Center for the Advancement of Technology in Education: Developing Multimedia applications for the Classroom. $750
5. SUNY Cortland, Office of Sponsored Programs "Determination of the Optimal Institutional Framework for NCAA Conferences. $4000.
6. Washington State University Office of Grants and Research Development, Ph.D. Research. $2000.

### C. Proposals Not Funded

1. Co-investigator with Chepyator-Thomson, R. and Hawkins, B. Application date:

January 2008. US-Kenya Partners Promotion of Cross-Cultural Understanding through Sports. United States Department of State, Bureau of Educational and Cultural Affairs.

2. Co-investigator with Chepyator-Thomson, R. and Hawkins, B. Application date: March 2009. Youth Sports Management in Kenya's Rural District: Improved Resources, Expanded Programs, and Increased Sports Participation. United States Department of State, Bureau of Educational and Cultural Affairs.

## VI. PRESENTATIONS

### A. Keynote Speeches

1. Maxcy J. (2023) Sport Facilities and Economic Development in the USA. 2nd International Forum on Sport and Urban Development. November 24, Shanghai, China.
2. Maxcy J. (2022). Sport and Urban Development in Philadelphia Pennsylvania. 1st International Forum on Sport and Urban Development. November 18, Shanghai, China.
3. Maxcy, J. (2017) Presidential Keynote. Sport Broadcasting in the Era of Live Streaming: Implications and Anticipatable Outcomes. IASE XVII International Conference in Sport Economics, November 8, 2017, Shanghai, China.
4. Maxcy, J. (2016). The Economics of College Sports. Federal Reserve Bank of Atlanta, Public Affairs Forum. October 26.
5. Maxcy, J. (2014). The Future of Professional Sport. Keynote IASE XVI International Conference in Sport Economics, December 3rd-5th 2014, Rio de Janeiro, Brazil.

### B. Papers Delivered at International and National Conferences and Academic Meetings

1. Maxcy, J. (2025) Antitrust in Sports: Recent Developments in the NCAA. IASE Conference. Las Vegas, NV June 17-18.
2. Maxcy, J. (2024) The Economics of Sustainability Programs in Sport Organizations: Do the Costs Justify the Benefits? Brunell University Symposium, London, UK. October 31.
3. Maxcy, J. (2024) The Economics of Sustainability Programs in Sport Organizations: Do the Costs. AK-IASE Conference, University of Bayreuth, Germany. June 20-22, 2024.
4. Maxcy, J. (2024) The Economics of Sustainability Programs in Sport Organizations: Do the Costs Justify the Benefits? Preliminary findings. ERASMUS+ Sustainable Sport Management Seminar. JAMK University, Jyvaskyla, Finland. March 20.
5. Maxcy, J. (2024). The Economics of Implementing Sustainable Strategies by Sports Organizations. Workshop: Sustainable Strategies in Sport. University of Monaco & World Athletics. Monaco. February 14-15.
6. Maxcy J. (2023) Evaluating the Economic Costs and Benefits of Adopting the United Nations Sustainable Development Goals for International and National Sport Organizations. 14th ESEA Conference on Sport Economics. University College Cork, Cork, Ireland. August 22-25.
7. Maxcy J. (2023). Monopsony Power, Wages, and Mobility in the National Basketball

Association. DE Sport Seminar. Center for Sports Law and Economics (CDES), Limoges University, France. June 15-16.

8. Stephenson, F. & Maxcy J. (2018). Sports Tourism in Philadelphia: Evidence from Hotel Occupancy Data. Sport Economics and Sport Management, 3rd International Conference. Vienna, Austria, May 11-12.
9. Maxcy, J. (2017). Multi–Period Contracts as Risk Management in Professional Sports. 9th European Conference on Sports Economics, Paderborn, Germany. August 30 - September 1.
10. Maxcy J. (2017). The Uncertainty of Outcome and Grand Tour Cycling. Sports Economics Workshop. Cork University Business School, University College Cork, Ireland. July 21.
11. Maxcy J. & Kurscheidt, M. (2017). Introduction to Current Issues in International Sports Governance. IASE Panel on International Sport Governance. Panel with D. Coates, N. Longley, R. Simmons. Sport Economics and Sport Management, 2nd International Conference. Berlin, Germany, May 11-12.
12. Maxcy, J. and Larson, D. (2017). The Uncertainty of Outcome Hypothesis: Is it the whole story or simply the end? Development of a More Holistic Metric. WEAI International Conference, Santiago Chile. January 3-6.
13. Maxcy, J. and Milwood, P. (2017). Taxes or Strict Limits: Regulation and Profits in Professional Team Sports. S*port, Business, and Management*. WEAI International Conference, Santiago Chile. January 3-6.
14. Maxcy, J. Wicker, P., Prinz, J. (2016). The Reward for Torture: Is Participation in a Long- Distance Triathlon a Rational Choice? 8th European Conference on Sports Economics, Groningen, Netherlands. August 31 - September 2.
15. Fort, R., Maxcy, J., Diehl, M. (2015). Uncertainty by Regulation: Is Rottenberg's Invariance Principal Subject to Policy and Circumstance? 7th European Conference on Sports Economics, Zurich, Switzerland. August 27-28.
16. Diehl, M., Maxcy, J., Leeds, M. (2015). Western Supremacy: The Salary Cap and Compensating Wage Differentials in the NBA. 7th European Conference on Sports Economics, Zurich, Switzerland. August 27-28.
17. Diehl, M., Maxcy, J. (2014). Price Elasticity of Demand in the Secondary Market. 6th European Conference on Sports Economics, Antwerp, Belgium. September 3-5.
18. Maxcy, J. Wicker, P., Prinz, J. The Reward for Torture: Is Participation in a Long-Distance Triathlon a Rational Choice? 6th European Conference on Sports Economics, Antwerp, Belgium. September 3-5.
19. Diehl, M., Maxcy, J. and Drayer, J. (2014). Price Elasticity of Demand in the Secondary Market: Evidence from the National Football League and the National Hockey League. WEAI Annual Meeting, Denver, CO. June 27-July 1.
20. Maxcy, J. and Diehl, M., (2014). An Assessment of the Relationship between Expenditures on Intercollegiate Athletics and Donations to the University. Western Economic Association International Annual Meeting, Denver, CO. June 27-July 1.
21. Larson, D.J. & Larson, R.D., and Maxcy J. (2014). Determination of Earnings for U.S. Professional Road Cyclists: Individual Tournaments with Team Effects. Western Economic Association International Annual Meeting, Denver, CO. June

27-July 1.
22. Diehl, M., Maxcy, J. and Drayer, J. (2013). Underpricing in the NFL: What Can Secondary Market Price Tell Us about the Demand for NFL Tickets? ESEA Conference on Sports Economics. Esbjerg, Denmark. September 19-20.
23. Larson, D.J. & Larson, R.D., and Maxcy J. (2013). The Determinants of Earnings for
24. U.S. Professional Road Cyclists: Individual Tournaments with Team Effects. ESEA Conference on Sports Economics. Esbjerg, Denmark. September 19-20.
25. Diehl, M., Maxcy, J. and Drayer, J. (2013). Underpricing in the NFL: What Can Secondary Market Price Tell Us about the Demand for NFL Tickets? North American Society for Sport Management (NASSM) Annual Conference, Austin, TX. May 28- 31.
26. Maxcy, J. and Drayer, J. and Diehl, M. (2013). Do Blackouts and Blackout Threats Alter Demand in the Secondary Ticket Market? Evidence from the NFL. WEAI-Pacific Rim Meetings, Tokyo, Japan. March 14-17.
27. Larson, D. and Maxcy, J. (2013). Reversal of Fortune or Glaring Misallocation: Is a New Stadium Worth the Cost to a University? NCAA Convention, Scholarly Colloquium. Dallas, TX. January 15-16.
28. Larson, D. and Maxcy, J. (2012). Individual Post-Contractual Opportunism in a Team Context: Professional Road Cyclists' Labor Market Shuffle. XIV IASE and IV ESEA Conferences on Sports Economics. London, UK. September 5-7.
29. Maxcy, J. (2012). Human Capital Skill Sets and Managerial Performance in FBS College Football: Can We Predict a Successful Successor? XIV IASE and IV ESEA Conferences on Sports Economics. London, UK. September 5-7.
30. Maxcy, J. (2012). Human Capital Skill Sets and Managerial Performance in FBS College Football: Can We Predict a Successful Successor? Western Economic Association International Annual Meeting, San Francisco, CA. June 29-July 3.
31. Maxcy, J. and Larson, D. (2012). Uncertainty of Outcome: A New Metric from Pro Cycling. Western Economic Association International Annual Meeting, San Francisco, CA. June 29-July 3.
32. Larson, D. and Maxcy, J. (2012). The Industrial Organization of Cycling Coaches. North American Society for Sport Management (NASSM) Annual Conference, Seattle, WA. May 22-26.
33. Maxcy, J. (2011). Bilateral Monopoly or Competition Policy: A Comparison of Sports Labor Markets under the North American and European Models. XIII IASE and III ESEA Conferences on Sports Economics. Prague, Czech Republic. May 17-18.
34. Larson, D. and J. Maxcy (2011). Uncertainty of Outcome and Radio Policy in Pro Cycling. XIII IASE and III ESEA Conferences on Sports Economics. Prague, Czech Republic. May 17-18.
35. Larson, D. and J. Maxcy (2010). The Industrial Organization of Cycling Coaches. Presented at the Southern Economic Association Annual Meetings, Atlanta, Georgia. November 20-22.
36. Larson, D. and J. Maxcy (2010). The Industrial Organization of Cycling Coaches. Presented at the European Conference on Sports Economics, German Sport University Cologne, Germany. October 6-7.

37. Maxcy J. & M. Mondello (2010). An Empirical Assessment of the Returns to Football Spending and Winning in the NCAA's FBS Classification. Presented at the Western Economic Association International Annual Meeting, Portland, OR. June 29-July 3.
38. Larson, D. and J. Maxcy (2010). Why the Master? Determinants of Cycling Coach Selection. Presented at the Western Economic Association International Annual Meeting, Portland, OR. June 29-July 3.
39. Maxcy J. & M. Mondello (2010). The FBS: Football, Bowls, and Salaries. Presented at the Scholarly Colloquium on College Sports, College Sports in Recessionary Times: Assessing Challenges and Opportunities. NCAA Convention, Scholarly Colloquium. Atlanta, GA. January 12-13.
40. Maxcy J. (2009). The Effect on Player Transfers of a Luxury Tax on Club Payrolls: The Case of Major League Baseball. Presented at the First European Conference in Sports Economics, Center of Economics, University of Paris, France. September 14-15.
41. Baker, T.A. & J.G. Maxcy (2009). Getting paid to play: An analysis of the application of antitrust law and labor law to NCAA Athletics. Presented at North American Society for Sport Management. Columbia SC. May 30.
42. Maxcy, J.G. & M. Mondello (2008). The Effect of Salary Dispersion and Performance Bonuses among National Football League Organizations. Presented at the International Association of Sports Economists Annual Meeting, Gijon, Spain. May 9-10.
43. Maxcy, J.G. (2007). Organization Specific Skills and Player Salaries: Evidence from the National Basketball Association. Presented at the International Atlantic Economic Society Annual Meeting, Savannah, GA. October 7- 10.
44. Maxcy, J.G. (2007). Revenue Sharing in MLB: The Effect on Player Transfers. Presented at the Western Economic Association International Annual Meeting, Seattle, WA. June 29-July 3.
45. Maxcy, J.G. (2007). Organization Specific Skills and Player Salaries: Evidence from the National Basketball Association. Presented at the Western Economic Association International Annual Meeting, Seattle, WA. June 29-July 3.
46. Maxcy, J. and Darling, J. (2007). Organization Specific Skills and Player Salaries: Evidence from the National Basketball Association. International Association of Sports Economists Annual Meeting, University of Dayton, Dayton, OH. May 26-27.
47. Maxcy, J. (2006) "Revenue Sharing in MLB: The Effect on Player Transfers" Western Economic Association International Annual Meeting, San Diego, CA. June 26-30.
48. Maxcy, J. (2006) "Revenue Sharing in MLB: The Effect on Player Transfers" International Association of Sports Economists Meeting, Ruhr University-Bochum, Germany. May 4-6.
49. Maxcy, J. and Mondello, M. (2005). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues." Presented at the International Association of Sports Economists Annual Meeting, Ottawa, Ontario, Canada. June 18-19.
50. Maxcy, J. and Mondello, M. (2004). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues."

Presented at the Joint Statistical Meetings Toronto, Ontario, Canada. August 8-12.

51. Maxcy, J.G. and Mondello, M.J. (2003). International Perspectives on the Effect of Free Agency on Professional Sports Leagues. Presented at the North American Society for Sport Management (NASSM) Annual Conference, Ithaca, NY. May 27-31.
52. Maxcy, J.G. (2003). The Use of Internet and Satellite Based Delivery Systems for Sport Management Course Instruction. Presented at the North American Society for Sport Management (NASSM) Annual Conference, Ithaca, NY. May 27-31.
53. Maxcy, J.G. (2002). Split Pool Revenue Sharing in MLB: A Disincentive to Winning? Presented at the International Conference on Sport & Entertainment Business. University of South Carolina, Columbia, SC. October 2-6.
54. Maxcy, J. (2002). Split Pool Revenue Sharing in MLB: A Disincentive to Winning? Presented at the International Association of Sports Economists Annual Meeting. New York, NY. July 10-12.
55. Fort, R. and Maxcy, J. (2002). Forest for the Trees: Competitive Balance in Major League Baseball. Presented at the International Association of Sports Economists Annual Meeting. New York, NY. July 10-12.
56. Maxcy, J.G. (2002). Split Pool Revenue Sharing in MLB: A Disincentive to Winning? Presented at the Western Economic Association International Annual Meeting. Seattle, WA, June 29-July 3. 2002.
57. Maxcy, J. and Fort, R. (2001). The Effectiveness of Incentive Mechanisms in Major League Baseball. Presented at the Western Economic Association International Annual Meeting, San Francisco, CA. July 7-July 10.
58. Maxcy, J.G. (2001). Rethinking Free Agency and Player Mobility in Major League Baseball. Presented at the Western Economic Association International, Annual Meeting, San Francisco, CA. July 7-July 10.
59. Maxcy, J.G. (2000). Analyzing the Changes in the Institutional Framework of the NCAA: A Transactions Costs Approach. Presented at the Western Economic Association International Annual Meeting, Vancouver, B.C. June 29-July 3.
60. Fort, R. and Maxcy, J. (2000). A Rival League Explanation of the Demise of African- American Baseball Leagues. Presented at the Western Economic Association International Annual Meeting Vancouver, B.C. June 29-July 3.
61. Duncan, K.C., Krall, L., Maxcy, J.G. and Prus, M.J (2000). Faculty Productivity and Eligibility for Seniority Based Equity Adjustments. Presented at the Western Economic Association International Annual Meeting Vancouver, B.C. June 29-July 3.
62. Maxcy, J. (2000). Rethinking Free Agency and Player Mobility in Major League Baseball: Evidence from the 1990s. Presented at the Southern Regional Science Association Annual Meeting, Miami, FL. April 13-15.
63. Maxcy, J. (1999). Rethinking Free Agency and Player Mobility in Major League Baseball: Evidence from the 1990s Presented at the Western Economic Association International Annual Meeting, San Diego, CA. July 7-10, 1999.
64. Maxcy, J. (1999). Motivating Long-term Employment Contracts: Risk Management in Major League Baseball. Presented at the North American

Society for Sport Management (NASSM) Annual Conference, Vancouver, B.C. June 2-6, 1999.

65. Maxcy, J. (1998). Motivating Long-term Employment Contracts: Risk Management in Major League Baseball. Presented at the Western Economic Association International Annual Meeting, Lake Tahoe, NV. June 28 –July 2.
66. Fort, R. and Maxcy, J. (1998). Last Period Problems in Sports with Rodney Fort Presented at the Western Economic Association International Annual Meeting, Lake Tahoe, NV. June 28 –July 2.
67. Maxcy, J. (1996). Efficient Contract Choice in the Market for Uniquely Skilled Labor. American Law and Economics Association Meeting, Chicago, IL. May 10-11.

C. **<u>Invited Speeches and Presentations</u>**

1. Maxcy, J. (2024). American Professional Sports: Characteristics & Regulation. JAMK University, Jyvaskyla, Finland. March 19.
2. Maxcy, J. (2024). American Professional Sports: Characteristics & Regulation. Center for Sports Law and Economics (CDES), Limoges University, France, January 23.
3. Maxcy, J. (2023). American Professional Sports: Characteristics & Regulation. Center for Sports Law and Economics (CDES), Limoges University, France, January 24.
4. Maxcy, J. (2017) North American Sport Leagues: Overview, Characteristics and Regulation. MESGO Seminar New York, NY. December 4.
5. Maxcy, J. (2016). The Economics of College Sports. Agnes Scott College, Economics Department Seminar, Decatur, GA. October 27.
6. Maxcy, J. (2016). The Economics of Sports Industry Standards. Forum on Wushu, China International Sporting Goods Show. Fuzhou, Peoples Republic of China. April 24.
7. Maxcy, J. (2016). Panel Debate Participant. Should The NCAA Be Afforded An Anti-Trust Exemption? With Lapiano, D., Zimbalist, A., and Edelman, M. Drexel University CARE Conference. Philadelphia, PA. March 26.
8. Maxcy, J. (2015) Public Sector Financing of Sport. Local Government and Sports Session. Government Finance Officers Association Annual Conference. Philadelphia, PA. May 31.
9. Maxcy, J. (2015). American College Sports and the NCAA: The purpose and governance of intercollegiate athletics in the United States. Center for Sport Law and Economics, Limoges University, France, February 17.
10. Maxcy J. (2015). Analytics in Sports: Using Data and Technology to Make Decisions. Presented at Seminar of Sport (Séminaire DESPORT), French Federation of Basketball (FFBB). Paris, France, February 13.
11. Maxcy, J. (2013). On Pricing in Sport: Lessons from the Secondary Market, Economics Department Seminar Series, University of Antwerp, Antwerp, Belgium. September 25.
12. Maxcy, J. (2013). Labor Relations in Major League Baseball, Drexel University, Philadelphia, PA, July 15.
13. Maxcy, J. (2013). Team-Sport Leagues: An Economic Analysis of the American System. Center for Sport Law and Economics, Limoges University, France, March 27.

14. Maxcy, J. (2013). The Economics and Regulation of Sport in North American Universities. Presented at Seminar of Sport (Séminaire DESPORT), French National Committee of Olympics and Sport, Paris, France, March 22.
15. Maxcy, J. (2012). Will the Proposed On-Campus Stadium be a Local Financial Cliff? SOSH, Colorado State University, Fort Collins, CO, September 24.
16. Maxcy, J. (2012). Collective Bargaining in American Professional Sports: the Case of the NBA Lockout. Presented at Seminar of Sport, French National Committee of Olympics and Sport. Paris, France, March 9.
17. Maxcy, J. (2012). The NBA and NFL Lockouts: Causes and Consequences. Limoges University, Limoges, France, March 14.
18. Maxcy, J. (2010). American Team-Sport Leagues: Antitrust Regulation & Labor Issues Center for Sports Law and Economics (CDES), Limoges University, France, September 21.
19. Maxcy, J. (2010). Alternative Models of Sport: General presentation of the North American Model. MESGO, Context of International Sport, Paris, France, September 15.
20. Maxcy, J. (2009). American Team-Sport Leagues: Characteristics and Regulation. Center for Sports Law and Economics (CDES), Limoges University, France, September 21.
21. Maxcy, J.G. (2009). An Economic Assessment of the Current State of Labor Relations in North American Professional Sports. University of Michigan, Kinesiology Seminar Series. UM, Division of Kinesiology, Ann Arbor, MI, February 13.
22. Maxcy, J.G. (2007). Progressive Revenue Sharing in MLB: The Effect on Player Transfers. Presented at the University of Georgia, Department of Economics, Seminar Series, September 27.
23. Maxcy, J.G. (2006). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues. Presented at North Carolina State University, Department of Parks, Recreation and Tourism Management, January 30.
24. Maxcy, J.G. (2006). The Impact of Free Agency on Competitive Balance in North American Professional Team Sports Leagues. Presented at the University of Illinois, Department of Recreation, Sport, and Tourism Lecture Series, January 17.
25. Maxcy, J. (2002). A Rival League Explanation of the Demise of African American Baseball Leagues. Presented at the University of Michigan, Division of Kinesiology, March 14.
26. Maxcy, J. (2002). A Rival League Explanation of the Demise of African American Baseball Leagues. Presented at the SUNY Cortland Scholar's Day, Cortland, NY. April 17.
27. Maxcy, J. (1996). Do Long-Term Contracts Influence Performance in Major League Baseball? Washington State University, Economics Club, April 26.

**D. <u>Symposiums, Roundtables & Workshops</u>**

1. A Historical Perspective on Publishing in Sport Management's Top Journals: Outlets and Expectations. Symposium Panel, Invited Participant. Academy of Management Annual Conference. Philadelphia, PA, August 2, 2026.

2. Quantitative Studies in Sport Management, Roundtable Discussion, Invited Participant. Academy of Management Annual Conference. Philadelphia, PA August 2, 2026.
3. International Sport Governance: Challenges, Concepts, Case Studies, Keynote Panel Discussion. AK-IASE Conference, University of Bayreuth, Germany. June 20-22, 2024.
4. Gender Differences in Researchers' Networks, WISEMS Workshop. AK-IASE Conference, University of Bayreuth, Germany. June 20-22, 2024.
5. Using Analytics to Evaluate the Effects of Events on the Hospitality Industry in Philadelphia. Visit Philly: Research and Policy Group. 722 Gerri C. LeBow Hall, Drexel University Philadelphia, PA. March 8, 2018.
6. Research Seminar with Bank Economists. The Law and Economics of College Sports Federal Reserve Bank of Atlanta. October 26, 2016.
7. Teacher Workshop. "US College Sports and The NCAA: The purpose and governance of intercollegiate athletics in the United States." Federal Reserve Bank of Atlanta. October 26, 2016.
8. Facilitator- Moderator: *RIO 2016: What is the Real Olympic Impact?* Cross-Country Conversations: Drexel Office of International Programs. August 10.
9. Presenter: *The Super Bowl by the Numbers*, Faculty at Residences Program, Van Rensselaer Hall, Drexel University. February 3, 2016.
10. Panel Participant. *No Vacancy: The Ripple Effect from Our Hospitality & Tourism Boom.* Greater Philadelphia Chamber of Commerce. October 20, 2015.
11. Workshop participant and session leader. B*uilding Dynamic Models of Hotel Pricing and Demand.* School of Tourism and Hospitality Management. Temple University, November 14 – 15, 2013.
12. Panel member. *Pay for play: Discussion on Paying College Athletes.* Temple University. October 8, 2013.
13. Roundtable; invited lead discussant. *Major League Soccer and the System of International Sport. National Handball League Headquarters*, Paris, France, September 16, 2010.
14. Round Table Discussion participant. *Implications for National and International Sport organizations in Relation to What Constitutes the 'European model of Sport.* MESGO, Paris, France, September 14, 2010.
15. Symposium. *Economic and Financial Aspects of Professional Team Sports.* North American Society for Sport Management (NASSM) Annual Conference, Ft. Lauderdale, FL, May 31, 2007.
16. Symposium**.** Cash, Caps and Coaching: An International Perspective on the Drivers of Competitiveness and Competitive Balance in Professional Sports Leagues. North American Society for Sport Management (NASSM) Annual Conference, Kansas City, MO, May 30-June 3, 2006.
17. Panel participant. Study Away & Abroad – L.A., Washington & London. Ithaca College, Department of Sport Management & Media Careers in Sport Symposium, Ithaca College, New York. November 5, 2005.
18. Symposia. The Advancement of Economics into the Sport Management Curriculum. Western Economic Association International Annual Meeting, San Francisco, CA, July 5-9, 2005.
19. Symposium & Workshop participant. Eighth International Session for Directors of National Olympic Academies. International Olympic Academy, Ancient

Olympia, Greece. April 18-25, 2005.

20. Symposium. From Jack Johnson to Marion Jones: Gains Made-Struggles Remain for African Americans in Sport Ithaca College, New York. January 20-21,2005
21. Workshop. Baseball and Educational Leadership: Finding Common Ground in Our National Pastime, Ithaca College and the National Baseball Hall of Fame. Cooperstown, New York. October 8-9, 2004.
22. Symposia. Economic Effects of the 2003 Masters Controversy. North American Society for Sport Sociology (NASSS) Annual Conference, Montreal, Quebec, Canada, October 29-November 1, 2003.
23. Exposition. Do Long-Term Contracts Influence Performance in Major League Baseball? Washington State University, Graduate and Professional Student Associations Annual Research Exposition, Pullman WA, April 10, 1996.

## VII. EDITORIAL SERVICE

### A. Editorial Boards

1. *International Journal of Sport Finance*, 2005—present (founding member).
2. *Journal of Sport Management*, 2012—2016 (resigned).
3. *Journal of Global Sport Management*, 2016-.

### B. Referee and Manuscript Review

1. Journal Manuscript Reviews (≈100 completed)
    1) *Contemporary Economic Policy*: 2000, 2003, 2005, 2006.
    2) *Dynamic Medicine*: 2007.
    3) *Economic Inquiry*: 2009, 2011, 2017, 2026.
    4) *Economic Letters*: 2013.
    5) *European Sport Management Quarterly*: 2005, 2014, 2015, 2016, 2017a, 2017,b. 2018, 2021, 1023, 2024,2026.
    6) *International Journal of the Economics of Business*: 2012, 2013, 2014.
    7) *International Journal of Sport Finance*: 2005a, 2005b, 2005c, 2006, 2007a, 2007b, 2007c, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014, 2015a, 2015b. 2016a, 2016b.
    8) *International Sport Management Review*: 2012.
    9) *Journal of Intercollegiate Sport*: 2012.
    10) *Journal of Global Sport Management,* 2018 and one or more annually 2020 - 2026.
    11) *Journal of Quantitative Analysis in Sport*: 2011.
    12) *Journal of Sports Analytics*: 2015.
    13) *Journal of Sports Economics*: 2001, 2003, 2004, 2005, 2007a, 2007b, 2009a, 2009b, 2011a, 2011b, 2012a, 2012b, 2013a, 2013b, 2013c., 2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2017a, 2017b.
    14) *Journal of Sport Management*: 2003, 2004, 2006, 2007, 2008, 2009a, 2009b, 2011a, 2011b, 2012a, 2012b, 2013, 2014a, 2014b, 2014c, 2015a, 2015b.
    15) *Journal of Sport Sciences*: 2008.
    16) *Journal of Sport and Social Issues*: 2012.
    17) *Omega: The International Journal of Management Science:* 2014.
    18) *Research in Higher Education*: 2012.
    19) *Review of Industrial Organization*: 2009, 2012, 2015.

20) *Southern Economic Journal,* 2014, 2015a, 2015b, 2016.
21) *Sport, Business, Management: An International Journal*: 2011, 2017.
22) *Sport Management Review*: 2003, 2004a, 2004b, 2014, 2016.
23) *Team Performance Management*, 2015.

2. Conferences: Abstract and Paper Submission Reviews

1) Scientific Committee: IASE International Conference, abstract submission review. 2014, 2017.
2) Scientific Committee: European Sports Economics Association Conference, abstract submission review. 2012, 2013, 2014, 2015, 2016, 2017.
3) North American Society for Sport Management Conference, Student Research Paper Competition, 2014
4) NCAA Scholarly Colloquium on College Sports, 2013.
5) North American Society for Sport Management Conference: Section Head (economics papers) for review of conference presentations, 2009.
6) North American Society for Sport Management Conference: Reviewer for conference presentation proposals 2005, 2008, 2009.

3. Book Manuscripts Reviewed for Publishers

1) *The Economics of Sports* by Michael Leeds and Peter von Allmen, Addison Wesley Longman Publishers, 2001.
2) *Financial Management of Sport Organizations* by Daniel Rascher, Matthew Brown and Mark Nagel. Holcomb Hathaway, Inc., 2006.
3) *International Handbook of Sport Policy Analysis* Ian Henry and Ling-Mei Ko, Eds., Routledge, 2010.
4) *Circus Maximus: The Economics of Hosting the Olympics and the World Cup* by Andrew Zimbalist. 2014
5) *The Economics of Sports* by Michael Leeds and Peter von Allmen, Routledge Publishers, 2016.

4. External Review of Documents Submitted for Promotion and Tenure

1) David Findlay, Colby College, 1999
2) Aaron J. Moore, Rider College, 2011
3) Darius Conger, Ithaca College, 2012
4) Anastasios Kaburakis, St. Louis University, 2014
5) Robert Case, Old Dominion University, 2018-19
6) Shane Sanders, Syracuse University, 2019
7) Nicholas Watanabe, University of South Carolina 2019
8) David Ridpath, Ohio University, 2021

C. **Service to Professional Meetings and Conferences**

1. Conference Organizer and Session (s) Chair IASE Conference. Las Vegas, NV June 17-18, 2025.
2. Session Chair: Sports Governance & Policy, AK-IASE Conference, University of Bayreuth, Germany June 20-22, 2024.
3. Session Chair: EASM Conference 2021, Event #7, Sport, Health, and Public Engagement. Hosted by Drexel University, October 28, 2021.
4. Organizer: IASE General Assembly and International Conference. Shanghai, China. November 7-9, 2017.
5. Session Chair: Labor. 9th ESEA Conference on Sports Economics. Paderborn, Germany, August 30 — September 2, 2017.
6. Organizer: IASE Sessions. WEAI Conference Santiago, Chile. January 3-6, 2017.
7. Session Chair: Sports Participation. 7th ESEA Conference on Sports Economics. Zurich, Switzerland, August 27-28, 2015.
8. Paper Discussant: WEAI Annual Meeting, Denver, CO, June 27— July 1, 2014.
9. Session Chair: Sports Participation. 5th ESEA Conference on Sports Economics. Esbjerg, Denmark, September 19-20, 2013.
10. Session Chair: Topics in Sports Economics. WEAI-Pacific Rim Meetings Tokyo, Japan March 2013.
11. Paper Discussant: WEAI-Pacific Rim Meetings, Tokyo, Japan March 2013.
7. Session Chair: Revenue Sharing, XIV IASE and IV ESEA Conferences on Sports Economics. London, UK September 2012.
8. Paper Discussant: WEAI Annual Meeting, San Francisco, CA June 29-July 3, 2012.
9. Session Chair: Topics in Sports Economics Western Economic Association International Annual Meeting, Portland, OR June 2010.
10. Paper Discussant: International Association of Sports Economists Annual Meeting, Gijon, Spain, 2008.
11. Paper Discussant: International Atlantic Economic Society Annual Meeting, Savannah, GA, October 2007.
12. Paper Discussant: Western Economic Association International Annual Meeting Seattle, WA, June 2007.
13. Paper Discussant: International Association of Sports Economists Annual Meeting, Dayton, OH, May 2007.
14. Session Chair: Comparative Approaches to Competitive Balance. International Association of Sports Economists Annual Meeting, Ruhr University- Bochum, Germany, May 2006.
15. Paper Discussant: International Association of Sports Economists Annual Meeting, Bochum, Germany, May 2006.
16. Paper Discussant: Western Economic Association International Annual Meeting San Francisco, CA, 2005.
17. Paper Discussant: Joint Statistical Meetings Toronto, Ontario, Canada, 2004.
18. Paper Discussant: Western Economic Association International Annual Meeting Seattle, WA, 2002
19. Paper Discussant: Western Economic Association International Annual Meeting San Francisco, CA, 2001
20. Paper Discussant: Western Economic Association International Annual Meeting Vancouver, B.C., Canada, 2000.
21. Paper Discussant: Western Economic Association International Annual Meeting San

Diego, CA. 1999.

22. Paper Discussant: Western Economic Association International Annual Meeting, Lake Tahoe, NV, 1998.

## VIII. TEACHING

### A. Courses Taught*

*A separate teaching experience record is available on request. That document details all college level courses taught and the student response evaluation scores for each one.

1. Drexel University: Since 2014-15

Graduate

SMT 605: Sports Economics
SMT 607: Financial Management in Sports
SMT 626: Global Perspectives in Sport

Undergraduate

SMT 110: The Business of Sport
SMT 260: Labor Relations in Sport
SMT280: Sport Business Consulting
SMT 375: Sport Finance
SMT 380: Sports Analytics
SMT 300: Quantitative Methods in Sport
SMT 320: Sport Economics
SMT 340: International Aspects of Sport

2. Courses Taught, Prior Appointments: 1990-2014

Graduate

Financial Management (M)
Finance and Economics of Sport (M)
Sport Analytics (M)
Readings (D)
Economics of Sports (M)
Sports Economics & Policy (M, D)
Labor Relations in Sports (D)
Sports Finance (M)
History of Sport (M)

Undergraduate Economics

Economics of Social Issues
Intermediate Microeconomics
Labor Economics
Law and Economics Management Science
Managerial Economics
Principles of Microeconomics and Macroeconomics

Undergraduate Sports Business

- Budget and Finance Systems in Sport and Recreation
- Economics of Sport and Recreation
- Honors Thesis (Fox School of Business)
- International Sport Administration Seminar
- Labor Relations in Sport
- Sport Business
- Practice Sports
- Economics Sports
- Finance
- Sport Governance
- Sport Law

## B. Supervision of Student Research

Research Supervision

| *Student* | *Program* | *Expected Grad. Year* | *Role* |
|---|---|---|---|
| Ntim, Margaret | Drexel University, DBA | 2027 | Committee Member |
| Diehl, Mark | FSBM, Ph.D. | 2016 | Primary Advisor |
| Steinmetz, Jason | FSBM, Ph.D. | 2015 | Committee Member |
| Campbell, Robert | FSBM Research Scholar | 2014 | Faculty Advisor |
| Jonathan Brown | Department of Economics | 2016 | Committee Member |

Completed PhD. Degrees: Committees

| *Student* | *University* | *Graduation Year* | *Role* |
|---|---|---|---|
| Brocard, Jean François | Limoges (France) | 2012 | Jury |
| Kirkpatrick, W. Nathan | Georgia | 2012 | Committee |
| Larson, Daniel | Georgia | 2011 | Chair |

Completed Research Master's Degrees: University of Georgia Committees

| *Student* | *Degree* | *Graduation Year* | *Role* |
|---|---|---|---|
| Hertzberg, Carl | M.S. Thesis | 2011 | member |
| Rodriguez, Fernando | M.A. | 2009 | member |

Professional Master's Degree, Committee Chair, University of Georgia

2011: Patrick Felton, Bryant Odom, Todd Okeson, Antavious Coates, Charles Byrd, Thomas Darden, Harry Day

2010: Christopher Neilson, Ryan Grab, Gregory Davis, Katherine Trimm, Dylan Wood Tiffany Barney, Andrew Jackson, William Powell, Gregory Roundtree, Brett Strahm, Jana Stough

2009: Lee Poole, Evan Poss, David Tomello, Andrew Cavins, Christopher Henderson, Timothy Storch, Elizabeth Klueter

2008: Zachary Tumlin, William Kirkpatrick, Brittany Lane, Sarah Royal, Caroline Domecq

2007: Kenneth Simonds

## IX. SERVICE CONTRIBUTIONS

### A. In-Service Activities

Member: Visit Philadelphia Research Consortium, 2013—
Chair, Global Temple Conference Organizing Committee. Delivered conferences' opening remarks. Temple University, 2012 & 2013.
Introduction of Speakers: Global Education Forum on Culture, Research, and Teaching. University of Georgia, 2008 & 2009.
Marshall of the Procession, Undergraduate Commencement, University of Georgia 2009.
Convocation: Presenter of Sport Management Graduates. University of Georgia, 2006. (December), 2007 (May, December), 2008 (December), 2009 (May, December), 2010 (May)
Faculty Representative to the NCAA and SUNY Athletic Conference, 1999 — 2003.
NCAA Division III Legislative Review Committee. 2001—2003.

### B. Service on University, School, & Departmental Committees

#### 1. Drexel University

University
Faculty Senate Committee on Faculty Affairs (SCFA). June 2015 — 2017.

Lebow College & Department of Sport Business

Head, July 1, 2015—.
CCRI Committee to oversee transition to semesters 2024-
and Transition Team. June 2015 —. Chair, Center Faculty Promotions
Committee, April, 2015. Center Strategic Lead major curriculum overhauls
at BS and MS levels 2028, 2021, 2024, 2025.
Established first Industry Advisory Board with Professor Cohen 2017
Lead efforts to update materials for recruitment, marketing, and promotions. P&T
evaluation and letter for Dr. James Reece (2016)
Chair, Program Alignment Review (PAR) Committee April, 2015 —June 2016
Department Curriculum Committee,
Major curriculum overhaul at BS and MS levels
CARE conference Organizing Committee. October, 2015 — April, 2016. Committee to
establish new joint major with Wesphal School of Media Arts & Design in Sports Media
Business

Center for Hospitality and Sport Management

Center Leadership Planning Committee, 2015.
Faculty Search Committee, (Food Science), winter and spring terms, 2015 & 2016
Steering Committee, September 2015—.Steering Committee, September 2015
Search Committees:
Faculty, Food Science, 2015 & 2016.
Communications Director, 2015.
Enrollment Management, 2016.

**2. Prior Appointments**

Temple University

University Wide Service

Committee for Administrative and Trustee Appointments (CATA), 2011—2014. Committee for International Programs, 2011—2014.
Chair Planning Committee, Global Temple Conference, 2012 and 2013.

Temple School of Tourism and Hospitality Management

Chair: Master's degree Comprehensive Examination Committee, 2012—2013.
Faculty Search Committees (4) 2011—2013.
Executive MBA Planning Committee, 2011—2012.
Developed Proposal for Center of Economic Analysis in Hospitality, Tourism, and Sport, 2013
Reviewer of PhD student 1st and 2nd year papers, 2012, 2013
Pro Seminar presentation, March 8, 2013.

University of Georgia

University Wide Service

Steering Committee UGAAA, NCAA Recertification Process, 2009-2010.
Professional Sports Consultation Panel, 2009—2011.
Faculty Senate, 2009—2011.
Committee to review the Office of the Associate Dean for Faculty & Finance, 2009.

Department of Kinesiology

Curriculum Development Sport Management & Policy Program, 2006-07, 2007-08 Program Assessment Reports, 2007-2010.
Post Tenure Review Committee (Cress), 2009
Post Tenure Review Committee (Shempp),
2010 Chair Kindig Award Committee, 2009.
Coordinated Lewis Lecture Series 2007-2008
Assigned Mentor to junior faculty members Won and Baker 2007-2011.
Chair of Third Year Review for Promotion and Tenure Committee, (Won), 2008. Chair of Third Year Review for Promotion and Tenure Committee, (Baker), 2010. Chair of Search Committee, Sport Management faculty positions (3) 2007, 2008, 2011.
Search Committee Member, department faculty positions (3) 2006—2010.
Committee to Revise Department Doctoral Programs, 2007.
Committee to Consider an Introduction to Kinesiology Course, 2007-08. Graduate Teaching Assistant Award Committee, 2007.
Assigned Mentor to junior faculty members Won and Baker

Ithaca College

Graduate Studies Council 2004—2006.
HS&HP Graduate Committee, Chair, 2005—2006.
HS&HP Graduate Committee, 2004—2006
HS&HP Curriculum Committee, 2003—2005.
Numerous Department of Sport Management and Media Search and Working Committees, 2003—2006.

SUNY Cortland

Chair, Cortland Intercollegiate Athletic Board (CIAB) 1999 — 2003
Faculty Senate 1999—2003.
Faculty Advisor to the Economics Club 1998—2001.
Sport Management Advisory and Curriculum Committee 1998—2003
College of Education Dean, Search Committee. 2001—2002
Athletic Director Search Committee: 2000—2001.
Public address announcer for women's basketball games. 2000—2001.
School of Arts and Sciences Curriculum Committee, 1999—2001.
SUNY Cortland Scholar's Day Session Moderator, 1999, 2001, 2002, 2003

**Exhibit B**

## Documents List, Moore et al v NCAA

### Academic Articles, Books, and Book Chapters:

1. Blair, R. D., & Romano, R. E. (1990), Collusive Monopsony in Theory and Practice: The NCAA. *Antitrust Bulletin*, 42, 681–719
2. Becker, G. S. (1987), *The NCAA: A Cartel in Sheepskin Clothing*, *Business Week*, (September 14): 24.
3. Ehrenberg, R.G., Smith, R.S., & Hallock, K.F. *Modern Labor Economics: Theory and Public Policy.* 14th ed. New York: Routledge, 2021.
4. Fleisher, A. A., III, Goff, B. L., & Tollison, R. D. (1992), *The National Collegiate Athletic Association: A Study in Cartel Behavior*. The University of Chicago Press.
5. Maxcy, J. G., (2004) Analyzing the Changes in the Institutional Framework of the NCAA: A Transaction Costs Approach, in *Economics of College Sports* 11 (Rodney Fort & John Fizel eds.), Praeger Publishers.
6. Nagle, M., & Southall, R Staurowsky, E. J., Karcher, R., Maxcy, J. (2023) *The NCAA and the Exploitation of College Profit Athletes.* Columbia, SC: University of South Carolina Press.
7. Sullivan, E.T. and Harrison, J.L. (1998), *Understanding antitrust and its economic implications.* 3rd edition. New York: M. Bender

### Depositions and Testimonies:

1. Declaration of David Berri, Ph.D. Exhibit in *Wisne v. NCAA*, 2026
2. Declaration II of Joel Maxcy, *Fourqurean v. NCAA,* August, 2025
3. Declaration of Daniel A. Rascher, *Patterson et al v NCAA*, November 10, 2025.

### Legal Documents:

1. *Elad v. NCAA*. United States District Court District of New Jersey, Civil Action No. 25-1981. Opinion. April 24, 2025.
2. *Elad v. NCAA*. United States Court of Appeals for the Third Circuit. Opinion Vacating Preliminary Injunction. Filed: November 25, 2025
3. Complaint for Injunctive Relief. Mykaela Moore and all v. National Collegiate Athletic Association, August 28, 2026
4. *NCAA v. Alston*, 141,S.Ct.2141 2153 (2021).
5. *NCAA v. Board of Regents Univ Of Okla.* (1984)
6. *NCAA v. Alston*, 141, S. Ct. 2141 2153 (2021).
7. *Sherman Anti-Trust* Act (1890)

### Websites / Online Content:

1. CollegeExpress.com. Attendance at Women's Basketball Games: The Top 10 in Division II. The Top 10 in Division III. https://www.collegexpress.com/lists/list/attendance-at-womens-basketball-games-the-top-10-in-division-ii/507/ (last visited August 25,2026).

**Exhibit B**


2. Evans, Ahsa. August 5, 2026. Division II adopts age-based eligibility model. NCAA News. (last visited Aug. 24, 2026)
3. Libit, D. (2025) "Rise of the Roster Resistance: House v. NCAA's Unwelcome Underdogs" *Sportico*, May 2. For a thorough discussion of the effects of House on non-scholarship athletes. Retrieved July 26, 2025 from https://www.sportico.com/leagues/college-sports/2025/roster-limit-objectors-house-v-ncaa-settlement-1234850724/
4. McCann, M. The NCAA House Settlement Is Suddenly Unsettling at https://www.sportico.com/law/analysis/2026/ncaa-house-settlement-multimedia-rights-nil-dispute-1234892391/ (last visited August 28 2026)
5. Men's Basketball Attendance Records Through 2024-2025, http://fs.ncaa.org.s3.amazon. (last visited August 26, 2026)
6. NCAA, Membership Directory, https://www.ncaa.org/sports/2021/5/3/membership-directory.aspx (last visited Aug. 19, 2026).
7. NCAA, Our Division 1 Members, NCAA, https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx (last visited Aug. 19, 2026).
8. NCAA, How the NCAA Works, NCAA, https://www.ncaa.org/sports/2015/10/28/how-the-ncaa-works.aspx (last visited Aug. 19, 2026).
9. NCAA, Division I adopts age-based eligibility model, NCAA, https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/ (last visited Aug. 19, 2026).
10. NCAA, Enforcement Process: Penalties, NCAA (Nov. 27, 2013), enforcement-process-penalties.aspx. (last visited Aug. 24, 2026)
11. NCAA (2026) Revenue Sources: Where the Money Comes From. https://www.ncaa.org/what-we-do/finances/where-does-the-money-go/ (last visited August 26, 2026)
12. NCAA Division II Transfer Portal Dashboard https://www.ncaa.org/what-we-do/research/student-athlete-transfer-research/#dII-portal (last visited August 26, 2026)
13. Russo, R., Mandell, S., & Williams, J. (2025). "Historic House v. NCAA settlement gets final approval, allowing schools to pay college athletes". *The Athletic* June 6. Retrieved July 26, 2025from https://www.nytimes.com/athletic/6367741/2025/06/06/house-ncaa-settlement-approved-revenue-sharing/ .


**Other Web-Based Data Sources:**


1. Equity in Athletics Data Analysis ("EADA") https://ope.ed.gov/athletics/
2. National Collegiate Athletic Association, 2026-27 NCAA Division I Manual" available at https://www.ncaapublications.com/p-4701-2024-2025-ncaa-division-i-manual.aspx.
3. National Collegiate Athletic Association, 2026-27 NCAA Division II Manual, https://ncaapublications.com/products/2025-2026-ncaa-division-ii-manual